UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br><br>                    -*versus*-<br><br>PAUL MANGIONE,<br><br>                              Defendant. | |

**CV 17-5305**

Civil Action No.:

**GARAUFIS, J.**

**LEVY, M.J.**

**COMPLAINT OF THE UNITED STATES OF AMERICA
AND DEMAND FOR JURY TRIAL**

Bridget M. Rohde
ACTING UNITED STATES ATTORNEY
Eastern District of New York

Edward K. Newman
Ryan M. Wilson
Assistant United States Attorneys
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

FILED
CLERK
2017 SEP 11  PM 3: 12
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

## TABLE OF CONTENTS

Introduction ...................................................................................................... 1

Parties .............................................................................................................. 7

Jurisdiction And Venue .................................................................................... 7

Background ....................................................................................................... 8

    I.      Mortgage Loan Origination ................................................................... 8

    II.    Mangione's Substantial And Essential Involvement In Deutsche Bank's Securitization Of Subprime Residential Loans ................... 11

        A.    Mangione's Background ............................................................. 11

        B.    Overview Of Deutsche Bank's Securitization Process .................. 12

        C.    Deutsche Bank's RMBS Team ................................................... 14

        D.    Mangione's Involvement In The Acquisition And Securitization Of Subprime Loans ......................................... 15

            i.     Mangione's Involvement In The Acquisition Of Subprime Loans ........................................................... 15

            ii.    Mangione's Involvement In The Structuring Of Deutsche Bank RMBS .............................................. 19

            iii.   Mangione's Direct Involvement In The Offering And Sale Of Deutsche Bank RMBS ................................ 22

            iv.   Mangione's Review And Approval Of Offering Documents And SEC Required Disclosures ...................... 23

Mangione's Scheme To Defraud ..................................................................... 29

    I.      HE4 And HE5 Representations .......................................................... 30

        A.    Representations In The HE4 And HE5 ProSupps ...................... 31

        B.    Representations In The HE4 And HE5 MLPAs .......................... 34

        C.    Mangione Was Aware Of And Approved The HE4 And HE5 Representations .............................................................. 34

            i.     HE4 ................................................................................ 35

            ii.    HE5 ................................................................................ 36

    II.    Mangione Knew That The HE4 And HE5 Representations Were False ......... 38

        A.    Mangione Knew That The Chapel-Related HE4 And HE5 Representations Were False ..................................................... 39

            i.     Diligence On Chapel Loans ........................................... 39

        ii.    Mangione Knew That Deutsche Bank Securitized Chapel Loans That Violated The Representations In HE4 And HE5 ................................................................................................ 42

    B.    Mangione Knew That Deutsche Bank Concealed "Silent" Second Liens ........................................................................... 57

III.    Mangione's Fraudulent Scheme Targeted And Affected Federally Insured And Other Financial Institutions. ....................................... 60

Claims For Relief ................................................................................................ 61

Demand For Jury Trial ....................................................................................... 66

Plaintiff the United States of America alleges and complains against Defendant Paul

Mangione ("Mangione") as follows:

## INTRODUCTION

1.      The United States brings this action pursuant to the Financial Institutions Reform,

Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a, to recover civil money

penalties and other appropriate relief from Mangione, head of Deutsche Bank AG's ("Deutsche

Bank" or the "Bank")[1] subprime whole loan trading desk,[2] on account of his participation in the

Bank's fraudulent and illegal scheme affecting financial institutions and other investors in

connection with two residential mortgage-backed securities ("RMBS")—ACE 2007-HE4 ("HE4")

and ACE 2007-HE5 ("HE5")—which Deutsche Bank sponsored, issued, underwrote and offered

on or about April 30, 2007, and June 29, 2007, respectively.

2.      Through publicly filed offering documents, in other deal transaction documents and

in direct communications with investors, Mangione systematically and intentionally

misrepresented key characteristics of the mortgage loans securitized by Deutsche Bank through

HE4 and HE5.

3.      Mangione made and approved representations about the creditworthiness of the

borrowers of the mortgages securitized in HE4 and HE5 despite knowing these representations

were false and that HE4 and HE5 had an escalating likelihood of widespread defaults.

---

[1] Unless otherwise specified, as used throughout, "Deutsche Bank" refers collectively to Deutsche Bank AG, DB USA Corporation (f/k/a Taunus Corporation), Deutsche Bank Securities, Inc., DB Structured Products, Inc., DB Home Lending LLC f/k/a Chapel Funding, LLC, MortgageIT Securities Corp., MortgageIT Holdings, Inc., ACE Securities Corp., and Deutsche Alt-A Securities, Inc., together with all of the aforementioned entities' predecessors, aliases, past and present parents, subsidiaries, affiliates, directors, officers, employees, agents or other persons acting for or on their behalf.

[2] "Subprime" mortgage loans are made to borrowers of lower credit quality and with lower credit ratings. Subprime mortgages typically result in higher interest rates as a result of a higher risk of default. Deutsche Bank securitized hundreds of thousands of additional loans made to borrowers that fell in other categories.

1

4.      Mangione had a clear understanding that Chapel Funding, LLC ("Chapel"), the primary originator of the loans in HE4 and HE5, had abandoned any semblance of responsible underwriting practices—to the point of underwriting loans with confirmed borrower fraud—in order to "drive volume." Nevertheless, Mangione approved detailed representations as to the sound and responsible origination practices of the mortgage originator.

5.      In selling certificates in HE4 and HE5, Deutsche Bank, with Mangione's approval, represented that the securitized loans complied with Chapel's underwriting guidelines, that Chapel had made a determination that the borrowers would likely have the ability to repay their loans, that the appraisals accompanying the mortgaged properties were reliable and that the properties had sufficient value to avoid loss in the event of default, and that Chapel had taken reasonable measures to verify income when loans were originated on a "stated income" basis. Deutsche Bank also represented that Chapel had "developed internal underwriting guidelines that it believe[d] generated quality loans" and that Chapel had instituted a quality control process that "monitor[ed] loan production with the overall goal of improving the quality of loan production," among numerous other representations designed to instill in investors trust in Chapel's underwriting processes. Mangione approved the offering documents that contained these representations.

6.      These representations were all false—a fact of which Mangione was keenly aware at the time he approved these representations. Mangione was aware that the representations as to Chapel were false because of his knowledge of Chapel's poor originations processes, and because of his knowledge of specific defects in the loans, after Deutsche Bank agreed to purchase the originator.

7.      In May 2006, Deutsche Bank agreed to purchase Chapel in order for it to be, according to Mangione, "an origination engine to feed the different DB trading desks." Beginning

2

that same month, Deutsche Bank's Head of Due Diligence (hereinafter, the "Diligence Director"), in conjunction with Mangione and other senior Deutsche Bank executives, instituted a monthly "quality control check" on a statistically significant random selection of 20% of Chapel-originated loans for the month.  The purpose of this quality control review was to check for guideline violations, non-compliance with relevant law, borrower fraud, loans originated based on inflated appraisals, loans underwritten to borrowers that would not likely have the ability to pay, and loans made to borrowers with unreasonable stated incomes, among other things.  The quality control checks were substantially similar to the due diligence that Deutsche Bank performed on loans it purchased from third-party originators.  The Diligence Director spearheaded the quality control checks, reviewed each month's results and routinely conveyed the results, or problems found therein, to other Deutsche Bank employees responsible for securitizing the Chapel loans, including Mangione.

8.      The monthly quality control checks revealed systemic deficiencies not only in the loans, but in Chapel's origination processes themselves.  Indeed, by the time Deutsche Bank issued HE4, the quality control checks performed to that point reflected that nearly 50% of the loans reviewed had significant defects, including rampant guideline violations, borrower fraud, inflated appraisals and loans made to borrowers that likely did not have the ability to repay their loan.

9.      At Mangione's direction and with his approval, the defective loans were securitized anyway.  Indeed, Deutsche Bank "owned" the Chapel loans, which resided on Mangione's subprime book, regardless of the defects founds in those loans.  And rather than accept the loss certain to be generated by its subsidiary's abandonment of responsible underwriting practices, or disclose to investors the defects, Deutsche Bank and Mangione surreptitiously securitized the

defective loans, thereby knowingly passing the loss on to their investors. Indeed, Mangione personally selected the loans that went into HE4 and HE5.

10.    Moreover, because the quality control checks were statistically significant random samples of Chapel's monthly production, Mangione understood that the unreviewed Chapel loans in HE4 and HE5 suffered from defects at the same rate as those that were reviewed. Indeed, as the Diligence Director informed Mangione with regard to another originator, "if you are looking at three out of ten [loans in a pool], you know, you're not going to [find all the issues], [but] if you looked at ten out of ten [loans] . . . you'd have three times as many issues[.]"

11.    Mangione was aware not only of the issues with the Chapel loans that Deutsche Bank securitized in HE4 and HE5, but he was also aware of substantial issues with Chapel's origination processes and its management, including management's fraud designed to cover up their abandonment of any semblance of underwriting standards in an effort to originate as many loans as possible, *i.e.*, "drive volume."

12.    Specifically, in a series of calls and email communications in mid-April 2007, the Diligence Director informed Mangione in detail of the defects found by the quality control checks, that the defective loans were nevertheless scheduled to be securitized in HE4 (and later, HE5), and that the sky-high defect rate was a direct result of Chapel's intentional fraud and relinquishment of underwriting standards in an effort to do "anything [Chapel's management] could to get volume." The Diligence Director informed Mangione that Chapel "c[ould not] be trusted to protect the credit or regulatory or reputation or risk of the Bank." Mangione admitted he "knew all that." Mangione later stated, on separate occasions, that Deutsche Bank should "fucking fire all those guys at Chapel," and that "the guys at Chapel should be arrested for the shit they were doing."

Nevertheless, Mangione approved the HE4 and HE5 offering documents, both of which touted Chapel's responsible and effective underwriting practices.

13.     After the Diligence Director and Mangione discussed the securitization of Chapel's defective loans and its intentional misconduct, the two discussed how to conceal this information from investors requesting Chapel diligence results.   After the Diligence Director informed Mangione that he had already lied to one such investor by telling the investor that the Diligence Director was not sure what loans were in HE4, the Diligence Director stated "how can [we] provide results to them on [Chapel] unless we pull all of those [defective] loans out."   The two ultimately decided to tell investors that the Bank had diligence results for all bulk loan purchases in HE4, but not for Chapel—a complete fabrication.   With a bulk subprime whole loan purchase from a third party, Mangione could "reject" loans with which he or the Diligence Group found diligence issues.

14.     Mangione, as head of the subprime trading desk, reviewed and approved offering documents for HE4 and HE5 that contained numerous representations directly contradicted by the quality control checks and Mangione's knowledge of Chapel's actual underwriting practices.

15.     Mangione approved the offering documents also while knowing that Deutsche Bank intentionally concealed the existence of second liens on thousands of properties collateralizing the loans securitized in HE4 and HE5 (including non-Chapel loans), thereby explicitly misleading investors about the indebtedness of the relevant borrowers.

16.     As Managing Director and head of the subprime trading desk, Mangione was intimately involved in every aspect of the HE4 and HE5 securitizations, including the representations that were made to investors.   It was his responsibility to ensure that Deutsche Bank's representations to investors as to the characteristics of the loans and originators were fully accurate and transparent so that investors could make a properly informed investment decision.

17.     But Mangione abandoned that responsibility, opting instead to rid the subprime book of the defective loans, thereby protecting Deutsche Bank's bottom line and, ultimately, his own salary, which was based in large part on the profitability of the subprime trading desk.

18.     HE4 and HE5 proved to be disastrous failures.  The relevant borrowers were significantly less creditworthy than Deutsche Bank had represented to investors, and the loans backing Deutsche Bank's RMBS ended up defaulting at exceptionally high rates and usually did so very early in their performance cycles.

19.     Indeed, *80%* of the loans in HE4 defaulted and lost money.  Similarly, *75%* of the loans in HE5 defaulted and lost money.

20.     Mangione earned millions of dollars during his time as head of the subprime trading desk, including in 2007, when he participated in a scheme to defraud investors in HE4 and HE5. By securitizing defective loans rather than retaining them on the subprime book, Mangione helped Deutsche Bank avoid hundreds of millions of dollars in collateral losses (and, across all subprime securitizations, billions of dollars) by passing the risk of those losses onto the investors whom Mangione and Deutsche Bank fraudulently induced to purchase RMBS certificates.

21.     Congress enacted FIRREA to provide the United States with authority to seek very stringent penalties for committing the type of fraud Mangione committed.  The Attorney General may seek a penalty up to the gain from the violation or, alternatively, up to the loss to any person from the violation.  Given the the egregious nature of Mangione's conduct, a stringent penalty should be imposed.

22.     The United States seeks from Mangione an appropriate civil penalty under FIRREA, and other appropriate relief, for: (a) mail fraud affecting federally insured financial

6

institutions; (b) wire fraud affecting federally insured financial institutions; and (c) conspiracy to commit the aforementioned crimes. *See* 12 U.S.C. § 1833a; 18 U.S.C. §§ 1341 and 1343.

## PARTIES

23.     Plaintiff is the United States of America, a body politic and sovereign.  It brings this action in its own right pursuant to FIRREA, 12 U.S.C. § 1833a.

24.     Defendant Paul L. Mangione was a Managing Director at Deutsche Bank Securities, Inc. ("DBSI") and was the head of subprime loan trading at Deutsche Bank.[3]

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 1833a(e), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

26.     Venue lies in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District. Deutsche Bank marketed HE4 and HE5 to investors in this District, who incurred significant losses on their investments.

27.     Venue also lies in this District under 28 U.S.C. § 1395 in that this is a civil proceeding for the recovery of a pecuniary fine, penalty, or forfeiture, and Mangione may be found in this District.  Mangione may be found in this District insofar as he is subject to personal jurisdiction in this District.

28.     Mangione is subject to personal jurisdiction in this District.  In addition, Mangione conducts a substantial amount of business within the State of New York, and provided banking and investment banking services to persons and entities in the State of New York, including while

---

[3] Although Mangione was technically employed by DBSI, he had "signature authority" for Deutsche Bank Structured Products ("DBSP"), the sponsor for all Deutsche Bank subprime RMBS.  Indeed, Mangione signed dozens of offering and transaction documents on behalf of DBSP.  In practice, and as discussed more fully below, DBSI and DBSP acted as one securitizing entity.

marketing and selling HE4 and HE5.  Substantially all of the events, actions, representations and omissions alleged herein relating to HE4 and HE5 occurred in the State of New York.

