SMITH | VILLAZOR

Smith Villazor LLP
1700 Broadway, Suite 2801
New York, New York 10019
www.smithvillazor.com

PATRICK J. SMITH
T  212 706 1871
patrick.smith@smithvillazor.com

October 23, 2017

**BY ECF**
The Honorable Nicholas G. Garaufis
United States District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Mangione</u>, Case No. 1:17-cv-05305-NGG-RML

Dear Judge Garaufis:

  We represent Defendant Paul Mangione in the above-referenced matter.  Pursuant to Rule III.A.2 of Your Honor's Individual Rules, we write to request a pre-motion conference to address our intention to move to dismiss all claims asserted against Mr. Mangione in the government's Complaint (Dkt. No. 1).

  Mr. Mangione worked in Deutsche Bank's securitization business as a trader responsible for negotiating the purchase of subprime residential mortgage loans from third-party originators.  In January 2017, Deutsche Bank settled potential credit-crisis-era claims under the Financial Institution Reform, Recovery & Enforcement Act ("FIRREA") relating to the securitization of mortgage loans.  After the government's multi-year investigation leading to that settlement, which included virtually unfettered access to Deutsche Bank's documents, records, and personnel, the government decided, at the close of the ten-year statute of limitations, to sue Mr. Mangione under FIRREA, and no one else.  The government claims Mr. Mangione participated in FIRREA predicate acts of mail fraud (Claim I), wire fraud (Claim II), and conspiracy to commit mail fraud and wire fraud (Claim III) in connection with only two residential mortgage-backed securitizations.  Despite its far-reaching investigation, the government's Complaint fails the most basic pleading requirements under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure on at least two grounds:

  *First*, the government has not stated an actionable FIRREA claim.  The Complaint fails to plead, as FIRREA requires, that the alleged fraudulent scheme "affected" federally insured financial institutions.  *See* 12 U.S.C. § 1833a(c)(2).  The government asserts that Mr. Mangione was a "critical co-conspirator" in Deutsche Bank's alleged scheme to defraud investors in connection with two residential mortgage-backed securities offerings:  ACE 2007-HE4 ("HE4") and ACE 2007-HE5 ("HE5").  Neither Deutsche Bank, nor any of the investors in the offering, are alleged to be federally insured financial institutions.  Instead, the government relies on the novel theory that the alleged scheme affected two contractual service providers involved in HE4 and HE5:  the trustee and master servicer, which happened to be federally insured financial institutions.  The Complaint does not allege how either the trustee (HSBC) or the master service (Wells Fargo) suffered loss, or increased risk of loss, *because of* the alleged misrepresentations

regarding the collateral pools underlying each deal that, according to the government, constitute a scheme to defraud. Courts—including the Second Circuit—recognize that the language of the statute provides a meaningful limitation on the government's authority. *United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (finding FIRREA's extended statute of limitations "applies to any act of wire fraud that affects a financial institution, provided the effect of the fraud is 'sufficiently direct'"). The participation of a federally insured contractual service provider in a transaction is too attenuated to support the application of FIRREA.

*Second*, even if the government could assert a FIRREA claim, the Complaint fails to state a fraud claim under Rule 9(b) of the Federal Rules of Civil Procedure. The government bases its fraud claims on alleged misrepresentations and omissions in the offering documents for HE4 and HE5. Those deals consisted largely of loans originated by a recently acquired Deutsche Bank subsidiary called Chapel Funding, LLC ("Chapel"). The government relies heavily on alleged misrepresentations regarding Chapel's compliance with underwriting guidelines that are set forth in each offering's prospectus supplement (or "prosupp") as well as the Mortgage Loan Purchase Agreement ("MLPA") that was executed between Deutsche Bank and the depositor—ACE Securities Corp.—which established the trust that ultimately owned the underlying mortgages for the benefit of investors.

None of the alleged misstatements in these documents satisfy the particularized pleading requirements under Rule 9(b). As a threshold matter, the government relies on the blanket assertion that Chapel had allegedly abandoned "any semblance of underwriting standards" to claim that the various statements in the prosupps regarding Chapel's underwriting and origination practices were false. But the government fails to identify a single loan, let alone a material number of loans, that violated the specific statements it references in the Complaint. Instead, it relies on quality control reports and anecdotal accounts of past problems with Chapel's underwriting practices, none of which identify the loans in the HE4 and HE5 collateral pools that allegedly violated the disclosures that the Government selectively quoted. Sweeping accusations of problems with Chapel's underwriting practices, without more, are insufficient to meet the requirements of Rule 9(b).

Even if the government had sufficiently explained why the prosupp statements were false, there are no particularized allegations linking Mr. Mangione to Chapel or its disclosures in the prosupps, which plainly state that the underwriting standards were provided by Chapel. The lack of detail regarding Mr. Mangione's involvement with Chapel, its acquisition, its origination practices, or its drafting of the underwriting disclosures in the prosupps is telling given the amount of time the government had to prepare its Complaint and its unusual access to pre-suit evidence, including two separate on-the-record interviews of Mr. Mangione.