29.     On March 31, 2017, the United States entered into a standstill and tolling agreement with Mangione tolling the statute of limitations from April 1, 2017, until May 16, 2017.  On July 26, 2017, the United States entered into a standstill and tolling agreement with Mangione tolling the statute of limitations from June 13, 2017, until September 12, 2017.

## BACKGROUND

### I.   Mortgage Loan Origination

30.     A mortgage loan is a loan made to the owner of real property, which loan is secured by the value of that real property.

31.     When a current or prospective homeowner wants to borrow money to purchase or refinance a home, he or she typically seeks a mortgage loan from a mortgage lender, also known as an "originator."  In exchange for the money to buy or refinance the home, the borrower promises to repay the original amount lent (the "principal"), plus interest at either a fixed or adjustable rate.  This promise is documented in a promissory note.  The originator obtains a lien against the home, on which the lender can foreclose in the event the borrower defaults on his or her obligation to repay.

32.     To determine whether a borrower has the wherewithal to repay the loan on the terms set forth in the note, and also whether the value of the particular property supports the loan amount, an originator performs a process called "mortgage loan underwriting."  The originator applies mortgage loan underwriting standards, or "guidelines," to determine whether a particular borrower is qualified to receive a mortgage for a particular property on the terms offered.

33.    Loan underwriting guidelines are designed to ensure that: (1) the borrower has the means to repay the loan; (2) the borrower will likely repay the loan; and (3) the loan is secured by sufficient collateral (property value) if the borrower defaults.

34.    Loan underwriting guidelines typically consider a variety of key facts about the borrower, including: the borrower's overall debt level, annual income, debt-to-income ("DTI") ratio, amount of cash reserves or disposable savings, employment history and prospects for future employment, credit history and credit score (a measure of a borrower's credit risk, also called a "FICO score"). Factors considered that concern the property itself are: whether the property was owner-occupied or investor-owned, the nature of the property (*e.g.*, single family home, multi-family home) and the ratio of the mortgage loan amount to the property value, also known as the loan-to-value ("LTV") ratio. If there are multiple liens on the property (including the mortgage being underwritten), the combined loan-to-value ("CLTV") ratio is the relevant metric.

35.    The CLTV ratio measures the overall amount of equity in the mortgaged property. The CLTV ratio is especially important because it relates not only to the likelihood of default, but also to the severity of loss upon foreclosure after a default.

36.    Because of the CLTV ratio's potential impact on a borrower's willingness to repay a mortgage loan, as CLTV ratios rise, so, typically, do defaults. A delinquent borrower with little to no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure. Thus, the higher a loan's CLTV ratio, the more likely it is that the borrower will walk away from the mortgage debt, particularly in a situation where home values are declining or where a borrower faces an unexpected financial hardship (such as a loss of job or medical condition). In situations where the CLTV ratio exceeds 100%, the risk that a borrower may walk

away from his or her mortgage obligations becomes especially strong, as the borrower is "underwater" and holds no (or negative) equity in his or her home.

37.     To determine whether the borrower will be likely to repay the loan, the mortgage lender considers whether the loan either: (1) fully complies with the mortgage loan underwriting guidelines; or (2) if it does not strictly comply, possesses sufficient "compensating factors" that nevertheless justify the extension of credit to the borrower.  "Compensating factors" must relate to, and materially offset, the particular deviations from the underwriting guidelines that apply to the loan.  For example, if a borrower has a slightly higher than acceptable DTI, a compensating factor may exist if the borrower has significant cash reserves to make up for the smaller income.

38.     The originator also must assess the adequacy of the value of the collateral securing the mortgage loan.  An appraisal of the property enables the originator to consider how much collateral the lender can recoup if the borrower defaults, and the property has to be foreclosed upon and sold.

39.     The originator also must ensure that the mortgage loan complies with all applicable law.  There are many provisions of federal, state and local law designed to prevent predatory lending and other improper lending practices, and to ensure truth-in-lending.  If a mortgage loan fails to comply with applicable law, the loan may be unenforceable.

40.     Historically, when an originator made a mortgage loan to a borrower, it held the loan on its own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from borrowers.

41.     When originators held the loans, they also retained the risk if a borrower defaulted on the loan. Because the originator was exposed to the risk, it had a financial incentive to ensure that proper underwriting had occurred—that the borrower had the financial ability to repay the

loan and that the underlying property had sufficient value to enable the originator to recover its principal if the borrower defaulted.

42.     In the 1990s and 2000s, however, originators increasingly turned to "securitizing" mortgages.  The originators would sell to investment banks large pools of mortgages to be structured into securities.  The payments on the securitized mortgages would go to investors in the RMBS.

43.     By selling their mortgages, the originators obtained the proceeds from the sale of the mortgages up front, and thereby had new capital to issue additional mortgages.  In this new "originate-to-distribute" business model, the originators were no longer subject to the risk that the borrowers might default.  Rather, that risk was transferred to the investors who purchased the RMBS.

## II.   Mangione's Substantial And Essential Involvement In Deutsche Bank's Securitization Of Subprime Residential Loans

### A.   Mangione's Background

44.     Mangione joined Deutsche Bank in 2000.  Prior to joining Deutsche Bank, Mangione, from 1994 until 2000, worked in the Asset Backed Securities ("ABS") Group at Credit Suisse.  In that position, Mangione focused on collateral analysis and structuring.

45.     With regard to his role as a collateral analyst, Mangione reviewed and analyzed the attributes of the loans to be purchased and securitized, including attributes such as CLTV ratios, DTI ratios and FICO scores.  Mangione provided these analyses to whole loan traders to assist in preparing bids for bulk whole loan purchases.

46.     In his role in ABS structuring, Mangione analyzed the cash flows and collateral attributes of the loans to be securitized in order to arrive at the capital structure for the

securitization.[4]   As Deutsche Bank touted in its marketing materials, while at Credit Suisse, Mangione structured "over 200 securitizations."

47.   In his first three years at Deutsche Bank, Mangione performed these same functions.  Indeed, by 2003, Mangione was the primary structurer for all Deutsche Bank whole loan securitizations.

48.   In 2004, Mangione became a subprime whole loan trader, and by 2006, he was Managing Director in charge of subprime whole loan trading.  In this capacity, Mangione was directly involved in every aspect of Deutsche Bank's subprime securitizations, from the purchase of the whole loan collateral to the issuance of offering documents.

49.   As a result, Mangione was intimately familiar with the RMBS securitization process and, as he testified, he fully understood the effect of collateral attributes on the capital structure of an RMBS issuance.

50.   Mangione's salary at Deutsche Bank was based, in large part, on the profitability of the subprime trading desk.

**B.     Overview Of Deutsche Bank's Securitization Process**

51.   Investment banks such as Deutsche Bank played a central role in arranging the securitization of loans and in making key representations and warranties to investors about the securities and about the loans being securitized.

52.   From 2005 to 2007, Deutsche Bank purchased residential home loans for the purpose of securitizing the loans in RMBS.  In addition to purchasing loans in pools sold by third-

---

[4] The capital structure of a securitization determines, among other things, the size of each "tranche" of bonds, *e.g.*, how much of the issuance would be rated AAA, which depended on how much subordination was required for each tranche.  The capital structure could change based on the results of diligence if, for example, diligence revealed that the securitized loans were of a lesser credit quality than indicated by the originator.

party originators such as New Century or Countrywide, Deutsche Bank securitized loans originated by its own subsidiary originators, Chapel and MortgageIT Securities ("MortgageIT"). In such "principal" transactions, Deutsche Bank underwrote, securitized, issued and sold RMBS using its own SEC shelf registrations.[5]

53.     Deutsche Bank had three "shelves" from which it issued RMBS: the "ACE" shelf, the "DBALT" shelf and the "MHL" shelf.[6]  Mangione was responsible for the ACE shelf, from which Deutsche Bank securitized subprime loans.

54.     After acquiring the loans, Deutsche Bank structured and securitized these loan pools on its own registered shelves using affiliates known as "sponsors"[7] and "depositors."[8] Through other affiliates, it then issued,[9] underwrote,[10] and sold to investors debt instruments known as "RMBS certificates," or, in common parlance, "mortgage bonds."  Investors expected to receive principal and interest payments based on the cash flows from the underlying loans.

---

[5] A "shelf registration" is an SEC-regulated procedure through which a corporation can register with the SEC a securities offering up to three years prior to the actual public offering.  Upon establishing a shelf registration, a corporation can execute multiple issuances within the three-year period.

[6] Deutsche Bank securitized "Alt-A" loans from its DBALT shelf.  Alt-A loans are mortgages made to borrowers with a risk profile between prime and subprime.  Borrowers of Alt-A mortgages typically have clean credit histories, but may have higher debt-to-income ratios or inadequate documentation of employment or income. Deutsche Bank securitized loans from its subsidiary, MortgageIT, from its MHL shelf, although MortgageIT loans were also securitized from Mangione's ACE shelf.

[7] Generally speaking, the pool or pools of loans to be securitized in a principal deal are aggregated by an entity known as a "sponsor," which is responsible for acquiring, holding and transferring (to the "depositor") the loans to be securitized in the RMBS.  The sponsor for ACE transactions was DBSP.  The sponsor then sells the aggregated loans to the depositor.

[8] The depositor purchases the loans from the sponsor in order to deposit the loans into a special purpose entity created by the depositor that is sometimes called the "issuer" or "issuing trust" and whose name typically contains the name of the security.  In selling the pool to the depositor, the sponsor makes representations and warranties about the specific characteristics of the loans, generally in a document called a Mortgage Loan Purchase Agreement ("MLPA"). In ACE transactions, the depositor Deutsche Bank utilized was ACE Securities Corp.

[9] After receiving the mortgages from the depositor, the issuing trust then holds the pool of mortgages during the remaining duration of the RMBS's existence.  The issuing trust is established pursuant to a Pooling and Servicing Agreement ("PSA"), which defines the rights, duties and obligations of various entities that have responsibility for servicing the assets of the trusts and RMBS held by investors (e.g., the servicer and the trustee).  The PSA provides that the representations and warranties made in the MLPA are made for the benefit of investors.

[10] The "underwriter" markets and sells the RMBS certificates to investors.  It is the underwriter's responsibility to structure the deal, to conduct the requisite due diligence and to prepare offering documents and other materials truthfully disclosing to investors all material information.  DBSI was the sole underwriter in all ACE transactions, with the exception of ACE 2006-NC3, which it co-underwrote with Société Générale.

55.    As head of Deutsche Bank's subprime trading desk, Mangione had an essential leadership role in every aspect of the securitization process.

**C.    Deutsche Bank's RMBS Team**

56.    Deutsche Bank's Residential Mortgage Backed Securities Group ("RMBSG") managed and executed all ACE transactions.   The RMBSG was comprised of (among other departments) the subprime trading desk, the whole loan securitization group ("Securitization Group") and the mortgage finance group ("Mortgage Finance Group").

57.    Deutsche Bank's subprime trading desk, ran by Mangione, was responsible for bidding on and purchasing all subprime mortgage pools.   Mangione reported directly to the Managing Director in charge of agency and non-agency MBS trading (hereinafter the "Head of RMBS").   Mangione was responsible for negotiating with originators on the terms (or "bid stipulations") of bulk whole loan purchases, and he worked with the Securitization Group to structure and issue ACE securitizations.

58.    Deutsche Bank's Securitization Group, which was run by a Director (hereinafter, the "Securitization Director") alongside Mangione, structured and securitized ACE securitizations, coordinated representations that were made to investors, including representations made in publicly filed offering documents, and ran cash flow models on deals to help determine optimal structures.

59.    Deutsche Bank's Mortgage Finance Group—which was responsible for the contracts and other documentation involved in purchasing mortgage pools—was run by another Managing Director (hereinafter, the "Mortgage Finance Director").   The due diligence group (the "Diligence Group") reported to the Mortgage Finance Director, although the Diligence Group routinely worked directly with Mangione to determine which subprime loans would be purchased and which would be rejected—a decision over which Mangione exercised authority.

60.     Although Deutsche Bank organized the subprime trading desk separately from the Securitization Group and Mortgage Finance Group, in practice Mangione exercised control over the functions of those groups.  For instance, Mangione determined which loans would collateralize which securitizations, and when those securitizations would be issued—functions ostensibly located in the Securitization Group.  Mangione also dictated the timing and pace of the offering documents and his approval was required before the Securitization Group could file ACE offering documents.  Likewise, when necessary, Mangione made final decisions as to whether the results of due diligence would lead to Deutsche Bank refusing to purchase a loan—a function ostensibly located in the Mortgage Finance Group.

**D.      Mangione's Involvement In The Acquisition And Securitization Of Subprime Loans**

**i.      Mangione's Involvement In The Acquisition Of Subprime Loans**

61.     The process through which Mangione acquired subprime loans from third parties began with Mangione bidding against other investment banks for a pool of whole loans offered for sale by an originator.

62.     With its bid solicitation, the originator provided Deutsche Bank and other investment banks with a "data tape" or "bid tape" that contained representations about each loan in the pool, including loan balance and term, interest rate information, mortgage product type (*e.g.*, fixed interest rate or adjustable rate), borrower's FICO score, DTI, LTV and CLTV, among myriad other "collateral attributes."

63.     In deciding whether and how much to bid on an offered pool, Mangione, working with Deutsche Bank's collateral analysts, would "crack the tape" and prepare "stratifications," or summary data regarding the pool.  The "cracked" loan tape and stratified data were then closely analyzed by the analysts, as well as by the due diligence and trading teams.

64.     After Deutsche Bank's collateral analysts reviewed the bid tape and presented Mangione with an analysis of the collateral attributes of the pool, Mangione worked with the Securitization Group to identify a capital structure.

65.     Moreover, in determining whether and how much to bid on an offered pool, Mangione looked at the results of due diligence on prior loan pools purchased from the same originator, as he believed that diligence results from prior pools were an indicator of the quality of the loan pool under consideration.

66.     Mangione determined whether to bid on an offered pool and, if so, at what price. If Mangione won the bid for a loan pool offered for sale, he then negotiated the terms of the pool acquisition, including the general parameters of the purchase, any contractual terms governing the acquisition and a timetable for due diligence and for concluding the transaction.

67.     These bid stipulations dealt with a variety of factors, including early payment default protection, the percentage of loans that would be subject to due diligence review and certain categories of loans that Deutsche Bank would not purchase.  Universally included among the categories of loans that Mangione would not purchase were loans with a CLTV in excess of 100%.