Unable to muster factual support linking Mr. Mangione to the Chapel statements that are the core allegations supporting the government's alleged scheme to defraud investors, the government attempts to premise its fraud claim on alleged misrepresentations in the MLPA. But Mr. Mangione is not alleged to have drafted, signed, or otherwise approved this contractual document for either offering. And the Second Circuit has rejected the government's previous attempts to convert breach of contract actions into FIRREA fraud claims. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662-63 (2d Cir. 2016). In an

additional effort to manufacture an alleged misrepresentation, the government claims that the disclosures of the Combined Loan-to-Value Ratios ("CLTV") in the HE4 and HE5 prosupps were misleading because the calculation Deutsche Bank used did not include second-lien information when the second lien was not part of the underlying security.  But there is no alleged duty to disclose such information.  And, contrary to the government's claim, there was no investor-understood definition, as the very documents the government cites show that investors used varying CLTV definitions when requesting additional information about the securities.

   The Complaint also fails for a separate, independent reason under Rule 9(b):  the government has failed to allege that Mr. Mangione acted with intent to defraud investors.  Critical to the government's fraud claim is that Mr. Mangione schemed with other bank employees to offload Chapel mortgage loans on investors that were materially worse in quality than disclosed.  But the government does not allege that Mr. Mangione stood to obtain any distinct benefit from the alleged scheme outside of his typical compensation.  Nor has the government alleged circumstantial evidence of conscious misbehavior.  Mr. Mangione was involved in neither the purchase of Chapel nor its origination practices.  As the government readily concedes in its Complaint, Mr. Mangione's core function was to manage Deutsche Bank's capital commitment decisions on the purchase of pools of whole loans offered for sale by third-party originators.  In this role, he placed bids to purchase the pools of whole loans from originators and was involved in selecting pools that the bank acquired for securitization.

   Chapel presented a separate mechanism by which Deutsche Bank acquired subprime mortgages.  Unlike whole-loan purchases from third parties, as alleged, Deutsche Bank did not subject Chapel loans to the same due diligence process after its acquisition.  Instead, Deutsche Bank instituted a quality control review involving a random sample of Chapel's monthly production.  According to the government, the quality control results showed substantial defects in Chapel's origination processes and underwriting such that Chapel had effectively abandoned its underwriting standards.

   It is not alleged that Mr. Mangione oversaw the quality control process or that he received the quality control results.  To overcome these inconvenient facts, the government resorts to outright speculation about Mr. Mangione's knowledge of the quality control results.  Speculation is no substitute for facts, and the government cannot allege any well-pled facts to show that Mr. Mangione received the quality control results or was aware of their findings prior to the issuance of HE4 or HE5.  Tellingly, despite summarizing the findings of the Chapel quality control reports in the Complaint, the government fails to identify when the quality control reports were sent to Deutsche Bank and who reviewed them prior to either issuance.

   Lacking any well-pled facts to tie Mr. Mangione to the allegedly problematic quality control reports, the government cherry picks, and mischaracterizes, two phone calls between Mr. Mangione and the "Diligence Supervisor" that took place days before the closing of HE4.  In the calls the Diligence Supervisor relays certain problems he encountered with Chapel based on his involvement in Chapel's acquisition.  The context of these calls is critical, and the full text of the calls, which the government chose to omit from its complaint, reveals a starkly different picture—one that cannot support an inference of fraud, much less an inference that is strong or more compelling than the opposing inferences of good faith.  For example, when the Diligence

Supervisor informed Mr. Mangione of issues that he identified at some unknown time after the Chapel acquisition, Mr. Mangione confirmed that the issues had been remedied and that the Diligence Supervisor reported the issues "to the top." Considering the full text of the calls and the clear indications of good faith undermines any inference of fraudulent intent.

Subject to the Court's approval, Mr. Mangione proposes the following briefing schedule in connection with his motion to dismiss, to which the government consents:

- Mr. Mangione will file his motion to dismiss on or before December 15, 2017;

- the government's opposition will be filed on or before March 15, 2018 (i.e., 90 days later); and

- Mr. Mangione will file his reply brief on or before April 30, 2018 (i.e., 46 days after the government's opposition).

Additionally, in light of the government's lengthy Complaint, which references and relies upon—but does not attach—numerous investigative materials, as well as the unprecedented nature of the government's application of FIRREA, Mr. Mangione respectfully requests leave to file an opening brief of no more than 35 pages and a reply brief of no more than 20 pages. Finally, pursuant to Rule III.A.3 of Your Honor's Individual Rules, Mr. Mangione respectfully requests an extension of his time to file his answer until after the Court rules on his anticipated motion to dismiss.

Respectfully submitted,

/s/

Patrick J. Smith