68.     After an originator accepted Mangione's bid, the Diligence Director and his team began conducting due diligence.  Mangione at all times stayed in close contact with the Diligence Director in order to monitor the results of the diligence.

69.     The purpose of due diligence was to ensure that the representations the originator made to Deutsche Bank about the quality and characteristics of the loan pool (representations Deutsche Bank would itself make to investors in connection with the sale of the RMBS securities) were accurate and to determine whether any loans in the pool represented an unacceptable risk to Deutsche Bank.

70.     Deutsche Bank engaged third-party vendors to conduct due diligence on its loan samples, including, primarily, The Clayton Group, Inc. ("Clayton").  Clayton provided regular updates to Deutsche Bank employees by multiple means, including by emailing reports or summaries, or posting reports to secure databases and websites that Deutsche Bank could access.

71.     Mangione routinely agreed with originators to limit the number of loans that Deutsche Bank could review in its diligence sample, and thus Deutsche Bank did not review substantial portions of loan pools, regardless of the results of the Bank's diligence on the loans it did review.

72.     Deutsche Bank's due diligence process consisted of a credit, compliance and valuation review.

73.     During the credit review, Deutsche Bank evaluated whether the loan was underwritten in accordance with the originator's underwriting guidelines or otherwise had sufficient compensating factors to warrant a deviation from those guidelines.  Deutsche Bank also evaluated whether the borrower likely had the ability to repay his or her loan based on an analysis of his or her credit profile, including his or her FICO score, income and history of delinquencies, among other characteristics.

74.     The compliance review evaluated whether the loan had been originated in compliance with federal, state and local laws and regulations.

75.     The value review assessed whether the originator's appraisal of the mortgaged property was supported by the actual value of the home.

76.     After the Diligence Group completed due diligence on the sample of loans, the Diligence Director shared with Mangione the results of diligence.  As Mangione testified, he saw diligence results on "every pool" of subprime loans that Deutsche Bank purchased.  In addition,

Mangione testified that the Diligence Director shared with Mangione loan-level diligence results for any loans with which there were diligence "issues," and that Mangione and the Diligence Director would "[d]iscuss any items that came up [or] issues that [the Diligence Group] thought were important."

77.      Deutsche Bank's Diligence Group, in conjunction with Mangione, decided which loans to purchase and which loans to reject from a given pool.  Mangione exercised authority over whether a subprime loan with "diligence issues" would be purchased and often overrode the Diligence Group's determination, directing the Diligence Group to reconsider for purchase loans that the department had designated for rejection.  In doing so, Mangione did not dispute the Diligence Group's conclusions about those loans, but instead he purchased those loans to ensure that the deal would go through and that the originators would continue to sell loans to Deutsche Bank in the future.  Indeed, throughout the diligence process, Mangione bowed to pressure from subprime originators to purchase loans that the Deutsche Bank's Diligence Group had determined should be rejected.

78.      The subprime loan pools that Deutsche Bank purchased were held on Mangione's subprime book.  Mangione received a daily "position report" that detailed, by category (*e.g.*, Chapel 1st lien, subprime 2nd lien, etc.), the unpaid principal balance ("UPB") and current market value of each category of subprime loans in this account.

79.      Mangione was responsible for the profits and losses of the subprime book – metrics that impacted directly his yearly salary[11]–and he was likewise responsible for hedging the risk of the subprime book.  In other words, Mangione "owned the risk" of the subprime book.  Mangione ensured that he was kept apprised of diligence results because, as he testified, in managing the

---

[11] As with most investment bankers, Mangione's salary was made up overwhelmingly of his year-end bonus.  The profit (or loss) of Mangione's subprime book was a primary factor in the amount of his bonus.

subprime book, "it would be important to understand the credit quality" of the loans he was acquiring.

80.     In addition, Mangione stated that he understood that two additional, critical purposes of diligence were to confirm that the collateral was underwritten in accordance with the originator's guidelines and to "verify that the loans were in line with the information that was going to be in the prospectus."

81.     Despite this understanding, Mangione also testified that he understood that collateral attributes represented in offering documents were based on data from the originator's bid tape, even if Deutsche Bank's diligence results contradicted that information.

#### ii.     Mangione's Involvement In The Structuring Of Deutsche Bank RMBS

82.     Mangione also had direct involvement in the securitization of subprime loans.

83.     In managing the subprime book, Mangione determined which subprime loans would go into which ACE issuances, when each securitization would be issued, the timing of the offering documents and what the capital structure of the securitization would be.

84.     Mangione's determination as to which loans would go into which issuances was based on a variety of factors.  First, Mangione determined whether the subprime book contained enough loans from a single originator so that Deutsche Bank could issue a single-originator securitization.

85.     If Mangione determined that a single-originator securitization was not feasible, such as in the case of HE4 and HE5, Mangione structured an "aggregation securitization," which meant simply that the issuance was an aggregation of loans from multiple originators.

86.     In determining which loans would go into an aggregation securitization, Mangione testified that one of his primary considerations was whether an originator was an "approved

originator" with Deutsche Bank's "large triple A clients,"[12] including, for example, Freddie Mac and Fannie Mae. In such cases, the approved originator was approved by the large client to have originated over a certain percentage of loans in the aggregation securitization. For example, if New Century was a Freddie Mac-approved originator, Freddie Mac was permitted to purchase an RMBS issuance in which New Century originated over a threshold amount of loans in the issuance. If New Century was not a Freddie Mac-approved originator, then Freddie Mac would be unable to invest in an issuance in which New Century originations exceeded the threshold percentage of the issuance.

87.     Chapel was a Freddie Mac-approved originator and, indeed, Freddie Mac purchased the AAA rated bonds of both HE4 and HE5.

88.     In determining the timing of a securitization, Mangione's goal was to issue as many securitizations as possible. As Mangione testified, in determining the timing of a securitization, he considered "what was available to sell," "how many securitizations we thought we could do," and "how much we thought the sales force could handle on a weekly basis." Mangione attempted to have all new subprime loans securitized within a month.

89.     In determining the capital structure of a securitization, Deutsche Bank created different classes of certificates, commonly referred to as "tranches." Different tranches paid different interest rates corresponding to the different levels of "credit protection" or "credit enhancement" for each particular tranche. The primary source of credit protection was "subordination," or subordinate (*i.e.*, junior) tranches, which created a hierarchy of cash flow among the tranches. Subordinate tranches were also the first to be impacted by mortgage defaults.

---

[12] A "large triple A client" refers to large, institutional clients that purchased only the AAA rated bonds of an RMBS issuance.

In other words, when the loans collateralizing the RMBS trust were no longer sufficient to pay out all bondholders, those bondholders in the most subordinate tranche were the first to incur losses.

90.    The size of each tranche was dictated by a number of factors, the most prominent of which was the collateral attributes of the loans to be securitized.  As Mangione understood, the better the credit quality of the loans, the less subordination was required for the senior—and better rated—tranches of the issuance.[13]

91.    Investors who purchased the most "senior" tranches were the first to be paid from the loans' cash flow.  These tranches generally paid the lowest interest rate, but had the highest credit rating ("AAA/Aaa").  That high credit rating assured investors that while these tranches might not pay the highest rate, they were classified as investment-grade quality, with a very small risk that the payments would be reduced.

92.    Investors who purchased more junior tranches were typically paid only after investors in the more senior tranches.  Junior tranches generally had lower credit ratings ("AA/Aa" to "BB/Ba"), but paid higher interest rates.  When borrowers defaulted and the underlying collateral lost value, these more junior tranches were affected first.  This payment structure made these tranches especially sensitive to defaults in the pool of loans.

93.    All of the tranches were sensitive to the performance of all the loans in the pool.  When borrowers defaulted, those defaults might lead to an increased risk of reduced payments, or

---

[13] Deutsche Bank arranged for each tranche in each deal to be rated by one or more of the nationally recognized rating agencies.  A rating agency's grade on an RMBS tranche was an opinion offered to investors on the quality of the cash flow backing the collateral and on the level of risk associated with the timely payment of principal and interest on a security over the life of the bond.  It was based on information provided to the rating agency by the underwriter.  Ratings for each tranche were based on a number of factors, including the reported characteristics of the underlying loans (particularly the likelihood of loss due to mortgage default), and the level and type of credit enhancements structured into the deal.  Standard & Poor's Financial Services LLC ("S&P"), Moody's Investors Service, Inc. ("Moody's") and Fitch Ratings, Inc. ("Fitch"), were the credit rating agencies that assigned credit ratings to HE4 and HE5.  Investors would not have purchased Deutsche Bank RMBS absent a credit rating by a nationally recognized rating agency.

actual reduced payments, first for the junior tranches and then for the senior tranches. Such defaults could lead to credit downgrades and reductions in value of certificates from all the tranches.

94. For these reasons, the characteristics of the loans that were securitized substantially affected investors. Whether an RMBS performed was directly affected by the credit quality of the borrower and the value of the mortgaged property. For example, if the credit quality of the borrower was poorer than reported, the borrower was more likely to default. Similarly, if the originator's appraisal of the property overstated its value, not only was the borrower more likely to default, but the recovery from a foreclosure would be smaller than expected.

### iii. Mangione's Direct Involvement In The Offering And Sale Of Deutsche Bank RMBS

95. Deutsche Bank sold RMBS certificates, including, specifically, certificates in HE4 and HE5, on the strength of its representations to investors. After Mangione determined the composition, timing and capital structure of a subprime RMBS issuance, he worked directly with Deutsche Bank's sales force to solicit investors and to "answer any questions [that investors] had about the deal." After obtaining preliminary commitments to subscribe to the issuance, Mangione then turned to the offering documents.

96. In securitizing mortgage loan pools and selling RMBS certificates to investors, Deutsche Bank as the underwriter made a number of representations about the certificates being sold, and more specifically, about the credit quality and other characteristics of the loans backing its securities. The purpose of these representations was to induce investors to purchase the RMBS certificates by assuring them that the material risks of these investments were transparent and fully disclosed.

97. In addition to representations that Mangione made directly to investors (either

personally or through the Bank's sales force), Deutsche Bank made representations in an issuance's "offering documents," which included: (a) ACE shelf registration statements, which covered all ACE securitizations issued for up to three years after filing with the SEC; (b) "base" prospectuses, which described the basic characteristics of ACE securitizations; (c) free writing prospectuses ("FWP(s)"), or "term sheets," which were preliminary supplements to the base prospectus used to obtain preliminary commitments from investors, and which contained statistical information about the characteristics of the loans and representations as to origination standards and compliance with law; (d) Prospectus Supplements ("ProSupp(s)"), which provided originator- and loan-level detail for ACE securitizations; (e) mortgage loan purchase agreements ("MLPA(s)"), which sold and transferred the loans to be securitized from the sponsor to the depositor and which described certain characteristics of each of the loans being sold; and (f) pooling and servicing agreements ("PSA(s)"), which established each ACE RMBS trust and transferred the loans to be securitized from the depositor to the trust.

### iv.   Mangione's Review And Approval Of Offering Documents And SEC Required Disclosures

#### a.   Mangione's Review And Approval Of ACE ProSupps

98.     Before issuing ACE RMBS, including HE4 and HE5, ACE Securities Corp.—a Deutsche Bank controlled entity—filed with the SEC a base prospectus, which described the general characteristics of ACE securitizations.

99.     After filing the base prospectus, ACE Securities Corp. filed the FWP, which Mangione and Deutsche Bank's sales force used to promote the issuance and solicit investors.

100.     Finally, with respect to each specific ACE issuance, ACE Securities Corp. filed with the SEC a ProSupp that applied only to that particular issuing trust.[14]

---

[14] As discussed below, the MLPA was also filed in connection with the ProSupp.

101.    Federal securities laws and regulations require the filing and dissemination of these documents.  At all times relevant to this complaint, SEC Regulation AB, 17 C.F.R. § 229.1111 (March 5, 2005) confirmed the general obligation to disclose all material facts relating to the issuance.  As the Rule recognized, "characteristics and quality of the asset pool and servicing is often what is most important to investors." 70 Fed. Reg. 1506, 1508 (Jan. 7, 2005).  It thus required a description of "the material characteristics of the asset pool." 17 C.F.R. § 229.1111(b).

102.    One material set of facts that had to be disclosed was the underwriting criteria used to underwrite the loans, as well as any changes to those criteria.  Specifically, Regulation AB requires a "description of the solicitation, credit-granting or underwriting criteria used to originate or purchase the pool assets, including, to the extent known, any changes to such criteria and the extent to which such policies and criteria are or could be overridden." *Id.* at (a)(3).

103.    Regulation AB requires the disclosure of other material statistics.  These include the average LTV ratio and weighted average standardized credit scores. *Id.* (Introduction).  Indeed, Regulation AB states for "a loan or similar receivable," that "loan-to-value (LTV) ratios" and "occupancy type for residential mortgages" may be material.  17 C.F.R. § 229.1111(b)(7).

104.    As a result of these disclosure obligations, ACE ProSupps included representations about the material characteristics and credit quality of the loans underlying the securitizations and the origination and underwriting practices of the primary originator(s).  Because the characteristics of the loans directly relate to the likelihood of payments, such statements are material to a reasonable investor's decision whether or not to purchase the RMBS, and how much to pay for the RMBS.

105.    ACE   ProSupps   contained   several   uniform   representations,   including representations that:

- Loans in the securitized pools were originated generally in accordance with the loan originator's underwriting guidelines and that exceptions to those underwriting guidelines had been made when the originator identified "sufficient compensating factors" at the time of origination;

- Originators' underwriting guidelines were primarily intended to assess the ability and willingness of the mortgagor to repay the debt and to evaluate the adequacy of the property as collateral for the mortgage loan;

- Each loan had been originated in compliance with federal, state and local laws and regulations; and

- No loan had a CLTV in excess of 100%

among others.

106.    The offering documents also contained detailed tables, called "stratification" or "strat" tables, representing to investors particular characteristics of the loans in each RMBS, such as CLTV ratios, and how many loans in the securitization fell into specific ranges for each of those characteristics.

107.    ProSupp representations were material to investors for a number of reasons, including because:

- Underwriting guidelines were designed to assess whether a borrower had the ability to repay his or her loan. Indeed, Deutsche Bank represented in each ProSupp that the originators' underwriting guidelines were "primarily intended to assess the ability and willingness of the borrower to repay the debt...." Thus, a loan that is not underwritten in accordance with applicable underwriting guidelines has a greater risk of not being repaid, and each loan delinquency or default negatively impacts the flow of payments to investors;

- A "non-compliant" loan was one with a materially increased risk of default and loss, particularly because trusts often have difficulty foreclosing on properties that secure illegal loans. Such defects could not be offset by compensating factors; and

- The value of the property securing a mortgage is one of the most important predictors of loss severity in the event of a default (meaning how much the trust stands to lose from the default). In addition, if the loan balance exceeds the value of the property, there is a significant risk that the borrower (who has no home equity) will forego monthly payments and walk away from the mortgage. Even small differences in the property value and LTV or CLTV ratio of a mortgaged property can have a significant effect on the likelihood of timely repayment or, if

25

not repaid, on the sufficiency of the underlying collateral. Misrepresenting property values therefore poses undisclosed material risks of loss to RMBS investors.

108.    Mangione had direct and substantial involvement in the offering documents for each ACE securitization.

109.    The FWP contained primarily preliminary information about the issuances capital structure and collateral attributes. Because Mangione determined the capital structure for each ACE issuance—a task directly dependant on the collateral attributes of the loans to be securitized—Mangione had substantial input into each ACE FWP, and he was provided for his review and approval a draft of each FWP prior to its filing with the SEC.

110.    Moreover, when the FWP was finalized, Mangione sent the document to the Syndicate Desk, so that it could be passed along to prospective investors.

111.    Similarly, because ACE securitizations were comprised of loans chosen by Mangione, and because Mangione determined the capital structure and timing for each ACE issuance, he had substantial input (or at least the opportunity to provide input) into each ACE ProSupp.

112.    Mangione also dictated the timing of ACE ProSupps, providing the Securitization Group the schedule for when certain benchmark drafts—including intermediate and final drafts—should be completed. For instance, with regard to the ProSupp for HE5, a member of the Securitization Group, on June 19, 2007, emailed Mangione to ask, "Please let me know when you would like the black [*i.e.*, final] prosupp." Mangione responded, "[W]e should price today/tomorrow so maybe 2 days after that." The Securitization Group member then forwarded Mangione's email to Deutsche Bank's outside securitization counsel, Thacher Proffitt & Wood, LLP ("Thacher"), stating only, "FYI."

113.    Once the final draft ProSupp was compiled by Thacher, the draft was provided to Mangione for his review, comment and sign-off.  ACE ProSupps could not be filed with the SEC without Mangione's approval.

114.    Finally, once the ProSupp was finalized, Mangione sent the document to Deutsche Bank's Syndicate Desk so that the Syndicate Desk could pass the document along to the committed investors.

115.    In short, ACE offering documents, the content therein, and their filing with the SEC and consequent distribution to investors were a direct result of Mangione's review, contributions and comments and, ultimately, his approval.

### b.    Mangione's Review, Approval And Certification Of ACE MLPAs And PSAs

116.    Mangione likewise had direct and substantial involvement in the transfer of loans from DBSP to the ACE trusts, including attesting to the accuracy of the myriad representations and warranties in the MLPA that transferred the loans from DBSP to ACE Securities Corp.

117.    While the offering documents were being prepared, the loans to be securitized were being transferred from DBSP to the ACE trust that would issue the certificates.  This process began with DBSP (*i.e.*, Mangione) "aggregating" the loans that Mangione had determined would be securitized in a particular issuance.

118.    After aggregating the loans to be securitized, DBSP "sold" the loans to ACE Securities Corp.  This sale took place pursuant to the MLPA, in which DBSP made certain "representations and warranties" regarding each loan being transferred.

119.    The representations and warranties in the MLPAs for all ACE transactions were, in sum and substance, identical and included representations that:

- "Loans [being transferred from the sponsor to the depositor] were underwritten in accordance with the originator's underwriting guidelines . . . except with respect to

certain of those Mortgage Loans which had compensating factors permitting a deviation from the Applicable Underwriting Guidelines";

- "No . . . fraud . . . has taken place on the part of any person involved in the origination of the Mortgage Loan";

- "The Mortgage Loans were originated in compliance with state, federal and local law"; and

- "The Mortgage Loan's originator made a reasonable determination that at the time of origination the Mortgagor had the ability to make timely payments [on his or her loan]."

120. Mangione testified that, during his time at Deutsche Bank, he understood that MLPAs were "standard documents" with standard, *i.e.*, uniform, representations applicable to every ACE transaction.

121. Mangione was aware of the representations and warranties made in ACE MLPAs as he routinely signed the agreements on behalf of DBSP. And, in addition to signing the agreement itself, each time Mangione signed an MLPA he also signed an attached certification "certify[ing that,] after reasonable investigation, [Mangione had determined that] [t]he representations and warranties of [DBSP] in the Mortgage Loan Purchase Agreement . . . are true and correct in all material respects."

122. Mangione also understood that the MLPA representations and warranties ultimately would be assigned to the ACE RMBS trust and that investors would review and rely upon these representations. As Mangione testified, Deutsche Bank made the MLPA representations and warranties, specifically including the representation that all loans in the securitization met originator guidelines, "so that investors in the trust would know what the collateral was originated under."

123. Indeed, the representations and warranties from the MLPA were incorporated into the PSA by which the ACE Securities Corp. established the RMBS trust and transferred the loans thereto. The PSA assigned the representations to the trust for the express benefit of the investors.

Mangione routinely signed ACE PSAs on behalf of DBSP, which acknowledged responsibilities under the agreement.

124.    Regulation AB required ACE Securities Corp. to file with the SEC any representations and warranties regarding the pool assets, 17 C.F.R. § 229.1107(h), and to summarize "any representations and warranties made concerning the pool assets…." 17 C.F.R. § 229.1111(e).  Thus, both the MLPA and PSA were filed with the SEC in conjunction with each ACE ProSupp.

125.    In addition, the representations made in the MLPA were incorporated by reference in each of the ACE ProSupps.  The ProSupps for each ACE securitization stated that "[p]ursuant to the terms of the Mortgage Loan Purchase Agreement, the Sponsor [DBSP] will make certain representations and warranties with respect to the Loans which the depositor will assign to the Trustee for the benefit of the certificateholders."  Each ACE ProSupp also stated:

> There are incorporated into this prospectus supplement by reference all documents, including but not limited to the financial statements and reports filed or caused to be filed or incorporated by reference by the Depositor with respect to the trust fund pursuant to the requirements of Sections 13(a) or 15(d) of the Exchange Act, prior to the termination of the offering of the Offered Certificates.  All documents subsequently filed by the Depositor pursuant to Sections 13(a) or 15(d) of the Exchange Act in respect of the offering prior to the termination of the offering of the Offered Certificates will also be deemed incorporated by reference into this prospectus supplement.

126.    These representations and warranties were made for the benefit of investors, and, as Mangione understood, ostensibly assured them that the loans to be securitized met certain basic requirements.  Because investors in RMBS do not have an opportunity to conduct their own due diligence on the thousands of loans that might be involved in an RMBS securitization, investors rely on these standard representations to assure them that the loans conformed to certain basic characteristics.

## MANGIONE'S SCHEME TO DEFRAUD

127.    Mangione was a critical co-conspirator in Deutsche Bank's scheme to defraud investors in HE4 and HE5.  The scheme to defraud investors in HE4 and HE5 was based primarily on Deutsche Bank's misrepresentations about Chapel loans and Chapel's origination standards and practices.

128.    In addition, Mangione and Deutsche Bank concealed the existence of second liens on the properties collateralizing HE4 and HE5.

129.    HE4 was a $1 billion issuance that closed on or about April 30, 2007.  The ProSupp was filed on April 27, 2007.  Chapel originated 61.4% of the loans in HE4.  As of January 2017, the projected lifetime losses for HE4 are $606 million.  Wells Fargo, National Association ("Wells Fargo"), a federally insured financial institution ("FIFI"), was the master servicer and Securities Administrator for HE4.  Ocwen Loan Servicing, LLC ("Ocwen"), was the sub-servicer for HE4.  HSBC Bank USA ("HSBC"), National Association, a FIFI, was the trustee for HE4.

130.    HE5 was a $420 million issuance that closed on or about June 29, 2007.  The ProSupp was filed on June 26, 2007.  Chapel originated 48.8% of the loans in HE5.  In addition, another Deutsche Bank subsidiary, MortgageIT, originated an additional 22.7% of HE5.  As of January 2017, HE5's projected lifetime losses are approximately $224 million.  Wells Fargo was the master servicer for HE5.  Ocwen and GMAC Mortgage, LLC ("GMAC"), were the sub-servicers for HE5.  HSBC was the trustee for HE5.

**I.    HE4 And HE5 Representations**

131.    Mangione was substantially involved in the preparation and filing of the offering documents for HE4 and HE5 and was aware of the representations made in those documents.  Indeed, the ProSupps for HE4 and HE5 could not have been filed without Mangione's approval.

132.    Based on his understanding of the uniform representations made in all Deutsche Bank offering documents—and the fact that he performed diligence to confirm those

representations—the Diligence Director likewise was aware of the representations made in the HE4 and HE5 offering documents.

133.    The relevant offering document representations for HE4 and HE5, including Chapel-related representations, representations regarding CLTV ratios and MLPA representations, were identical, with the only exception being that the Chapel-related representations in HE5 were made also as to the MortgageIT loans in that securitization.[15]

### A.    Representations In The HE4 And HE5 ProSupps

134.    Because Chapel originated 62% and 49% of the loans in HE4 and HE5, respectively, the ProSupps for those deals made extensive representations regarding Chapel and its origination processes.  With regard to HE5, these representations applied equally to the loans originated by MortgageIT, which constituted nearly 23% of the issuance.

135.    By the time HE4 was securitized, Chapel had been renamed DB Home.

136.    Among the most notable are the following representations:[16]

- "DB Home underwrites each mortgage loan that it originates in accordance with its internal underwriting guidelines.  DB Home has developed internal underwriting processes and criteria that it believes generate quality loans and give it the ability to approve and fund loans quickly."

- "DB Home's internal underwriting guidelines are designed to help it evaluate a borrower's credit history, capacity, willingness and ability to repay the loan, and the value and adequacy of the collateral."

- "DB Home may allow . . . an exception [to its guidelines] [only] if the application reflects certain compensating factors . . . .  DB Home expects that not a substantial number of the mortgage loans they originate will represent such underwriting exceptions."

- "DB Home's guidelines are primarily intended to (1) determine that the borrower has the ability to repay the mortgage loan in accordance with its terms and (2) determine

---

[15] In July 2006, Deutsche Bank agreed to acquire MortgageIT, a subprime and Alt-A originator.  The deal closed on January 3, 2007.

[16] Because the representations in HE5 applied also to loans originated by MortgageIT, the relevant representations each began "DB Home *and MortgageIT* . . . ." (emphasis added)

that the related mortgaged property will provide sufficient value to recover the investment if the borrower defaults."

- *"Stated Income*. The borrower's income used to qualify for the loan is taken from the borrower's signed application and compared to the borrower's line of work or profession for reasonableness. . . . A verification of employment and position is done for each stated income loan."

- "DB Home has implemented an appraisal review process to support the value used to determine the LTV ratio. DB Home uses a variety of steps in its appraisal review process in order to attempt to ensure the accuracy of the value provided by the initial appraiser."

- "DB Home's quality control program is intended to monitor loan production with the overall goal of improving the quality of loan production generated by its independent mortgage broker channel. Through systematically monitoring loan production, the quality control department can identify and communicate to management existing or potential underwriting and loan packaging problems or other areas of concern. The quality control file review ensures compliance with DB Home's underwriting guidelines and federal and state regulations. This is accomplished by focusing on: the accuracy of all credit and legal information; a collateral analysis, which may include a desk or field re-appraisal of the property and review of the original appraisal; employment and/or income verification; and legal document review to ensure that the necessary documents are in place."

- "At origination, no Mortgage Loan had a combined loan-to-value ratio greater than approximately 100.00%[.]"

137.    The HE4 and HE5 ProSupps also represented the "weighted average original combined loan-to-value ratio" of the securitized loans and provided a stratification table detailing how many securitized loans fell into each CLTV range.[17]

138.    The HE4 and HE5 ProSupps also represented in stratification tables the "Occupancy Status of the Mortgage Loans."[18]   Occupancy status was an especially important

---

[17] The following is an example of a CLTV stratification table, taken from HE4:

### Original Combined Loan-to-Value Ratios of the Mortgage Loans

| Original Combined Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date |
|---|---|---|---|
| Lesser than or equal to 50.00 | 97 | $ 15,095,112 | 1.42 % |
| 50.01 - 55.00 | 30 | 6,091,604 | 0.57 |
| 55.01 - 60.00 | 59 | 13,010,228 | 1.22 |
| 60.01 - 65.00 | 97 | 23,168,291 | 2.18 |
| 65.01 - 70.00 | 151 | 34,868,784 | 3.28 |
| 70.01 - 75.00 | 203 | 51,481,309 | 4.84 |
| 75.01 - 80.00 | 1,776 | 501,590,374 | 47.17 |
| 80.01 - 85.00 | 305 | 80,485,023 | 7.56 |
| 85.01 - 90.00 | 515 | 138,392,518 | 13.01 |
| 90.01 - 95.00 | 330 | 85,228,545 | 8.01 |
| 95.01 - 100.00 | 1,185 | 114,575,387 | 10.77 |
| Total: | 4,748 | $ 1,063,987,175 | 100.00 % |

[18] The following is an example of an occupancy status stratification table, taken from HE4:

### Occupancy Status of the Mortgage Loans*

| Original Combined Loan-to-Value Ratio (%) | Number of Mortgage Loans | Aggregate Principal Balance Outstanding as of the Cut-off Date | % of Aggregate Principal Balance Outstanding as of the Cut-off Date |
|---|---|---|---|
| Primary | 4,448 | $ 1,001,861,548 | 94.16 % |
| Investment | 239 | 46,765,050 | 4.40 |
| Second Home | 61 | 15,360,577 | 1.44 |
| Total: | 4,748 | $ 1,063,987,175 | 100.00 % |

* The occupancy status of a Mortgaged Property is as represented by the mortgagor in its loan application.

33

metric, as borrowers are far more likely to default on an investment property than on the home in which they reside.

139.    The HE4 and HE5 ProSupps also represented in stratification tables the FICO scores of borrowers.  Deutsche Bank represented that the disclosed scores were accurate "as of the cut off date" of HE4 and HE5, which was April 1, 2007, and June 1, 2007, respectively.

**B.      Representations In The HE4 And HE5 MLPAs**

140.    The HE4 and HE5 MLPAs contained the standard representations made by DBSP in each ACE ProSupp.

141.    Among the most notable are the following representations:

- "Loans [being transferred from the sponsor to the depositor] were underwritten in accordance with the originator's underwriting guidelines . . . except with respect to certain of those Mortgage Loans which had compensating factors permitting a deviation from the Applicable Underwriting Guidelines";

- "No . . . fraud . . . has taken place on the part of any person involved in the origination of the Mortgage Loan";

- "Each Mortgage Loan and the related Prepayment Charge, if any, complied in all material respects with any and all requirements of any federal, state or local law"; and

- "The Mortgage Loan's originator made a reasonable determination that at the time of origination the Mortgagor had the ability to make timely payments [on his or her loan]."

142.    The HE4 and HE5 MLPA representations applied to all loans securitized in those issuances.

143.    Mangione understood that, in determining whether to invest in HE4 and HE5, investors relied on the MLPA representations, in addition to those made in the ProSupps.

**C.      Mangione Was Aware Of And Approved The HE4 And HE5 Representations**

144.    Mangione was substantially involved in the preparation and dissemination of the HE4 and HE5 offering documents.   He contributed content, discussed Reg AB disclosure

requirements, reviewed and approved drafts and disseminated documents to investors through the Deutsche Bank sales team.  Indeed, the HE4 and HE5 ProSupps could not be finalized and filed with the SEC without Mangione's approval.

        **i.**       **HE4**

       145.   On April 23, 2007, seven days prior to the issuance of HE4, Mangione was discussing with a Director in the Securitization Group the HE4 ProSupp disclosures regarding the certificates being offered.  Mangione instructed the Director that "HE4 will need a ce2 class[.]"[19] The Director responded that he had "added the CE-2 class."  He then asked Mangione, "What are we paying Ocwen, CW and GMAC to subservice?  Reg AB requires us to disclose these fees in the docs."  Mangione responded with the information requested by the Director.

       146.   Similarly, on April 23, Mangione was discussing with the same Director the disclosures regarding "special servicer provisions."  After Ocwen had raised an issue about certain of the provisions/disclosures, the Director asked Mangione, "Paul, Ocwen is making comments with respect to the special servicer provisions that I have added to the docs[.]  Have you had discussions with them in this regard?"

       147.   On April 25, Freddie Mac, which ultimately purchased the AAA tranche of HE4, emailed a DBSI sales person to confirm that the HE4 "related deal documents will contain in all material respects all of our required representations and covenants set forth in the [attached] Investment Requirements."  The sales person forwarded the email to Mangione, who responded "we confirm the freddie reps."  Among the numerous representations Freddie Mac required to be included in the HE4 offering documents was the representation that "the mortgage loan's

---

[19] The CE-2 class was an interest only junior tranche of HE4.

originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the mortgage loan."[20]

148. Freddie Mac's investment requirements also required that Freddie Mac be sent directly the MLPA and PSA.

149. That same day, on April 25, Thacher sent Mangione, among others, the final draft HE4 ProSupp. Thacher instructed the group to "[k]indly forward all final comments and sign off to my attention."[21]

150. The next day, on April 26, Mangione intervened when Ocwen's attorneys were holding up the finalization of the HE4 ProSupp. Specifically, Mangione emailed Ocwen, stating "your lawyer is holding up our RED prospectus – we need it finalized now – we need to talk to get this resolved."[22]

151. That same day, Ocwen provided its final approval for the HE4 ProSupp. Once the HE4 ProSupp was finalized, Mangione sent the document to two members of Deutsche Bank's Syndicate Desk, which was responsible for selling the deal, so that the Syndicate Desk could pass the document along to the likely HE4 investors.

    **ii.    HE5**

152. Mangione was similarly involved in the HE5 offering documents.

---

[20] Similiarly, on June 25, 2007, as Freddie Mac was preparing to invest in HE5, Freddie Mac realized that Deutsche Bank had not sent to Freddie Mac the HE4 MLPA and PSA which, pursuant to Freddie Mac's investment requirements, Deutsche Bank was required to send to Freddie in order for Freddie to invest in the deal. When Freddie Mac requested from a Deutsche Bank RMBS sales person a copy of these documents, the sales person forwarded the request to Mangione, who provided the documents, which were then, on the same day, passed along to Freddie Mac.

[21] Mangione also received from Thacher drafts of the HE4 MLPA prior to its execution, though he need not have received the draft to know what representations were contained therein because, as he testified, he understood that the same standard representations and warranties were made in each ACE MLPA. Mangione also received and approved a draft of the HE4 FWP.

[22] Mangione also dealt with Ocwen regarding an investor that declined to invest in HE4 because of negative press that Ocwen had recently received. Specifically, Mangione emailed Ocwen and stated "Gentlemen – an investor is passing on our HE4 deal because of the following posting – have you seen it and do you want to respond[?]"

153.     On June 12, 2007, a member of Deutsche Bank's Securitization Group sent to Mangione the HE5 FWP, asking Mangione if he had any comments on the document.  Mangione approved the FWP, stating that it "look[ed] ok" to him.

154.     Mangione approved the HE5 FWP despite his knowledge of the false representation that "DB Home . . . underwrites each mortgage loan that it originates in accordance with its internal underwriting guidelines."

155.     On June 15, 2007, Mangione took the finalized HE5 FWP and passed it along to Deutsche Bank's Syndicate Desk so that it could be provided to prospective investors.[23]

156.     On June 19, 2007, a member of the Securitization Group emailed Mangione to ask, "Please let me know when you would like the black [*i.e.*, final] prosupp."  Mangione responded, "we should price today/tomorrow so maybe 2 days after that[.]"  The Securitization Group member then forwarded Mangione's email to Thacher, stating only, "FYI[.]"

157.     On June 21, 2007,  Thacher sent Mangione, among others, the final draft HE5 ProSupp, asking, "If you have not done so already, please sign off as soon as possible."

158.     The next day, a member of Deutsche Bank's Securitization Group followed up with Mangione, because Mangione had not signed off and the ProSupp could not be finalized and filed without Mangione's approval.  Specifically, the Securitization Group member stated to Mangione, "Attached is [a] version of [the] Prosupp signed off by all parties.  Please review and give me your ok and I will send down [the] final version."  The same day, Mangione approved the HE5 ProSupp, stating, "I have no comments on the doc[.]"

159.     On June 19, as with HE4, Freddie Mac emailed a DBSI sales person, stating, "With respect to our participation concerning the above deal [HE5], it is our understanding that . . . The

---

[23] Mangione also received a draft of the HE5 MLPA.

related deal documents will contain in all material respects all of our required representations and covenants set forth in the Investment Requirements." The sales person forwarded the email to Mangione, who responded, "we will provide these reps." Among the numerous representations Freddie Mac required to be included in the HE5 ProSupp was the representation that "the mortgage loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the mortgage loan."

160.    In short, Mangione was aware of and approved the representations made in the HE4 and HE5 offering documents, including, as discussed below, representations he knew to be materially false.

## II.    Mangione Knew That The HE4 And HE5 Representations Were False

161.    Mangione knew that myriad representations in HE4 and HE5 were materially false, including representations about Chapel and MortgageIT securitized loans, representations touting Chapel's origination processes and procedures and representations regarding the CLTV ratios of the securitized loans.

162.    In approving false and material misrepresentations about the loans securitized in HE4 and HE5, Mangione knew that he was leading investors to believe that the loans securitized had the represented loan quality and characteristics set forth in the offering documents and associated materials.

163.    Similarly, in approving gross misrepresentations about Chapel's sound and responsible origination practices, Mangione knew that he was leading investors—including Freddie Mac, for which Chapel was an approved originator—to believe that they could put their trust, and their money, in the originator that underwrote over $800 million of loans in the two deals.

38

164. By participating in and approving these misrepresentations, Mangione and his co-conspirators concealed from investors the true risk of losses in HE4 and HE5. In doing so, Mangione fraudulently deprived investors of their right to make an informed decision about whether they should invest in HE4 and HE5.

**A.   Mangione Knew That The Chapel-Related HE4 And HE5 Representations Were False**

165. Deutsche Bank agreed to acquire Chapel in May 2006, believing (as Mangione stated) that it would be "an origination engine to feed the different DB trading desks."

**i.   Diligence On Chapel Loans**

166. Prior to May 2006, Deutsche Bank subjected Chapel loans to the Bank's standard due diligence procedures. By acquiring Chapel, the Bank committed to purchase all Chapel-originated loans regardless of any defects that might be found. Because Deutsche Bank would no longer be rejecting Chapel loans, the Bank ceased conducting its full, standard due diligence. Instead, Deutsche Bank instituted a monthly "quality control check," pursuant to which the Bank sent a random sample of 20% of Chapel's monthly originations to Clayton and Adfitech – providing each vendor with a 10% sample.

167. The Diligence Director instituted the monthly quality control reviews because he knew that Chapel had "a deficient QC process," which, prior to the acquisition, had resulted in a "steadily increasing" rejection rate.

168. Clayton's quality control check was substantially similar, if not identical, to Deutsche Bank's standard credit and compliance due diligence, with one significant exception that made the quality control check a more accurate tool in predicting defect rates in the unreviewed loans. Namely, unlike the Bank's standard diligence, which utilized adverse sampling, the quality

control check reviewed, primarily, a statistically significant random sample of loans.[24] Thus, the quality control check gave the Bank (and Mangione) a more precise knowledge of the defect rate in the unreviewed loans.[25]

169.   As Mangione understood, the primary purpose of the Clayton review was to ensure that Chapel's loans were underwritten in accordance with guidelines, that the loans complied with relevant federal, state and local law and that the loans were underwritten to borrowers who likely had the ability to repay the loan.

170.   Specifically, Clayton employed teams of trained underwriters to review the underlying loan files and assess the quality and creditworthiness of the loans in the statistically significant random sample, including whether the loans complied with the originator's underwriting guidelines and with all applicable laws and regulations.   In doing so, Clayton's underwriters assigned each loan an "Event Grade."

171.   Clayton graded a loan an Event Grade 1, or "EV1," when it complied with the originator's underwriting guidelines and all laws and regulations.

172.   An Event Grade 2, or "EV2," did not comply with the originator's underwriting guidelines or laws and regulations, but sufficient compensating factors offset the risk associated with the exceptions to the underwriting guidelines.

173.   An Event Grade 3, or "EV3," did not comply with the originator's underwriting guidelines or laws and regulations and did not have sufficient compensating factors to offset the risks associated with those underwriting exceptions.

---

[24] Adverse sampling consisted of the Diligence Director choosing a sample based on adverse credit characteristics that might signal a lack of creditworthiness—such as a low FICO scores, high DTI and prior foreclosures or delinquencies, among a number of other criteria.
[25] Beginning in October 2006, at least a portion of the Clayton sample was chosen adversely.   The Adfitech sample was, at all times, chosen randomly.

174.    Clayton also graded a loan an EV3 when, based on additional criteria set by Deutsche Bank, often referred to as "overlays," it was evident that the borrower would not likely have the ability to pay their loan, regardless of whether the loan generally complied with the originator's underwriting guidelines.   Mangione testified that Deutsche Bank instituted these overlays because originator guidelines were consistently being revised, for "competitive" reasons, in order to make it easier for a borrower to obtain a loan.   In other words, Mangione understood that guidelines were being loosened in order to make loans to lower credit quality borrowers so that originators could stay "competitive" against the rest of the market and continue to increase loan volume.

175.    Adfitech's quality control review was similar to Clayton's review, although Adfitech's review placed a greater emphasis on identifying loans with borrower fraud.

176.    Adfitech performed its quality control review on loans "randomly selected . . . based on statistical sampling methods" agreed to by Deutsche Bank.   The loans were reviewed to identify a variety of defects including unsupported appraisals, misrepresentations regarding owner occupancy, loans not underwritten in compliance with guidelines, loans missing material compliance documents, misrepresented stated income or assets or any other material, intentional misrepresentation, among other things.

177.    Adfitech graded each loan on a "Severity Code" scale of 0–5. Loans with a Severity Code of 0–2 were identified as having only minor or curable problems.

178.    Loans with a Severity Code of 3 were underwritten not in accordance with guidelines.

179.    Loans with a Severity Code of 4 were identified as having a "serious error," defined as a "discrepancy that could severely hinder the ability to sell the subject loan in the secondary

market." The most commonly found examples of such serious errors include missing material compliance documents, such as a HUD-1, undisclosed debt negatively affecting the borrower's DTI, unreasonable stated income and false statements about owner occupancy.

180.    A Severity Code 5 indicated fraud, *i.e.*, that "information [was] obtained during the QC process that indicate[d] that deliberate action was taken on the part of someone involved in the transaction to mislead the lender or [Deutsche Bank]."

181.    Both Clayton and Adfitech provided the Diligence Director with monthly reports detailing the results of the above reviews.

182.    In addition to the reports provided by Clayton and Adfitech, the Diligence Director "refreshed" the FICO scores for the loans in the samples sent to the two vendors. In doing so, the Diligence Director obtained up-to-date FICO scores for these borrowers.

### ii.    Mangione Knew That Deutsche Bank Securitized Chapel Loans That Violated The Representations In HE4 And HE5

183.    No later than the first quarter of 2007, and likely much earlier, Mangione realized that subprime loans had been deteriorating rapidly and that he needed to draw down his most toxic inventory.

184.    On February 23, 2007, Mangione received a position report that indicated that his subprime book had swelled to $5.9 billion, including nearly $850 million in Chapel loans.

185.    That same day, Mangione had a call with Deutsche Bank's Head of Global Markets ("Head of Global Markets"). During the call, Mangione informed the Head of Global Markets that Mangione had needed to mark down the Bank's position in Chapel-originated loans by nearly $30 million that day alone.[26]

---

[26] Deutsche Bank's position reports indicated both the UPB and daily market value of the Bank's position in Chapel originated loans.

186.    After the Head of Global Markets expressed some surprise at the full amount of the mark down, Mangione stated, "[w]e gotta sell the stuff. That's the problem." Mangione stated that "selling everything" was "going to take a while" because Mangione had "a real backlog of deals . . . ."

187.    Mangione's haste to securitize as many toxic subprime loans as he could is further reflected in a post-mortem analysis requested by the Head of Global Markets.

188.    In November 2007, the Head of Global Markets requested a "time series of . . . subprime-mortgage related risk positions," which would detail how Mangione handled his deterioriating subprime position throughout the first three quarters of 2007, including "how risk was reduced."

189.    The document created stated that, in light of "subprime deteri[or]ation," "[t]he [subprime] desk [in Q1] . . . was actively working to sell off our residual positions and decrease whole loan inventory."

190.    The document also reflected that, for a short window in Q2 2007, there was a "tightening" in RMBS spreads, which allowed Mangione to "t[ake] advantage" of market conditions in order to "price 3 subprime deals," including HE4 and HE5. That window proved to be shortlived because, as the document reflected, "Q3 . . . saw the second major downfall in the Subprime market," when, only a month after HE5 was issued, two Bear Sterns hedge funds specializing in RMBS collapsed.

191.    Thus, no later than Q1 2007, the pressure was on Mangione to rid the subprime book of the toxic Chapel loans. Indeed, by the beginning of April 2007 (the first month of Q2 2007), the month HE4 was securitized, Chapel loans on Mangione's subprime book had ballooned

to $950 million. By the end of Q2 2007, through Mangione's fraud on investors, only $146 million remained.[27]

192.     Finally, as discussed *supra* Paragraphs 17 and 50, the profitability of Mangione's subprime book—which was directly impacted by Mangione's ability to unload the toxic Chapel loans—was a substantial component of Mangione's yearly salary. Thus, Mangione was a direct beneficiary of this fraud.

### a.     Mangione Knew That Deutsche Bank Securitized Chapel Loans With Substantial Defects

193.     Mangione indisputably was aware that the Chapel quality control process identified significant defects in Chapel's originations, and that Deutsche Bank nevertheless retained and securitized the defective loans, including, specifically, in HE4 and HE5. Moreover, Mangione agreed with the Diligence Director to conceal this fact from at least one potential investor in HE4.

194.     Because Mangione's knowledge of the defects in Chapel loans and origination processes applied to all loans that were, at that time, on his subprime book, Mangione's knowledge of Chapel-related misrepresentations applied equally to the Chapel loans in HE4 and HE5.

195.     On April 11, 2007, a senior employee of Ocwen Structured Investment, LLC ("OSI"),[28] indicated to the Diligence Director that OSI was "taking a hard look at potentially purchasing [the HE4 residual] from Deutsche Bank."[29] The senior OSI employee then indicated that in order for OSI to purchase residuals on the deal, OSI's "due diligence advisor" would need

---

[27] Similarly, of the $5.9 billion in subprime loans that resided on the subprime book as of February 23, 2007, Mangione reduced the book to $2.3 billion by the end of Q1 2007 (including $3.1 billion in deals between March 15 and March 30) and further to $534 million by the end of Q2 2007.

[28] OSI was an affiliate of Ocwen, which sub-serviced HE4 and HE5.

[29] The residual tranche is the most junior tranche in an RMBS securitization. Investors in the residual tranche get monthly interest payments only to the extent there is excess interest and principal in the deal (*i.e.*, principal and interest collected on the collateralized loans minus principal and interest paid out to senior bond holders) and also have a claim to any excess collateralization (*i.e.*, the difference between the principal of the securitized loans and the principal owed to the RMBS bondholders) upon the deal's maturity.

to "review the specific [diligence] work done on the ACE HE4 collateral assuming we move forward with a residual trade."

196.    On April 18, 2007, twelve days before the close of HE4, Mangione phoned the Diligence Director to discuss a Deutsche Bank presentation at an ABS conference (the "April 18 Call").   At the conclusion of the discussion regarding the conference, the Diligence Director informed Mangione that he "met with [the senior OSI employee] today."  As the Diligence Director stated to Mangione, OSI was "looking for . . . due diligence results" for the loans in HE4.  The Diligence Director then stated that "because this is Chapel . . . we have none."[30]

197.    The Diligence Director then informed Mangione that he lied to OSI.  Specifically, the Diligence Director stated:

> I said, 'Well, I don't know what's in the pool.  So until I know what's in the pool,' —and I pretended like I didn't know. . . .  I said, 'Until I know what's in the pool, I can't give you any results.'  So I figure, okay, I'll let you [Mangione] know.  *Because I know what's in the pool.*[31]

(emphasis added).  Mangione then stated, "Yeah, I'll talk to him tomorrow."

198.    Mangione then asked, "now what do we do on Chapel," to which the Diligence Director replied,

> We're keeping all the loans.  We're not kicking them out.  What am I supposed to do?  I give feedback.  I say this is a mistake, you shouldn't have underwritten this loan.  This is an error.  This is a compliance error.  These are credit issues it's got.  You know what I'm saying? . . . [B]ut we don't kick loans out.  *We keep everything.*

(emphasis added).  Mangione replied, "Yeah, I think they originate crap."

199.    The Diligence Director went on to tell Mangione that

---

[30] It is important to note here that when the Diligence Director stated that the Bank had no diligence results, he meant summary results resulting from the Bank's standard diligence process.  The Bank did, of course, have diligence results in the form of the quality control reviews.

[31] All quotes from telephone calls were taken from certified transcriptions of the relevant call.

[Chapel's President and COO] was . . . volume driven last year . . . . I did reviews on [Chapel's loans] and I'll tell you, I found some real, real bad loans. . . . [T]here's nothing really we [Deutsche Bank] did to control the underwriting.[32] . . . But we never, you know, we kept all the loans.  We didn't have a choice, you know. Everything stayed.[33]

200.     Two days later, the Diligence Director and Mangione had another call, this time in response to the senior OSI employee's colleague following up on OSI's request to see diligence results on the loans in HE4 (the "April 20 Call") (together with the April 18 Call, the "April Calls"). Again the Diligence Director reiterated that if they told OSI about the monthly quality control process, OSI would likely request the results.  Specifically, the Diligence Director stated,

> Paul, we kept all of those loans [with diligence issues] in.  Every loan we found an issue with is in that pool.  So to provide results to them, they're going to see loans in there that we found misrep, we found . . . So, I mean, they're going to see all the Clayton issues, compliance errors.  They're going to see everything in there that, basically, is—you know, was an exception.  So how can you provide results to them on that *unless we pull all of those loans out*?  You know. . . .  So to provide results to them, they're going to look to see, okay, what loans did you pull out?  Why are you giving us loans that you are finding have inflated values?  Why are you giving us loans that you feel are ability to be play [sic] is compliance errors, misrep, and fraud?  We found fraud loans that are paying.  You know, occupancy where we found misrep on occupancy.

(emphasis added).

201.     As the Diligence Director has testified previously, "if you note[] fraud, . . . regardless of the fraud type, you want to remove that loan from the pool."  Likewise, the Diligence Director has testified, "if you found some level of misrepresentation or fraud . . . you would have

---

[32] Despite the Diligence Director informing Mangione that Deutsche Bank had done "nothing . . . to control [Chapel's] underwriting," eight days after the April 18 Call Mangione stated to a potential, and ultimately actual, investor in HE4 that "our own due diligence team . . . have some oversight in terms of how the process should be set up when Chapel originates a loan."

[33] The Diligence Director also informed Mangione that he caught Chapel "scrubbing" the loans prior to submitting them to the Diligence Director for the random quality control sample.  In other words, the Diligence Director caught Chapel altering loan files in order to cover up defects in the loans.  The Diligence Director stated that Chapel was scrubbing "the [loans] I was sampling because they didn't want me to find issues."  The Diligence Director then relayed his recommendation that Deutsche Bank "ought to clean the whole senior management and fire them all."

to classify that as [a] material [exception]. [I]f you actually can validate and you have knowingly misrep or fraud attached with a loan file, there is no way you could classify that as immaterial."

202. The Diligence Director further informed Mangione that the quality control reviews revealed multiple Chapel underwriters (of the 13 underwriters employed by Chapel) with "high percentages" of bad loans.

203. Mangione agreed that the information should be concealed from OSI. Specifically, Mangione instructed the Diligence Director to "get a CUSIP list . . . on the bulk so you *just have those*. Just get that stuff together and say the rest is all we're [sic] an originator, so we're not— you know.[34] Like, just show me what you have in terms of due diligence." (emphasis added). As discussed *supra*, footnote 30, when Mangione and the Diligence Director were discussing "due diligence," they were not including the results of the Chapel quality control review. The Diligence Director responded, "Yeah . . . I'll provide results on that [sic] we had to the bulk—to the bulk program."[35] Mangione responded, "That's what I'm saying, yeah."[36] Critically, the "bulk program" did not include Chapel loans.

204. Three days later, on April 23, a Diligence Group employee began execution of Mangione and the Diligence Director's scheme. Specifically, the employee sent to Mangione a zip file for Mangione to provide to OSI. The zip file contained diligence results for all HE4 loans

---

[34] Although using stilted language – which the Diligence Director nevertheless understood – what Mangione was instructing the Diligence Director to do was state to OSI that because Chapel was Deutsche Bank's originator, there were no due diligence results to provide. Mangione was thus instructing the Diligence Director to conceal the diligence that had been done on the Chapel loans.

[35] The "bulk program" included bulk whole loan purchases from third parties, which were subjected to Deutsche Bank's standard due diligence.

[36] On April 23, the Diligence Director emailed Mangione to inform Mangione that OSI had followed up on its request for diligence results for HE4. The Diligence Director emailed to confirm that he should send only the diligence results for bulk whole loans purchases and tell OSI (falsely) that "we have no due diligence results" for Chapel because "if [the Diligence Director] disclosed [the Bank] reviewed loans, [he] would have no 'results' and if asked, would have to disclose all loans with issues were purchased."

purchased from third parties through bulk whole loan purchases.  Notably, the file contained no results from the Chapel quality control reviews.

205.    Thus, the Diligence Director and Mangione expressly agreed to defraud OSI.[37]

206.    OSI bid on the residual.  Indeed, Mangione personally negotiated with OSI regarding the sale of the HE4 residual, attempting to convince OSI to raise its initial bid, which Mangione thought was too low.  At no point during the multiple conversations that Mangione had with OSI did he disclose the results of the Chapel quality control review or, indeed, that the review had even taken place.

207.    OSI's bid ultimately was rejected.[38]

---

[37] This was not the only instance in which Mangione participated in a scheme to conceal from a potential HE4 investor highly material information regarding the quality of Chapel loans.  On April 23, 2007, a Deutsche Bank salesperson contacted an Alliance Bernstein investor to inform the investor of a "new issue hel[oc] off the ace shelf (ace 07-he4)[.]"  Given Chapel's position as the primary originator of loans in HE4, the investor requested the "historical performance and collateral strats for DB home lending (chapel funding)."  The salesperson then turned to Mangione and one of Mangione's direct reports to obtain the historical performance information.  Mangione, in turn, requested this information from a junior member of the RMBSG.  That junior member provided Mangione and his report with a spreadsheet containing delinquency rates for Chapel loans in seven deals—one from 2004, three from 2005, and two from 2006.  Although the two deals from 2006 were less seasoned, the Chapel loans in those deals had *far* greater delinquency rates than the Chapel loans in the 2004 and 2005 deals.  For instance, nine-month old Chapel loans in ACE 2005-HE6 had a delinquency rate of 6.2%.  Nine-month old Chapel loans in ACE 2006-HE3 had a delinquency rate of 15.8%.  In light of this gross disparity, which revealed with crystal clarity Chapel's rapidly declining origination standards, either Mangione or his report instructed the junior member of the RMBSG to excise the two 2006 deals and resend the spreadsheet with only the 2004 and 2005 deals.  Mangione's report, with a copy to Mangione, sent Alliance Bernstein the revised spreadsheet.  Once again, Mangione concealed from an investor highly material information regarding Chapel so that he could sell the HE4 deal.  Alliance Bernstein invested approximately $20 million in HE4 on behalf of itself and its investors.  Moreover, this conduct further reflects Mangione's awareness of Chapel's precipitously deteriorating origination standards.

[38] Mangione also knew that Deutsche Bank, in HE5, securitized defective MortgageIT loans for the same reason that it securitized defective Chapel loans—the Bank owned the loans (*i.e.*, could not reject them) regardless of any defects.  Indeed, in December 2006, a Deutsche Bank RMBS Group Vice President emailed Mangione (among others) to let him know that Deutsche Bank's "current approach [was to] treat the prior due diligence drops as marketable loans, leave them in your respective pools, and mark them as you see fit."  The Vice President then went on to inform Mangione that of the MortgageIT loans then on the subprime book, over 10% had been "prior due diligence drops."

**b.    Mangione Knew The Specific Results Of The Chapel Quality Control Reviews**

208.    Mangione was informed of the Chapel quality control results no later than April 23, 2007, a week prior to the issuance of the HE4, and likely much earlier. Thus, Mangione knew precisely how many defective loans he had chosen to securitize in HE4 and HE5.

209.    On April 23, 2007, Mangione phoned a Diligence Group employee to discuss the diligence results for the loans in HE4. *See supra,* Paragraph 204. Mangione was inquiring about the results because of Ocwen's request, detailed above. After discussing the results for the non-Chapel loans in the pool, which the employee had sent Mangione, Mangione asked about diligence results for Chapel. Specifically, after the employee stated that he did not know exactly "how the Chapel work[ed]," Mangione asked, "[D]on't we do QC stuff on [Chapel]?" After the employee confirmed the quality control review, Mangione asked specifically, "[W]hat are the results of the due diligence [on Chapel]?" The subordinate responded that he would locate the results and provide them to Mangione.

210.    But it is likely Mangione received the results much earlier than that.

211.    Mangione undeniably was aware that the monthly Chapel quality control review was taking place. In addition to the calls with the Diligence Director, Mangione discussed the quality control review, in detail, in September 2006, with potential investors in RMBS in which Chapel loans would be securitized. In January 2007, Mangione discussed the monthly review with Chapel's President and COO.

212.    And beginning no later than May 2006—at nearly the exact same time the QC process was instituted—Mangione began receiving daily Chapel inventory reports that detailed Chapel's daily and cumulative subprime loan originations, which included detailed analyses of the collateral attributes of those originations.

213.    Mangione was kept apprised of the daily Chapel originations—and the collateral attributes of those originations—because, as with bulk subprime whole loan purchases, Chapel subprime loans resided on Mangione's subprime book and were securitized in RMBS for which Mangione was responsible, such as HE4 and HE5.  Indeed, Mangione personally chose which Chapel loans would be securitized in which ACE issuances.

214.    Furthermore (and in conjunction with Mangione managing the subprime book), Mangione testified that he was responsible for managing (through hedging) the Bank's risk exposure related to Chapel subprime originations.  As Mangione testified, when managing this risk, "it would be important to understand the credit quality" for which he was responsible.

215.    Moreover, in September 2006—after the monthly quality control had been ongoing for at least five months—Mangione described in a phone call to a potential investor his opinion regarding the quality of Chapel loans and specifically the quality of the diligence on Chapel loans. To wit, when the phone call turned to Chapel, Mangione informed the investor of Deutsche Bank's acquisition of the company.  After describing, historically, the good quality of Chapel's "paper,"[39] Mangione stated, "In terms of the due diligence, the due diligence results on Chapel have typically been . . . very good."  Although it appears from the context of this statement that Mangione was discussing pre-acquisition diligence, Mangione then went on to discuss Deutsche Bank's acquisition of Chapel, stating that it was "going to be used as an origination engine to feed the different DB trading desks [including, specifically, the] subprime desk . . . ."  He then stated that he "like[d] the Chapel product so far" in terms of its collateral attributes.  He then proceeded to describe for the investor the monthly quality control check, stating:

> [W]e monitor how our team at DB Home Lending underwrites the loans, and then
> we pull a sample out of there just as quality control. . . . [A]s a separate check, just

---

[39] As Mangione knew (and contrary to what he told the investor), an historical analysis of Chapel loans reflected a rapid deterioriation in quality (*i.e.*, a precipitous increase in defaults from 2005 to 2006).  *See supra*, fn 37.

for quality control to make sure we like what's getting done at DB Home Lending, we'll just pull another between 10-20% sample randomly and, you know, some other criteria just to make sure that the processes that have been set up at DB Home Lending are in effect.

216. Finally, Mangione has testified that he understood that one of the primary purposes of diligence was to confirm that the collateral was underwritten in accordance with the originator's guidelines and to "verify that the loans were in line with the information that was going to be in the prospectus." Moreover, Mangione testified that for "every [subprime] pool" that Mangione purchased for the subprime desk, the Diligence Director would provide Mangione with summary results of due diligence and that, when there were diligence "issues," the Diligence Director provided Mangione with loan-level diligence detail.

217. Mangione thus was aware of the specific results of Chapel's quality control reviews. The results of the Chapel quality control review are as follows:

218. Nearly 70% of the Chapel loans in HE4 were originated in June, July, August, September and December of 2006, as well as February of 2007. Clayton performed a quality control review on the Chapel production from each of these months. Of the 565 overall loans reviewed for these months, Clayton graded 256 as EV3s, representing 45% of the cumulative sample.[40]

219. Because Clayton's sample was a statistically significant random sample, Mangione understood that these results could be extrapolated to the unreviewed Chapel loans. In other words, Mangione understood that, based on the Chapel quality control reviews, he could expect that

---

[40] The cumulative results of *all* quality control reviews performed by Clayton up to the point that HE4 and HE5 were securitized bear out substantially similar results. Of the 846 overall loans reviewed in the Clayton quality control reviews by April 2007, Clayton graded 406 loans as EV3s, representing 48% of the overall sample.

approximately 45% of the unreviewed Chapel loans securitized in HE4 from those months' productions would suffer from the same defects as the random samples.

220.    In addition, Deutsche Bank, in HE4, securitized $35.3 million in loans, representing 3.3% of the issuance, for which the Clayton quality control check reflected a final grade of EV3.[41] In other words, Deutsche Bank (and Mangione) knew *with certainty* that Deutsche Bank was securitizing $35.3 million loans in HE4 that violated the representations in the HE4 ProSupp.

221.    Nearly 45% of the Chapel loans in HE4 were originated in June, July, August, September and December of 2006.  Adfitech performed a quality control review on the Chapel production from each of these months.  Of the 407 loans reviewed in the Adfitech quality control reviews for these months, Adfitech graded 231 loans as Severity Code 3–5, representing 57% of the overall sample.[42]

222.    Because Adfitech's sample was a statistically significant random sample, Mangione understood that these results could be extrapolated to the unreviewed Chapel loans.  In other words, Mangione understood that, based on the Chapel quality control reviews, he could expect that approximately 57% of the unreviewed Chapel loans securitized in HE4 from those months' productions would suffer from the same defects as the random Adfitech sample.

223.    In addition, Deutsche Bank, in HE4, securitized $11 million in loans, representing 1% of the issuance, for which the Adfitech quality control check reflected a final Severity Code

----

[41] Deutsche Bank did not, in HE5, securitize any loans actually found by Clayton to be EV3s. However, nearly 25% of the Chapel loans in HE5 were originated in June, July, October and December of 2006, as well as February of 2007.  Clayton performed a quality control review on the Chapel production from each of these months. Of the 569 overall loans reviewed in these months, Clayton graded 308 as EV3s, representing 55% of the cumulative sample.  Thus, Mangione understood that, based on the Chapel quality control reviews, he could expect that approximately 57% of the unreviewed Chapel loans securitized in HE4 from those month's productions would suffer from the same defects as the random samples.

[42] The cumulative results of *all* quality control reviews performed by Adfitech up to the point that HE4 and HE5 were securitized bear out substantially similar results.  Of the 694 loans reviewed in the Adfitech quality control reviews, Adfitech graded 429 loans as Severity Code 3–5, representing 62% of the overall sample.

3–5. In other words, Deutsche Bank (and Mangione) knew *with certainty* that Deutsche Bank was securitizing $11 million *additional* loans in HE4 that violated the representations in the HE4 ProSupp.

224.    Moreover, the refreshed FICO scores obtained by the Diligence Director revealed that for 167 of the 2,609 Chapel loans in HE4, the borrower's FICO score was, by the HE4 cut-off date, lower than the score at origination by 50 points or more, with 50 borrowers whose scores had drifted lower by 100 points or more.  Nevertheless, as the Diligence Director and Mangione knew, Deutsche Bank reported the FICO scores of the borrowers at the time of origination.

225.    Nearly 72% of the Chapel loans in HE5 were originated in June, July, October and December of 2006, and January, February and March of 2007.  Adfitech performed a quality control review on the Chapel production from each of these months.  Of the 610 loans reviewed in the Adfitech quality control reviews for these months, Adfitech graded 446 loans as Severity Code 3–5, representing 73% of the overall sample.

226.    Because Adfitech's sample was a statistically significant random sample, Mangione understood that these results could be extrapolated to the unreviewed Chapel loans.  In other words, Mangione understood that, based on the Adfitech quality control reviews, he could expect that approximately 73% of the total unreviewed Chapel loans securitized in HE5 from those months' productions would suffer from the same defects as the Adfitech random samples.

227.    In addition, Deutsche Bank, in HE5, securitized $13 million in loans, representing 3% of the issuance, for which the Adfitech quality control check reflected a final Severity Code 3–5. In other words, Deutsche Bank (and Mangione) knew *with certainty* that Deutsche Bank was

securitizing $13 million *additional* loans in HE5 that violated the representations in the HE5 ProSupp.[43]

<strong>c.    Mangione Knew That Chapel's Origination Standards And Underwriting Process Fell Far Short Of The Standards And Processes Represented In The HE4 And HE5 ProSupps</strong>

228.    In addition to Mangione's knowledge of the falsity of Deutsche Bank's representations regarding securitized Chapel *loans*, Mangione also knew of the falsity of the Bank's representations about Chapel itself, including its origination standards and practices.

229.    Mangione knew that Chapel's underwriting processes resulted in loans that were riddled with defects, and that Chapel, in Mangione's words, "originated crap."

230.    But Mangione also knew (contrary to the Bank's representations) that Chapel's defective loans were not the result of negligent underwriting but rather an intentional abandonment of any semblance of underwriting standards.

231.    On March 1, 2007, the Diligence Director stated to a Senior Vice President at MortgageIT after pointing out several instances of borrower misrepresentation found in Chapel loans,

> I have had concerns about the credit policy at Chapel since we began conducting reviews; . . . I continue to have those same concerns – it's unfortunate that I cannot trust the management at Chapel to control the credit, regulatory and reputational risk of the Bank. I believe the division is production oriented and needs to more [sic] credit focused, especially in today's environment.

232.    On the April 18 Call, the Diligence Director reiterated these substantial concerns to Mangione in far greater detail. Specifically, the Diligence Director stated that, during 2006 (*i.e.*, the origination year of the majority of the Chapel loans in HE4 and HE5) "[Chapel's President and

---

[43] Ten percent of HE4 was made up of loans acquired though bulk whole loan purchases from third parties. Mangione saw the diligence results for each of these purchases. The weighted average EV3 rate for the loan pools that contributed loans to this 10% was 16%. Mangione was aware of this as well.

COO] had [monthly origination volume] up to $300 million a month. I mean, she was just doing anything and anything she could to get volume. . . . It was out of control."[44]  The Diligence Director also stated (again, despite representations to the contrary) that Chapel "ha[d] real no true QC [sic] . . . [because] it was volume oriented last year."[45]

233. The Diligence Director went on to reiterate what he stated in an email he had sent previously, namely that "[Chapel's President and COO] can't be trusted to protect the credit or regulatory or reputation or risk of the bank." The Diligence Director also informed Mangione that, despite Chapel's abandonment of any origination standards, and despite the fact that the Diligence Director caught Chapel's management blatantly "scrubbing," *i.e.*, altering, Chapel's loan files in order to evade the quality control process,[46] Chapel's entire management team remained in place. Mangione responded, "I kind of knew all that," to which the Diligence Director stated, "I know, nobody wanted to admit it."

234. Subsequent to the April Calls, Mangione reiterated exactly what he thought of Chapel and its management. In a May 17, 2007, call with a Deutsche Bank Vice President in charge of early payment defaults ("EPD") and repurchase demands, the Vice President informed

---

[44] Chapel generated these substantial numbers with only 13 underwriters originating loans.

[45] In fact, as both the Diligence Director and Mangione knew, Chapel was "volume oriented" well into 2007. In the first quarter of 2007, Chapel funded $606 million in loans. In this regard, Mangione once again participated in misrepresentations to an investor. In the same call discussed *supra* fn 32, Mangione and two colleagues attempted to convince the investor that, after Deutsche Bank acquired Chapel, the Bank reigned in Chapel's volume driven approach. Specifically, the investor asked, "the volumes are down since we've implemented our [Deutsche Bank's] kinda guidelines on things, right?" Mangione's direct report (with Mangione on the line) stated "[a]bsolutely." The Deutsche Bank salesperson likewise stated, "Yeah, they're down from where they were pre-DB." Mangione began to chime in in agreement when he was cut off by the salesperson, who went on to state, "That's the important thing to realize, . . . they were probably twice as much in volume, because once we bought them, we put our standards on and half of it is coming through the pipe versus what was done before." As discussed above, for nearly a *year* after Deutsche Bank agreed to acquire Chapel in May 2006, Chapel continued to churn hundreds of millions of dollars a month in loans. Mangione stayed silent while his subordinates again misled an investor.

[46] In essence, what the Diligence Director was telling Mangione was that Chapel's management was fraudulently altering loan files, after the loans had been made, in order to cover up the fact that Chapel had abandoned anything resembling responsible origination practices. Incredibly, even with this "scrubbing," the quality control checks still revealed myriad loan defects.

Mangione that GMAC, a servicer for HE4, had, prior to HE4's issuance, determined that approximately $2 million in Chapel loans had gone into EPD and thus could not be securitized.[47] Mangione responded by stating, "Chapel, these guys . . . they should fucking fire all those guys at Chapel[.]"

235.    Similarly, on July 12, 2007, less than two weeks after HE5 was issued, a trader on Deutsche Bank's Alt-A desk called Mangione to inform him that HE4 was the lowest rated RMBS in the ABX Index.[48]  Mangione responded, "I'll say one word to you . . . Chapel.  That's the fucking—that deal's all Chapel loans. . . .  Those guys—the guys at fucking—the guys at Chapel should be arrested [for] the shit they were doing." After explaining to the trader many of the things that the Diligence Director and Mangione had discussed in April, Mangione concluded by stating, "So you can thank your good friends at Chapel Mortgage for that deal [HE4]."

236.    Mangione's knowledge of Chapel's abandonment of any semblance of reasonable underwriting practices, lack of quality control processes and outright fraud directly contradicted the Bank's representations, which presented a sound and responsible originator whose policies and procedures "generate[d] quality loans," whose guidelines were designed to ensure that borrowers had the "ability to repay [their] mortgage loan," and whose quality control process "monitor[ed] loan production with the overall goal of improving the quality of loan production."

237.    Mangione, desperate to get the toxic Chapel loans off of his subprime book, approved these fraudulent statements so that Deutsche Bank could sell the RMBS in which he had determined the Chapel loans should be securitized.  Mangione and his co-conspirators thus decided

---

[47] The Vice President was only then informing Mangione about the situation because by May 17, GMAC had determined that the Chapel loans should be "charged off."
[48] The ABX index was a financial benchmark comprised of 20 RMBS issuances, the purpose of which was to measure the overall health of the RMBS market.  Each tranche of the ABX index was marked daily, and RMBS traders used the ABX index in order to create derivative securities, in the form of credit default swaps, in order to make long or short bets on the overall RMBS market without having to actually own the underlying RMBS.

to defraud investors so that they could shift the risk—or, more aptly, near certainty—of loss from the Bank (and their bonuses) to their unsuspecting victims.

### B.    Mangione Knew That Deutsche Bank Concealed "Silent" Second Liens

238.    In addition to Mangione's knowledge of Chapel-related misrepresentations, Mangione also knew that Deutsche Bank misrepresented the CLTV ratios of a substantial number of loans in HE4 and HE5 by concealing the impact of "silent" or "simultaneous" second liens, which were second lien mortgages that were originated in connection with the origination of the first lien mortgage (usually by a different lender) but that were not included in the securitization. Indeed, Mangione knew that Deutsche Bank provided no information about mortgaged properties with second liens unless the second lien was itself securitized in the deal.[49]

239.    Mangione testified that when he received bid tapes from originators, he understood and expected the CLTV calculation to include the sum total of all known liens on the property. In other words, as the name suggests, Mangione expected the "combined loan" portion of the equation to include every known lien on the property.

240.    Indeed, in one particular instance, the Diligence Director alerted Mangione to "a problem with the CIT [bid] tape." The Diligence Director had come across "30 loans where CIT did not report the correct CLTV," because it had omitted silent second liens from the calculation. Indeed, the entire purpose of the CLTV metric (as distinct from the LTV metric) was to convey the total outstanding debt related to the property, including any second lien.

---

[49] The following example illustrates the issue. If a borrower simultaneously takes out two mortgages on a property—a first lien that represents 80% of the value of the property and a second lien that represents 20% of the value of the property—the CLTV ratio is 100%. If Deutsche Bank securitized the first lien, but not the second—thereby preventing an investor from discovering the second lien—the Bank inaccurately reported the CLTV as only 80%. Indeed, Deutsche Bank provided no indication whatsoever that large numbers of the first liens securitized in HE4 and HE5 had simultaneously acquired accompanying second liens, despite the Bank's knowledge of such liens.

241.   Similarly, when Mangione submitted bids for a whole loan pool, the bids, in nearly every instance, contained a stipulation that Deutsche Bank would not purchase loans with a CLTV in excess of 100%.   Again, Mangione testified that when he used CLTV in this context, he meant (and he believed that originators understood him to mean) "a first [lien] plus the second [lien] divided by" the value of the mortgaged property.

242.   Mangione also knew that, like himself, investors understood CLTV to include the impact of silent second liens.   For instance, in February 2006, Declaration, a Deutsche Bank investor, submitted to Deutsche Bank, and specifically to Mangione, a template within which Deutsche Bank was to input the collateral characteristics for ACE 2006-HE1.   In the legend for the template, it was expressly stated that CLTV "should include first mortgage balance and any additional mortgages on the property (whether in this collateral pool or not) at the time of origination."

243.   Thus, in every context pertinent to Mangione, including when he was attempting to protect himself and the Bank, Mangione expected CLTV ratios to include silent second liens.

244.   Moreover, Mangione knew that CLTV was material to investors.   In addition to certain investors specifically requesting silent second lien figures, investors who requested and received this information often pulled out of deals.   For instance, in March 2007—the month prior to the issuance of HE4—Barclays requested second lien information for ACE 2007-HE2.   After obtaining the information, Barclays pulled out of the deal, stating to a Deutsche Bank sales person, "Wasn't comfortable with the deal.  Too much silent 2nds and investor props."   This response was passed along to Mangione.

245.   In addition to alerting him of the importance to investors of second liens, investors pulling out of deals because of too many silent second liens was a powerful motive for Mangione

to insure that second lien information was not disseminated to all investors through the SEC-filed offering documents.

246.   Indeed, Mangione testified that he knew that Deutsche Bank consciously decided not to include second liens in the CLTV ratios disclosed in ProSupps, including in the ProSupps for HE4 and HE5.

247.   In at least one instance, Mangione expressly instructed a member of Deutsche Bank's Securitization Group not to include second liens in ProSupp CLTV disclosures.  In June 2005, a Deutsche Bank employee in the Securitization Group relayed to Mangione that a potential investor was "asking about the % of silent seconds in the [ACE-2005] HE-4 deal[.]" The employee continued, "We have not been disclosing this info in our termsheets/prosupps but I know we do send it to investors who ask for it during the marketing period. . . . Do you want us to look into including this information in our marketing materials/prosupp?" Mangione replied tersely, "Tell them verbally . . . [b]ut don't put in prospectus."  Thus, the only investors that received second lien information were those that understood that Deutsche Bank did not correctly report this information and were prescient enough to specifically request the correct information.

248.   Similarly, in a phone call on April 25, 2007, a Deutsche Bank sales person asked Mangione why the Bank did not include silent second liens in the CLTV calculations for HE4. Mangione responded, "most other [banks] don't, so we don't bother."  Mangione's statement, that "most other" banks did not disclose silent seconds, was false.  To the contrary, "most other" banks included one or more disclosures regarding the level of silent second liens in a securitization.[50]

---

[50] Indeed, many banks (if not most or all but Deutsche Bank) provided some form of disclosure regarding silent second liens. *E.g.*, Citigroup (disclosure of the percentage of securitized loans that "are subject to a second lien mortgage which is not included in the trust" and the "weighted average fully combined loan-to-value ratio of such mortgage loans"); Countrywide (specific disclosure that it's loan-to-value ratio did "not take into account any secondary financing on the mortgage loans that may exist at the time of origination").

249.   In HE4, Deutsche Bank represented that 1,414 loans had CLTV ratios at or below 80%, when in fact, including silent second liens, those loans had a CLTV above 95%.[51]

250.   In HE5, Deutsche Bank represented that 90 loans had CLTV ratios at or below 80%, when in fact, including silent second liens, those loans had a CLTV above 95%.

## III.   Mangione's Fraudulent Scheme Targeted And Affected Federally Insured And Other Financial Institutions.

258.   Mangione's fraudulent scheme affected multiple federally insured financial institutions ("FIFIs").

259.   Mangione's fraud substantially affected the FIFI trustee of HE4 and HE5, HSBC. Specifically, HSBC has been and continues to be exposed to loss or risk of loss—through possible costly investor litigation—as a direct result of Mangione's fraudulent scheme.  Indeed, many trustees for Deutsche Bank subprime (*i.e.*, ACE) securitizations have in fact been been sued by investors on account of systemic misrepresentations as to the underlying securitized loans.  (*See, e.g., BlackRock Balanced Capital Portfolio, et al. v. HSBC Bank USA, Nat'l Ass'n, et al.*, No. 14-cv-09366, 2014 WL 6767573 (S.D.N.Y. Nov. 24, 2014) (concerning ACE 2006-CW1, ACE 2006-FM2, ACE 2006-HE1, ACE 2006-NC2, among other Deutsche Bank securitizations); *Phoenix Light SF Ltd., et al. v. HSBC Bank USA, Nat'l Ass'n*, Nos. 14-cv-10101, 14-cv-09366, 2015 WL 5697802 (S.D.N.Y. July 6, 2015) (concerning ACE 2006-ASAP1, ACE 2006-HE1, ACE 2007-SL1, ACE 2007-HE1, among other Deutsche securitizations)).

260.   Moreover, through the HE4 and HE5 PSAs, HSBC was assigned the fraudulent rerpresentations contained in the HE4 and HE5 MLPAs.   Although DBSP made these representations initially to ACE Securities Corp., the Depositor, ACE Securities Corp. was merely a shell corporation, controlled by DBSP, incorporated solely to pass the loans from DBSP to HSBC

---

[51] These calculations do not include the impact of securitized loans with inflated appraisals.

and the trust.  Thus, DBSP, in sum and substance, made the fraudulent representations directly to HSBC.

261.    In addition, in conjunction with this assignment, HSBC, under the terms of the PSA, was obligated to monitor and enforce the fraudulent warranties and representations made in the HE4 and HE5 MLPAs.  Indeed, HSBC recently settled costly and lengthy RMBS litigation—as plaintiff against DBSP—for DBSP's violation of those representations.  *See ACE Sec. Corp., Home Equity Loan Trust, Series 2007-HE4 by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.,* Case No. 13-CV-02828-AJN (S.D.N.Y) and *ACE Sec. Corp., Home Equity Loan Trust, Series 2007-HE5 by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.,* Case No. 13-CV-03687-AJN (S.D.N.Y.).

262.    Mangione and the Diligence Director's fraud also substantially affected the FIFI master servicer and securities administrator of HE4 and HE5, Wells Fargo.  Specifically, Wells Fargo suffered losses resulting from reduced servicer fees, unearned interest on the "float"[52] of uncollected mortgage payments of defaulting borrowers and potentially having to advance to the RMBS trust the mortgage payments of defaulting borrowers, which Wells Fargo may not have recouped until the eventual foreclosure and sale of the mortgaged property.

## CLAIMS FOR RELIEF

### CLAIM I: FIRREA CIVIL MONEY PENALTIES PREDICATED ON MAIL FRAUD
### (12 U.S.C. § 1833a; 18 U.S.C. § 1341)

263.    The allegations set forth above in paragraphs 1 through 262 of this Complaint are realleged as if fully set forth in this paragraph.

---

[52] In each month that Wells Fargo serviced HE4 and HE5, it collected interest on mortgage payments in the trust's distribution account.  Interest on the mortgage payments was one of Wells Fargo's primary sources of remuneration for its role as master servicer.  To the extent that borrowers defaulted, and thus did not make their mortgage payments, Wells Fargo did not collect the interest it expected to receive on those payments.

264.     In connection with HE4 and HE5, Mangione, acting separately and in concert with others, committed violations of 18 U.S.C. § 1341 affecting one or more FIFIs, for which he is subject to a civil penalty.

265.     In connection with HE4 and HE5, Mangione, separately and in concert with others, engaged in a scheme to defraud in which, acting knowingly, or in deliberate ignorance of or with conscious disregard of the truth, he made and approved false and misleading representations and omissions of material facts to investors.  In pursuit of this fraudulent scheme, Mangione repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

266.     In connection with HE4 and HE5, Mangione, separately and in concert with others, had an intent to defraud one or more victims when he, acting with an intent to deceive and in contemplation of actual harm to the property interests of his victims, made and approved false and misleading representations and omissions to investors.  At the time he participated in these representations and omissions, Mangione knew that the statements were false or was aware of a high probability that the statements were false and he consciously avoided confirming that suspicion. Mangione also knew at that time that a necessary consequence of his fraudulent scheme, if it were successful, would be injury to others, and he consciously intended for this injury to occur.

267.     In connection with HE4 and HE5, Mangione, in concert with others, knowingly used the mails in pursuit of their scheme to defraud when they, *inter alia*, caused to be deposited for delivery by the United States Postal Service, or by a private or commercial interstate carrier, *inter alia*, (1) final execution copies of the documents creating the Issuing Trusts to the Trustees, (2) prospectuses, ProSupps, and additional information regarding the securities that were mailed to investors and potential investors, and (3) confirmations and account statements mailed to investors.

268.     In connection with HE4 and HE5, Mangione, separately and in concert with others, knowingly made materially false representations and omissions to investors.

269.     The misrepresentations and omissions made and approved by Mangione on HE4 and HE5 went to essential aspects of their bargain with RMBS investors, who provided funds to Deutsche Bank in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt. In HE4 and HE5, the misrepresentations were not limited to a few loans, but instead related to significant percentages of the securitized loan pools.

270.     In connection with HE4 and HE5, Mangione's acts of mail fraud affected one or more FIFIs.

271.     In connection with HE4 and HE5, Mangione's acts of mail fraud actually and proximately resulted in pecuniary loss to one or more persons other than himself.

272.     For each violation of 18 U.S.C. § 1341 as to HE4 and HE5, Mangione is liable for an appropriate civil penalty under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

## CLAIM II: FIRREA CIVIL MONEY PENALTIES PREDICATED ON WIRE FRAUD
### (12 U.S.C. § 1833a; 18 U.S.C. § 1343)

273.     The allegations set forth above in paragraphs 1 through 262 of this Complaint are realleged as if fully set forth in this paragraph.

274.     In connection with HE4 and HE5, Mangione, acting separately and in concert with others, committed violations of 18 U.S.C. § 1343 affecting one or more FIFIs, for which he is subject to a civil penalty.

275.     In connection with HE4 and HE5, Mangione, acting separately and in concert with others, engaged in a scheme to defraud in which, acting knowingly, or in deliberate ignorance of

or with conscious disregard of the truth, he made and approved false and misleading representations and omissions of material facts to investors. In pursuit of this fraudulent scheme, Mangione repeatedly engaged in dishonest and deceitful actions that deprived investors of something of value.

276. In connection with HE4 and HE5, Mangione, acting separately and in concert with others, had an intent to defraud one or more victims when, acting with an intent to deceive and in contemplation of actual harm to the property interests of their victims, he made and approved false and misleading representations and omissions to investors. At the time he made and approved these representations, Mangione knew that the statements were false or was aware of a high probability that the statements were false and he consciously avoided confirming that suspicion. Mangione also knew at that time that a necessary consequence of his fraudulent scheme, if it was successful, would be injury to others, and he consciously intended for this injury to occur.

277. In connection with HE4 and HE5, Mangione, acting separately and in concert with others, knowingly used the interstate wires in pursuit of their scheme to defraud when he (or they), *inter alia*, (1) executed an interstate wire transfer of funds to the originator selling the loan pools to Deutsche Bank or the originator securitizing the loans on its own behalf; (2) electronically filed documents with the SEC; (3) electronically transmitted prospectuses, ProSupps, and additional information regarding the securities to investors and potential investors; and (4) communicated via telephone, email, or Bloomberg chat with originators, due diligence vendors, rating agencies, investors, prospective investors, and among Deutsche Bank employees to make representations concerning HE4 and HE5, or to acquire and exchange knowledge contradicting those representations.

278.    In connection with HE4 and HE5, Mangione, acting separately and in concert with others, knowingly made and approved materially false representations and omissions to investors.

279.    The misrepresentations and omissions made and approved by Mangione on HE4 and HE5 went to essential aspects of the bargain with RMBS investors, who provided funds to Deutsche Bank in exchange for RMBS Certificates backed by loans with certain stated characteristics and which were purportedly originated in accordance with underwriting standards designed to ensure the ability of the borrower to repay the loans and the adequacy of the mortgaged property as collateral for the debt.  In HE4 and HE5, the misrepresentations and omissions were not limited to a few loans, but related to significant percentages of the securitized loan pools.

280.    In connection with HE4 and HE5, Mangione's acts of wire fraud affected one or more FIFIs.

281.    In connection with HE4 and HE5, Mangione's acts of wire fraud actually and proximately resulted in pecuniary loss to one or more persons other than himself.

282.    For each violation of 18 U.S.C. § 1343 as to HE4 and HE5, Mangione is liable for an appropriate civil penalty under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

## CLAIM III: FIRREA CIVIL PENALTIES PREDICATED ON CONSPIRACY TO COMMIT MAIL FRAUD AND WIRE FRAUD

283.    The allegations set forth above in paragraphs 1 through 262 of this Complaint are realleged as if fully set forth in this paragraph.

284.    In connection with HE4 and HE5, Mangione and others violated 18 U.S.C. §§ 1341 and 1343 for which Mangione is subject to a civil penalty, by conspiring to devise a continuing scheme and artifice to defraud investors through the conduct set forth above.

285.    In connection with HE4 and HE5, Mangione's conspiracy to violate 18 U.S.C. §§ 1341 and 1343 actually and proximately resulted in pecuniary loss to one or more persons other than Mangione.

286.    For this conspiracy, Mangione is liable for an appropriate civil penalty under FIRREA, 12 U.S.C. § 1833a(b)(3)(A).

* * *

WHEREFORE, the United States respectfully requests judgment against Mangione for an appropriate civil penalty under FIRREA, 12 U.S.C. § 1833a(b), together with pre- and post-judgment interest and all allowable costs and attorneys' fees, and for any other relief that the Court deems just and proper.

### DEMAND FOR JURY TRIAL

The United States demands a jury trial for all issues so triable.

Dated: Brooklyn, New York
        September 11, 2017

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, NY 1201-1820

By: _____

EDWARD K. NEWMAN
RYAN M. WILSON
Assistant United States Attorneys
Eastern District of New York
(718) 254-7000
Edward.Newman@usdoj.gov
Ryan.Wilson2@usdoj.gov

66