UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                     :

UNITED STATES OF AMERICA,

                Plaintiff,     :           No. 17 Civ. 5305 (NGG) (RML)

                                     :

                -against-      :

PAUL MANGIONE,

                                     :

                Defendant.    :

-------------------------------------------------------- X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PAUL MANGIONE'S MOTION TO DISMISS THE COMPLAINT

SMITH VILLAZOR LLP
Patrick J. Smith
Andrew J. Rodgers
Brian T. Burns
1700 Broadway, Suite 2801
New York, New York  10019
Tel:  (212) 582-4400
Fax:  (347) 338-2532

*Attorneys for Defendant Paul Mangione*

December 15, 2017

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ...................................................................................................... 1

BACKGROUND ......................................................................................................... 4

    A. Mr. Mangione's Core Functions in Deutsche Bank's Residential
       Mortgage-Backed Securities Group ........................................................... 4

    B. Deutsche Bank's Securitization Group ........................................................ 6

    C. Deutsche Bank's Acquisition of Chapel Funding, LLC ............................... 7

    D. Mr. Mangione's Limited Involvement in the Securitization of Chapel
       Loans in ACE 2007-HE4 and ACE 2007-HE5 .......................................... 8

    E. The Limited Roles of HSBC and Wells Fargo in ACE 2007-HE4 and
       ACE 2007-HE5 .......................................................................................... 9

    F. Summary of Allegations Against Mr. Mangione .................................... 11

        1. Chapel Representations ..................................................................... 11

        2. CLTV Representations ....................................................................... 17

LEGAL STANDARD ................................................................................................ 18

ARGUMENT ............................................................................................................. 19

I.  THE COMPLAINT DOES NOT ADEQUATELY ALLEGE THAT THE
    PURPORTED VIOLATIONS OF THE MAIL AND WIRE FRAUD
    STATUTES AFFECTED A FEDERALLY INSURED FINANCIAL
    INSTITUTION ................................................................................................. 19

    A. "Affecting" Under FIRREA Excludes Conduct That Does Not Create
       or Increase Risk of Loss ........................................................................... 20

    B. HSBC as Trustee Was Not Plausibly Affected by the Alleged Scheme ................. 22

    C. Wells Fargo as Master Servicer and Securities Administrator Was Not
       Plausibly Affected by the Alleged Scheme ............................................... 25

II. THE COMPLAINT FAILS TO STATE A CLAIM THAT
    MR. MANGIONE VIOLATED THE MAIL OR WIRE FRAUD
    STATUTES..............................................................................................26

    A. The Complaint Fails to Allege an Actionable Misstatement or
        Omission ...........................................................................................27

        1. The Complaint Fails to Allege that Statements Concerning
            Chapel Loans and Its Origination Practices Were Materially False..................27

        2. The Complaint Fails to Allege that Mr. Mangione Made Any
            Statements About Chapel or Its Underwriting Standards...................31

        3. The Complaint Fails to Allege that the MLPAs Contained an
            Actionable Misstatement ...........................................................32

        4. The Complaint Fails to Allege a Duty to Disclose the Existence
            of Unsecuritized Second Liens .....................................................33

    B. The Complaint Fails to Allege that Mr. Mangione Acted with
        Fraudulent Intent.............................................................................35

        1. The Complaint Fails to Allege a Sufficient Motive to Commit
            Fraud................................................................................35

        2. The Complaint Fails to Allege Strong Circumstantial Evidence of
            Conscious Misbehavior .............................................................37

CONCLUSION...........................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................................ 29

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................ 18

*Brass v. Am. Film Techs., Inc.*,
987 F.2d 142 (2d Cir. 1993)..................................................................................... 4

*Busic v. United States*,
446 U.S. 398 (1980)................................................................................................ 20

*Chisom v. Roemer*,
501 U.S. 380 (1991)................................................................................................ 21

*Cresswell v. Sullivan & Cromwell*,
922 F.2d 60 (2d Cir. 1990)..................................................................................... 20

*Crigger v. Fahnestock & Co., Inc.*,
443 F.3d 230 (2d Cir. 2006).................................................................................... 27

*DeAngelis v. Corzine*,
17 F. Supp. 3d 270 (S.D.N.Y. 2014)....................................................................... 31

*DeBlasio v. Merrill Lynch*,
2009 WL 2242605 (S.D.N.Y. July 27, 2009) .......................................................... 35

*ECA & Local 123 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)............................................................................... 35, 36

*Faulkner v. Verizon Commc'ns, Inc.*,
189 F. Supp. 2d 161 (S.D.N.Y. 2002)..................................................................... 38

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
104 F. Supp. 3d 441 (S.D.N.Y. 2015), *aff'd*, 873 F.3d 85 (2d Cir. 2017) ................ 29

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)........................................... 29, 31, 32

*IKB Int'l S.A. v. Bank of Am. Corp.*,
584 F. App'x 26 (2d Cir. 2014) .................................................................. 27, 28, 35

*IKB Int'l S.A. v. Bank of Am.*,
  2014 WL 1377801 (S.D.N.Y. Mar. 31, 2014) ........................................................ 28

*In re Salomon Analyst Level 3 Litig.*,
  373 F. Supp. 2d 248 (S.D.N.Y. 2005) ................................................................... 30

*In Re UBS AG Secs. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac
  Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ................... 36-37

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
  2014 WL 1311979 (E.D.N.Y. Mar. 28, 2014) ........................................................ 18

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ........................................................................... 36, 37

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
  821 F. Supp. 2d 616 (S.D.N.Y. 2012), *aff'd*, 478 F. App'x 679 (2d Cir. 2012) .......... 28, 30, 38

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006) ............................................................................. 35

*Modonna v. United States*,
  878 F.2d 62 (2d Cir. 1989) .............................................................................. 13

*Mohamed v. Donald J. Nolan, Ltd.*,
  967 F. Supp. 2d 647 (E.D.N.Y. 2013), *aff'd*, 574 F. App'x 45 (2d Cir. 2014) ................ 18

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,
  85 F. Supp. 2d 282 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001) .................. 34

*O'Brien v. Nat'l Prop. Analysts Partners*,
  936 F.2d 674 (2d Cir. 1991) ............................................................................. 35

*Pencheng Si v. Laogai Research Found.*,
  71 F. Supp. 3d 73 (D.D.C. 2014) ...................................................................... 27

*Polar Int'l Brokerage Corp. v. Reeve*,
  108 F. Supp. 2d 225 (S.D.N.Y. 2000) ................................................................. 13

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ............................................................................. 31

*Ross v. Bolton*,
  904 F.2d 819 (2d Cir. 1990) ............................................................................. 18

*S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*,
   84 F.3d 629 (2d Cir. 1996)................................................................................... 27

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008)................................................................................. 38

*Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*,
   2013 WL 1342529 (S.D.N.Y. Mar. 29, 2013) .............................................. 29, 31

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016)............................................................................ 32, 33

*United States v. Agne*,
   214 F.3d 47 (1st Cir. 2000) .................................................... 21, 22, 24, 26

*United States v. Alkins*,
   925 F.2d 541 (2d Cir. 1991)................................................................................ 39

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000)............................................................................ 27, 33

*United States v. Bank of N.Y. Mellon*,
   941 F. Supp. 2d 438 (S.D.N.Y. 2013)........................................ 19, 20, 22, 27

*United States v. Benson*,
   79 F. App'x 813 (6th Cir. 2003) ......................................................................... 23

*United States v. Bouyea*,
   152 F.3d 192 (2d Cir. 1998)............................................................................ 20, 22

*United States v. Carollo*,
   2011 WL 3875322 (S.D.N.Y. Aug. 25, 2011) ................................................... 21

*United States v. Countrywide Fin. Corp.*,
   996 F. Supp. 2d 247 (S.D.N.Y. 2014)............................................................. 21, 24

*United States v. D'Amato*,
   39 F.3d 1249 (2d Cir. 1994)................................................................................ 32

*United States v. Grass*,
   274 F. Supp. 2d 648 (M.D. Pa. 2003) ............................................................... 25

*United States v. Guadagna*,
   183 F.3d 122 (2d Cir. 1999)................................................................................ 37

*United States v. Heinz,*
   790 F.3d 365 (2d Cir. 2015)........................................................................... 23

*United States v. Mullins,*
   613 F.3d 1273 (10th Cir. 2010) .............................................................. 20, 21, 25

*United States v. Ubakanma,*
   215 F.3d 421 (4th Cir. 2000) ...................................................................... 21

*United States v. Vanoosterhout,*
   898 F. Supp. 25 (D.D.C. 1995), *aff'd,* 96 F.3d 1491 (D.C. Cir. 1996).................... 20

*United States v. Wells Fargo Bank, N.A.,*
   972 F. Supp. 2d 593 (S.D.N.Y. 2013)............................................................. 40

*Wang v. Bear Stearns Cos.,*
   14 F. Supp. 3d 537 (S.D.N.Y. 2014).............................................................. 34

*Wood ex rel. United States v. Applied Research Assocs., Inc.,*
   328 F. App'x 744 (2d Cir. 2009) ................................................................. 18

## STATUTES AND RULES

Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L.
   No. 101-73, 103 Stat. 498 ................................................................... *passim*

   12 U.S.C. § 1833a ..................................................................... 19, 20, 21

   12 U.S.C. § 1833a(c)(2).................................................................... 19, 20

   12 U.S.C. § 1833a(h) ........................................................................ 19

18 U.S.C. § 3293(2) ........................................................................... 20

Fed. R. Civ. P. 9(b) .................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)........................................................................ 18

## REGULATIONS

SEC Regulation AB, 17 C.F.R. § 229.111.......................................................... 33

**INTRODUCTION**

After an extensive investigation into Deutsche Bank's residential mortgage-backed securities practices, capped by a comprehensive settlement with Deutsche Bank in January 2017, the government elected to bring this case against just one individual:  Paul Mangione.  The Complaint, which seeks civil penalties under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), alleges a broad conspiracy involving scores of Deutsche Bank employees in many parts of its mortgage business.  So why sue Mr. Mangione and no one else?  One would think this question would answer itself in the form of allegations of fraud that are specific and egregious.  Allegations so clear that the decision to sue Mr. Mangione and ignore all of his former colleagues and supervisors is understandable.  Allegations that justify invoking FIRREA, its ten-year statute of limitations, and its extraordinary application of federal criminal law in the civil enforcement context.  Allegations that might begin to explain why a hard-working family man should be subjected to the devastating, livelihood-threatening reputational harm that a government lawsuit like this one creates.

What we see instead is a Complaint so deeply flawed on at least two grounds that the only conclusion to be drawn is that it never should have been filed.  For starters, the answer to the threshold question of whether FIRREA applies to the conduct at issue is an obvious "No."  FIRREA is not an all-purpose fraud statute.  It was enacted in the wake of the savings-and-loan crisis to provide increased penalties for defrauding federally insured depository institutions and their depositors.  FIRREA allows the government to pursue civil penalties for violations of certain enumerated offenses, including mail or wire fraud, but only if the alleged violations "affect[] a federally insured financial institution."

According to the government, Mr. Mangione was a participant in Deutsche Bank's scheme to defraud investors in two residential mortgage-backed securities offerings:  ACE 2007-

HE4 ("HE4") and ACE 2007-HE5 ("HE5").  But neither Deutsche Bank, nor any of the investors in the offerings, are alleged to be federally insured financial institutions.  Instead, the government relies on the novel theory that the alleged scheme to defraud HE4 and HE5 investors somehow affected two contractual service providers that happened to be federally insured institutions:  the trustee (HSBC) and the securities administrator and master servicer (Wells Fargo).  But neither entity faced a realistic risk of loss related to the alleged fraud, mainly because neither had any capital at risk.  HSBC and Wells Fargo were also amply protected from any risk of loss under the contracts that defined their respective roles.

The Complaint's theories of how HSBC and Wells Fargo were "affected" by the alleged scheme to defraud are far-fetched.  The possibility that HSBC might have been sued—but never was—by HE4 and HE5 investors on a theory unrelated to the alleged fraud created no risk of loss.  Wells Fargo, as master servicer and securities administrator, was never at risk of not recouping any discretionary advances it might have had to make, and the notion that it faced a risk of loss from potentially earning less money from a bank deposit is ludicrous.  The Court should swiftly reject the government's effort to reach conduct that had no possibility of harming federally insured financial institutions.

The Complaint also fails to satisfy Rule 9(b)'s requirements of pleading (i) an actionable misstatement or omission with particularity and (ii) facts sufficient to raise a strong inference that Mr. Mangione intended to defraud investors.  The government's fraud claim against Mr. Mangione rests on alleged underwriting defects in loans originated by Chapel Funding, LLC ("Chapel"), a Deutsche Bank subsidiary, that were securitized in HE4 and HE5.  But the origination of Chapel loans fell outside of Mr. Mangione's core function, which was to manage Deutsche Bank's capital-commitment decisions on the purchase of pools of subprime whole

loans offered for sale by third-party originators.  Mr. Mangione had no oversight over Chapel, its origination process, or its drafting of the allegedly false disclosures.

The government resorts to rank speculation about Mr. Mangione's knowledge of adverse quality-control reports that Deutsche Bank commissioned to monitor Chapel's post-acquisition origination practices.  Speculation is no substitution for facts, and the government cannot allege any well-pled facts to show that Mr. Mangione received the quality-control reports or was aware of their findings prior to either issuance.   Even if he did receive the reports, the reports say nothing about the loans underlying each securitization *at issue in this case*.  The government is forced to admit that each securitization contained an immaterial number of loans graded as deficient in the quality-control reports, and it does not provide a valid basis for extrapolating the quality-control results to the HE4 and HE5 collateral pools.

Unable to link Mr. Mangione to the allegedly problematic quality-control reports, the government cherry picks from two phone calls between Mr. Mangione and a Deutsche Bank "Diligence Director" that took place days before the closing of HE4.  In the calls, the Diligence Director relays certain problems he encountered with Chapel based on his involvement in Chapel's acquisition nearly a year earlier.  The calls lack any particularized facts about the alleged defects in the HE4 collateral, and the full transcripts show that there was only a mere possibility that some unknown number of potentially deficient loans were in the HE4 collateral pool.  The full text of the calls, which the government chose to omit from its Complaint, also undermines any suggestion that Mr. Mangione acted with an intent to defraud investors.  Mr. Mangione asks all the right questions when he hears about problems at Chapel and receives several assurances that the Diligence Director had reported the issues "to the top" of the bank. These clear indications of good faith vitiate any inference of fraudulent intent.

In a last-ditch effort to assert a claim, the government tacks on the allegation that Deutsche Bank and Mr. Mangione concealed the existence of second liens on certain properties collateralizing HE4 and HE5.  But there is no duty to disclose such information, and Mr. Mangione is not alleged to have been responsible for the bank's decision to exclude unsecured second liens from the disclosure of the combined-loan-to-value ("CLTV") ratio.  The notion that the bank, and Mr. Mangione specifically, schemed to withhold second-lien information is rebutted by the government's own pleadings, which show that second-lien information was widely disseminated to potential investors.

## BACKGROUND[1]

### A.    Mr. Mangione's Core Functions in Deutsche Bank's Residential Mortgage-Backed Securities Group

Mr. Mangione is a Bronx native and graduate of The Bronx High School of Science.  He attended MIT, where he earned degrees in computer science and electrical engineering, funding his education through scholarships, loans, and summer jobs, including custodial work at New York City public schools in the Bronx.  At Deutsche Bank, Mr. Mangione was a subprime whole-loan trader in Deutsche Bank's Residential Mortgage-Backed Securities Group.  (Ex. 1 at 2-3 (Deutsche Bank's Whole Loan Program (April 2007) ("April 2007 Presentation")).)[2]  Mr. Mangione's central job responsibility was to manage Deutsche Bank's capital-commitment decisions on the bulk purchase of subprime loans from third-party originators.  (Compl. ¶¶ 57, 61-67, Sept. 11, 2017 (Dkt. No. 1).)  He reported to the Head of US Home Equity Whole Loan

---

[1] The facts set forth below are derived from the Complaint and are assumed to be true solely for the purposes of this motion.  In addition to the factual allegations in the Complaint, the Court may consider "documents referenced in the complaint, as well as documents that are in the plaintiff's possession or that the plaintiff knew of and relied upon in filing the suit."  *Mazza Consulting Grp., Inc. v. Canam Steel Corp.*, 2008 WL 1809313, at *1 (E.D.N.Y. Apr. 21, 2008) (Garaufis, J.) (citing *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

[2] The cited exhibits are attached to the Declaration of Patrick J. Smith filed contemporaneously with this motion.  These exhibits are either referenced in the Complaint or are otherwise in the government's possession as a result of its investigation into Deutsche Bank's residential mortgage-backed securities practices.

Trading ("Head of Whole Loan Trading").  (Ex. 1 at 4 (April 2007 Presentation).)

As a subprime whole-loan trader, Mr. Mangione placed bids to purchase loan pools offered by third-party originators.  (Compl. ¶¶ 57, 61-67.)  If a bid was accepted, the bank would conduct pre-purchase due diligence on the loan pool, which typically involved a review of a sample of the underlying loans.  (*Id.* ¶¶ 66-67.)  Deutsche Bank's Mortgage Finance Group, which coordinated and monitored the purchase and sale of whole loans and mortgage-backed securities, oversaw the bank's due diligence group.  (*Id.* ¶¶ 59, 68; Ex. 1 at 2-3 (April 2007 Presentation).)  The Director of the Mortgage Finance Group also reported to the Head of Whole Loan Trading.  (Ex. 1 at 2-3.)

The Director of Due Diligence (the "Diligence Director") employed an adverse sampling methodology, which meant he chose the sample based on adverse credit characteristics that might signal a lack of creditworthiness.  (Compl. ¶ 168 n.24.)  Deutsche Bank engaged a third-party vendor, The Clayton Group, Inc. ("Clayton"), to perform the due diligence on the adverse sample of loans selected by the Diligence Director.  (*Id.* ¶ 70.)  Among other things, Clayton would evaluate whether the loans in the sample were underwritten according to the originator's underwriting guidelines.  (*Id.* ¶ 73.)  Clayton would provide reports, commonly referred to as "Exhibit 1s," that summarized the due diligence results.  (*Id.* ¶¶ 70, 76.)  Mr. Mangione typically received the due diligence summaries.  (*Id.*)

Following the purchase of a pool of subprime loans, Mr. Mangione managed the risk associated with holding the loans on the bank's books.  (*Id.* ¶¶ 78-79.)  Mr. Mangione would receive "position reports" that provided summary information about the subprime inventory.  (*Id.* ¶ 78; *see e.g.*, Exs. 2, 3, 3(a).)  The position reports provided no information about specific loans, nor did the reports say anything about the underwriting characteristics for individual loans.

(*Id.*)

B.      **Deutsche Bank's Securitization Group**

Deutsche Bank's Securitization Group structured the securitization of subprime loans. (Compl. ¶ 58.)  It also coordinated, with the advice of outside advisors including lawyers at Thacher Proffitt & Wood LLP ("Thacher") and accountants at Deloitte & Touche, the representations that were made to investors in offering documents.  (*Id.* ¶¶ 58, 112-13; Ex. 4 at 1, 5 (HE4 Working Group List).)  The Director of the Securitization Group ran the group and also reported to the Head of Whole Loan Trading.  (Ex. 1 at 3, 6 (April 2007 Presentation).)  Mr. Mangione was not a member of the Securitization Group and he is not alleged to have had any role in either the drafting of the offering documents or the bank's disclosure policy.

Deutsche Bank securitized subprime loans through Ace Securities Corp. ("ACE"), a Deutsche Bank entity.  (Compl. ¶ 53; Ex. 1 at 8 (April 2007 Presentation).)  Mr. Mangione would assist in structuring a securitization, which included selecting the loan pools from the subprime inventory that would form the underlying collateral for specific ACE securitizations. (Compl. ¶¶ 83-84, 88, 111, 117.)  Deutsche Bank sold the selected loans to ACE, which established trusts that owned the collateral for the benefit of investors.  (*Id.* ¶¶ 116-18.)

Deutsche Bank sold loans to ACE pursuant to a contract called a Mortgage Loan Purchase Agreement (or "MLPA").  (*Id.* ¶ 118; Ex. 5 (HE4 MLPA); Ex. 6 (HE5 MLPA).)[3]  The MLPA included certain contractual "representations and warranties."  (Compl. ¶ 119; Ex. 5 § 6 (HE4 MLPA).)  In the event that any loan failed to satisfy the representations and warranties, ACE—and the trust it established to issue the certificates to investors—could seek contractual remedies against Deutsche Bank, which included the repurchase of any defective mortgage loan.

---

[3] The MLPAs were a standard document that included uniform representations that were applicable to all ACE offerings.  (Compl. ¶ 120.)

(Ex. 5 § 7.)

After ACE acquired the loans, Deutsche Bank's Securitization Group would file a free writing prospectus or "term sheet" with the SEC that would notify the market of a new offering from Deutsche Bank's ACE securitization entity.  (Compl. ¶ 97.)  The Securitization Group—with the assistance of outside counsel—"compiled" a preliminary (or "red") prospectus supplement ("prosupp") as well as a final (or "black") prosupp, which once completed, was filed with the SEC and provided to investors.  (*Id.* ¶ 113-14.)

### C.    Deutsche Bank's Acquisition of Chapel Funding, LLC

Around May 2006, Deutsche Bank acquired Chapel, a California-based subprime mortgage originator.  (*Id.* ¶ 7.)  Chapel became part of a Deutsche Bank subsidiary called DB Home Lending LLC ("DB Home") and constituted a different, and wholly separate, channel through which Deutsche Bank obtained subprime mortgages.  (Ex. 1 at 3 (April 2007 Presentation); *see also* Compl. ¶ 9 (recognizing Chapel as a Deutsche Bank "subsidiary"); Ex. 7 at 23:2-24:3 (Apr. 26, 2007 Call Tr.).)  DB Home reported into the Head of Deutsche Bank's Residential Mortgage-Backed Securities Group.  (Ex. 1 at 3 (April 2007 Presentation).)  Mr. Mangione is not alleged to have had any responsibility for DB Home's policies or operations. DB Home subprime loans were owned by Deutsche Bank and were included in Deutsche Bank's subprime inventory.  (Compl. ¶¶ 79, 184.)

Prior to the acquisition, Deutsche Bank purchased whole-loan pools from Chapel and subjected the loan pools to the third-party due diligence process that the Diligence Director oversaw.  (*Id.* ¶ 166.)  After the acquisition, the bank owned all loans Chapel originated and no longer subjected them to its third-party diligence procedures.  (*Id.*)  Instead, Deutsche Bank instituted a quality-control review to monitor Chapel's monthly production.  (*Id.* ¶ 166-68.) According to the Complaint, the Diligence Director—not Mr. Mangione—received monthly

reports from Clayton and another diligence provider, Adfitech, in connection with the review of Chapel's monthly production. (*Id.* ¶ 181.) The government does not allege when the Diligence Director received the monthly reports, nor does it allege what monthly reports were available prior to the issuance of HE4 or HE5. Critically, the government fails to allege that Mr. Mangione ever received or saw the reports, which purportedly show defects in the Chapel collateral.

### D.   Mr. Mangione's Limited Involvement in the Securitization of Chapel Loans in ACE 2007-HE4 and ACE 2007-HE5

Mr. Mangione's involvement with the securitization process was limited to identifying loan pools from Deutsche Bank's subprime inventory for inclusion in each securitization. (*Id.* ¶¶ 111, 145-59.) He is not alleged to have had responsibility for the disclosures regarding Chapel and its underwriting standards.

The government's own allegations show the limited role Mr. Mangione played in the securitization process for HE4 and HE5. (*Id.*) For HE4, the Complaint cites a handful of communications where Mr. Mangione:

- informed the Securitization Group about the addition of the CE-2 class to the securitization (*Id.* ¶¶ 58, 145; Ex. 8);

- answered one question from the Securitization Group about servicer payments and fielded another, apparently unanswered, question about a servicer's comments to the disclosures regarding the "special servicer provisions." (Compl. ¶¶ 146-47; Ex. 9; Ex. 10);

- confirmed to a Deutsche Bank sales person and members of the Securitization Group that the deal documents contained all of Freddie Mac's required representations and covenants (Compl. ¶¶ 147-48; Ex. 11);

- received a revised draft of the preliminary prospectus supplement from Thacher that was sent to a group of over 100 people (Compl. ¶ 149; Ex. 12); and

- informed one of the servicers, Ocwen, that their lawyers were holding up the "RED prospectus," to which a Director of the Securitization Group responded that he had

"spoken to there [sic] lawyers and we should be good" (Compl. ¶ 150; Ex. 13).

The allegations are similarly threadbare about Mr. Mangione's involvement in the HE5

securitization process.  For HE5, the government alleges that Mr. Mangione:

- stated that the term sheet "look[ed] ok" in response to an email from a Securitization Group Associate (Compl. ¶ 153; Ex. 14);

- forwarded the term sheet to the Syndicate Desk, which is the group at Deutsche Bank responsible for providing information to prospective investors (Compl. ¶ 155; Ex. 15);

- received a draft of the MLPA (Compl. ¶ 155 n.23);

- responded to a question from an Associate in the Securitization Group about the preparation of the final prosupp (*id.* ¶ 156; Ex. 16);

- received an email from Thacher sent to over 100 recipients attaching a revised prosupp and requesting "sign-off" from the amorphous group (Compl. ¶ 157; Ex. 17);

- received an email from a Securitization Group Associate asking for Mr. Mangione's and another individual's "ok" to "send down [the] final version" of the prosupp, to which the other individual responded, "its [sic] fine" (Compl. ¶ 158; Ex. 18); and

- confirmed to a Deutsche Bank sales person and members of the Securitization Group that the deal documents contained all of Freddie Mac's required representations and covenants (Compl. ¶ 159; Ex. 19).

None of these allegations in any way indicate that Mr. Mangione knew of any alleged

defect in Chapel collateral or that any prosupp disclosure was misleading.

### E.   The Limited Roles of HSBC and Wells Fargo in ACE 2007-HE4 and ACE 2007-HE5

After Deutsche Bank sold the mortgage loans underlying HE4 and HE5, ACE placed the

mortgage loans in trusts for the benefit of the investors.  (Compl. ¶ 54 n.9.)  Each trust was

created pursuant to a Pooling and Servicing Agreement ("PSA") setting forth the rights, duties,

and obligations of the various service providers that managed the trusts' collateral pools.

(Compl. ¶¶ 54 n.9, 97, 123; *see also* Ex. 20 § 2.10 (HE4 PSA); Ex. 21 § 2.09 (HE5 PSA).)[4]  For HE4 and HE5, two of those service providers were federally insured financial institutions: HSBC Bank USA, N.A., which served as trustee, and Wells Fargo Bank, N.A., which served as master servicer and securities administrator.

As trustee, HSBC held the underlying loans on behalf of the trust for the benefit of the certificateholders.  (Ex. 20 § 2.01 (HE4 PSA).)  Its duties included an obligation to enforce the contractual remedies in the MLPAs, including Deutsche Bank's obligation to repurchase non-conforming loans.  (*Id.* § 2.03(a).)  This obligation was triggered only "[u]pon discovery or receipt of notice" of a breach (*id.*), and HSBC had no duty to conduct any "affirmative investigation" into whether a breach occurred.  (*Id.* § 9.02(a)(xii).)

HSBC benefited from indemnification provisions protecting it from loss.  For example, HSBC was not required to "expend or risk its own funds" if it had grounds for believing that repayment was not assured to it.  (*Id.* § 9.02(a)(xi).)  HSBC similarly had no obligation to conduct or defend any litigation at the request or direction of any certificateholder without a satisfactory indemnity (*id.* § 9.02(a)(iii)); had no obligation to investigate any matter brought to its attention by any certificateholder without a satisfactory indemnity (*id.* § 9.02(a)(v)); and was entitled to indemnity from the trust for any liability it may incur except as a result of its own negligence or malfeasance (*id.* § 9.05).

As master servicer and securities administrator, Wells Fargo had the obligation to "supervise, monitor and oversee" the servicers (Ocwen, GMAC, and Countrywide), who in turn were responsible for the day-to-day administration of the mortgages.  (*Id.* § 4.01 (HE4 PSA).)  As compensation, Wells Fargo was entitled to a "Master Servicing Fee," which was calculated as

---

[4] Unless otherwise noted, references to a section of the HE4 PSA are applicable to the same section of the HE5 PSA.

a percentage of the deal's "Scheduled Principal Balance" on the date the fee was due.  (*Id.* § 4.13; *see also id.* § 1.01 (defining "Scheduled Principal Balance").)[5]  Wells Fargo was also entitled to income earned on funds, collected from borrowers, that sat in a distribution account before payments were made to investors.  (*Id.* § 4.13; *see also id.* § 3.10(a)-(b).)

### F.    Summary of Allegations Against Mr. Mangione

Despite alleging only limited involvement in the securitization process, the government alleges that Mr. Mangione knew that "myriad representations in HE4 and HE5 were materially false."  (Compl. ¶ 161.)  The government claims that Mr. Mangione was aware of two categories of representations in the HE4 and HE5 offering documents that were allegedly materially false.  The first category relates to Chapel's disclosed underwriting standards and the second category relates to the disclosure of CLTV ratios.  (*Id*.)

### 1.    Chapel Representations

Because the Chapel loans originated through the DB Home channel constituted 61.37% and 48.78% of the loans in the HE4 and HE5 offerings, respectively, the offering documents disclosed Chapel's underwriting standards.  (*Id.* ¶ 102; Ex. 22 at S-67-68 (HE4 prosupp); Ex. 23 at S-60 (HE5 prosupp).)   While the government highlights certain statements from the HE4 and HE5 prosupps that address Chapel's underwriting standards (Compl. ¶ 136), it only claims that a handful were false based on Mr. Mangione's alleged knowledge of "Chapel's abandonment of any semblance of reasonable underwriting practices, lack of quality control processes and outright fraud" (*id.* ¶ 236).  According to the Complaint, this alleged knowledge contradicted the following disclosures in the HE4 and HE5 prosupps:

- "DB Home has developed internal underwriting processes and criteria that it believes generate quality loans and give it the ability to approve and fund loans quickly" (*id.*

---

[5] For HE4, the relevant percentage was zero.  (*Id.* § 1.01 (defining "Master Servicing Fee Rate" as "0.000% per annum").

¶¶ 136, 236; Ex. 22 at S-68);

- "DB Home's guidelines are primarily intended to . . . determine that the borrower has the ability to repay the mortgage loan in accordance with its terms . . ." (Compl. ¶ 136; Ex. 22 at S-68); and

- "DB Home's quality control program is intended to monitor loan production with the overall goal of improving the quality of loan production generated by its independent mortgage broker channel."  (Compl. ¶ 136; Ex. 22 at S-70.)

The government also selectively quotes from certain representations and warranties that were made to ACE and the issuing trusts in the MLPAs, including: (i) that the loans "were underwritten in accordance with the related originator's underwriting guidelines"; (ii) that "[n]o error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person . . . involved in the origination of the Mortgage Loan"; (iii) that each loan "complied in all material respects with any and all requirements of any federal, state or local law"; and (iv) that the originator "made a reasonable determination that at the time of origination the Mortgagor had the ability to make timely payments . . . ."  (Compl. ¶ 141; Ex. 5 § 6 (HE4 MLPA).)

The government's sole basis for its claim that Mr. Mangione knew the statements in the prosupps and MLPAs were false is his alleged knowledge of the results of the Chapel quality-control review.  (Compl. ¶¶ 193-94, 208, 217.)  But the government does not allege that Mr. Mangione received the quality-control results prior to the issuance of HE4 and HE5 (or at all). Nor does the government allege when Deutsche Bank received the reports for the specific monthly production that went into each securitization.  All the government alleges is that 3.3% of loans in HE4 and none of the loans in HE5 were graded as "EV3" by Clayton, which according to the government, indicated that "the loan did not comply with originator's guidelines or laws and regulations."  (*Id.* ¶¶ 173, 220 n.41.)  As for the Adfitech reviews, the government

12

alleges that Adfitech graded 1% of the loans in HE4 and 3% of the loans in HE5 with a "Severity Code 3-5," which, according to the government, indicated that the loans did not comply with underwriting guidelines.  (Compl. ¶¶ 223, 227.)  The Complaint does not include a single quality-control report and does not specify what the loan-level defects were for the loans that were securitized in HE4 or HE5.

The government tries to bolster its claims with two phone calls from April 18 and 20, 2007, between Mr. Mangione and the Diligence Director, that occurred days before the closing of HE4.  (*Id.* ¶¶ 193-207.)  The government declined to attach as exhibits the transcripts of the calls referenced in the Complaint.  (*See id.* ¶ 197 n.31.)  We briefly summarize here the context of the April 18 and 20 calls and highlight language that the government omitted to provide a clearer understanding of what actually transpired.[6]

On April 18, 2007—eight business days before HE4 closed on April 30, 2007—the Diligence Director contacted Mr. Mangione after he had met with a representative of Ocwen Structured Investments, LLC ("OSI")—an affiliate of Ocwen, which also served as a servicer on several of Deutsche Bank's RMBS deals.  (*Id.* ¶ 196).  OSI was considering a bid for the residual component of the securitization.  (*Id.* ¶ 195.)  As the government explained, the residual tranche is the most junior level in a securitization and the "first to be impacted by mortgage defaults."  (*Id.* ¶¶ 89, 195 n.29.)  Typically, Deutsche Bank retained the residual component of its subprime securitizations, which were managed by the subprime trading desk.  (*Id.* ¶ 78; Exs. 3 & 3(a) ("Position Summary" tab of the Feb. 23, 2007 Whole Loan Position Report).)

---

[6] Complete transcripts as well as the actual audio recordings of the April 18 and 20 calls are attached to the Smith Declaration.  (*See* Exs. 24, 24(a), 25, 25(a).)  While the Court must accept as true the well-pled allegations of the Complaint, it "need not adopt the [government's] subjective characterization of the documents properly before it."  *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 241 (S.D.N.Y. 2000) (citing *Modonna v. United States*, 878 F.2d 62, 65 (2d Cir. 1989)).  The audio recordings therefore trump any interpretation of the calls that the government relied on in drafting the Complaint.

As part of its bid for the residual, OSI wanted to review the due diligence results for the loan pools in the HE4 securitization.  (Compl. ¶¶ 195-96.)  During a phone call on April 18, 2007, the Diligence Director explained to Mr. Mangione that OSI was "looking for . . . due diligence results" for Chapel but that the bank "ha[d] none."  (*Id.* ¶ 196; Ex. 24 at 4:13-20 (Apr. 18, 2007 Call Tr.).)  Because of the unique nature of Chapel, the Diligence Director was unsure how to handle the inquiry from OSI, so he "pretended like [he] didn't know" what was in the HE4 collateral pool in order to "give [Mr. Mangione] the high sign" on the request.  (Compl. ¶ 197; Ex. 24 at 4:22-5:5.)  Mr. Mangione said he would speak with the OSI representative the next day.  (Ex. 24 at 5:11-12.)

Mr. Mangione then asked "what do we do on Chapel, though?  I mean like effectively, we're the originator.  We're doing our own due diligence."  (*Id.* at 5:14-17.)  The Diligence Director responded:

> Yeah . . . we're keeping all the loans.  We're not kicking them out.  You know, what am I supposed to do?  I give feedback, I say this is a mistake, you shouldn't have underwritten this loan, this is an error, this is a compliance error, these are credit issues, this has got—you know what I'm saying?  We go through all that stuff, we give them all the feedback, we tell them who the underwriters are.

(*Id.* at 5:18-6:1.)  The Diligence Director continued:  "but we don't kick loans out.  We keep everything."  (*Id.* at 6:3-4.)  Mr. Mangione asked the Diligence Director why the bank did not do a review "before we approve a loan and close on it" and asked if the Diligence Director had "ever looked at [Chapel's] process?"  (*Id.* at 6:5-16.)  The Diligence Director said that he "did a review when [the bank] bought the company" and "based on issues [he] found through Adfitech and through the Clayton reviews," the bank "cut off a broker, [and] fired some underwriters."  (*Id.* at 6:17-7:14.)

The Diligence Director also relayed an incident that occurred "a long time ago" where

14

Chapel employees were "scrubbing files" before the Diligence Director could review them as part of the quality-control process instituted by Deutsche Bank.  (*Id.* at 8:3-8.)  Upon hearing this information, Mr. Mangione asked whether the Diligence Director "relayed this all to" the Diligence Director's supervisors, which included the Head of Whole Loan Trading.  (*Id.* at 9:7-8.)  The Diligence Director confirmed:  "Oh it went all the way up."  (*Id.* at 9:9.)  The Diligence Director informed Mr. Mangione that he had alerted his supervisors about the problems he encountered in an email that said the head of Chapel "can't be trusted to protect the credit or regulatory or reputational risk of the bank."  (*Id.* at 11:13-18.)

Two days later, on April 20, 2007, Mr. Mangione called the Diligence Director in response to further inquiries from OSI regarding due diligence results.  (Compl. ¶ 200; Ex. 25 at 3:18-4:4 (Apr. 20, 2007 Call Tr.).)  Mr. Mangione again questioned why the bank failed to do reviews "when we buy the [Chapel] loans?"  (Ex. 25 at 2:18-20.)  The Diligence Director reminded Mr. Mangione that the bank did post-close reviews and explained:  "every month, Chapel would send its funding stuff . . . [a]nd we would have Clayton do a review and Adfitech do a review.  The results we had, we . . . gave back to Chapel for feedback.  We didn't pull those loans back.  We own those loans."  (*Id.* at 3:22-4:4.)[7]

The Diligence Director observed that "those loans that we found issues with are probably in the security."  (*Id.* at 4:6-7.)  Mr. Mangione questioned "why are we closing on these loans?  Why don't we do the due diligence?  Like who is doing the review?"  (*Id.* at 4:16-19.)  The Diligence Director explained that the "underwriters in Chapel's office" are closing the loans and

---

[7]  The Diligence Director continues to explain other issues he discovered with the Chapel loans but it is clear from the context of the call that Mr. Mangione was away from his phone and not listening to the Diligence Director's comments.  (Ex. 25 at 3:5-6; Ex. 25(a) (audio file of the April 20 call.)  The government, however, references this portion of the call and omits the language that shows Mr. Mangione was not listening.  (Ex. 25 at 3:15; Compl. ¶ 200.)

stated that "they probably have a QC department" that "was volume oriented last year." (*Id.* at 4:24-5:3.)

Upon hearing this information, Mr. Mangione asked "[s]o is that now remedied?" (*Id.* at 5:6-7.)  The Diligence Director confirmed "[o]h, absolutely" because he "gave them all the results" and "show[ed] them exactly what underwriters . . . seem[ed] to have high percentages of bad loans." (*Id.* at 5:8-12.)  The Diligence Director confirmed that the issues were reported to a litany of people including the "head of credit" for Deutsche Bank. (*Id.* at 5:13-20.)  Mr. Mangione then asked the Diligence Director to "show [him] what you have in terms of due diligence." (*Id.* at 6:8-9.)

Following the April 20 call, Mr. Mangione continued to inquire about Chapel and asked a subordinate of the Diligence Director whether "we do QC stuff on that." (Ex. 26 at 4:6-7 (Apr. 23, 2007 Call Tr.); Compl. ¶ 209.)  The government claims that "the subordinate responded that he would locate the results and provide them to [Mr.] Mangione" (Compl. ¶ 209), but the actual record of the conversation shows that the subordinate said that he did not "know if we have any exhibits for" Chapel and that he would need to "see what [the Diligence Director] has in regards to that." (Ex. 26 at 4:8-19.)  The government does not allege that the subordinate or the Diligence Director provided Mr. Mangione with a single quality-control report.

No information regarding bulk-purchase due diligence or Chapel quality-control results was ever provided to OSI because, on April 23, 2007, OSI submitted an indicative bid for the residual that was unacceptable to Deutsche Bank. (Compl. ¶ 206.)  Consequently, Mr. Mangione informed the Diligence Director that he did not need to provide any information to OSI because it was not "going to be getting involved in the residual." (Ex. 27 at 6:11-14 (Apr. 26, 2007 Call Tr.).)

### 2.      CLTV Representations

The government also alleges that Deutsche Bank misrepresented the CLTV ratios of a "substantial number of loans in HE4 and HE5 by concealing the impact of 'silent' or 'simultaneous' second liens." (Compl. ¶ 238.)  According to the government, the CLTV disclosures in the prosupps did not include the impact of second liens when the second lien was not part of the underlying collateral pool for the securitization.  (*Id.* ¶ 238.)  While Mr. Mangione was aware of how the bank calculated the CLTV ratio in the prosupps (*id.* ¶¶ 246-48), he is not alleged to have been involved in the bank's decision to omit unsecuritized second liens from the CLTV calculation.

The documents that the government references show that investors frequently requested second-lien information and provided their own definition of how they wanted the CLTV ratio calculated.  (*Id.* ¶ 242.)  For example, the Complaint references a 2006 request from Declaration, a potential investor that provided a template for the bank to input collateral characteristics for ACE 2006-HE1.  (*Id.* ¶ 242.)  In the template, Declaration made clear that "COLTV should include first mortgage balance and any additional mortgages on the property (whether in this collateral pool or not) at the time of origination."  (Exs. 28, 28(a).)[8]  There is no allegation that responses to such requests were not truthful and complete.

The Complaint also acknowledges that Deutsche Bank and Mr. Mangione provided second-lien information to investors upon request.  (Comp. ¶¶ 244, 247.)  Additionally, second-lien information was disseminated to potential investors via the Syndicate Desk, which according to the Complaint, was responsible for "selling the deal" and could pass along information to likely investors.  (*Id*. ¶¶ 151, 155.)  Mr. Mangione personally provided the Syndicate Desk with

---

[8]  The government intentionally omits reference to "COLTV" and misleadingly states that the template "expressly stated . . . CLTV."  (Compl. ¶ 242.)

the loan tape for both HE4 and HE5, which included second-lien information for the HE4 and

HE5 collateral pools.  (*See, e.g.*, Exs. 29-29(a) (HE4 loan tape with column for "CLTV w/SS");

Exs. 30-30(a) (same for HE5).)  He also personally provided the percentage of loans in each pool

with second liens as well as the CLTV ratio with second liens.  (Ex. 31 (HE4); Ex. 32 (HE5).)

Among other things, the Syndicate Desk circulated deal highlights and answers to common

questions to the sales force that included the information provided by Mr. Mangione.  (Ex. 33

(HE4); Ex. 34 (HE5).)

## LEGAL STANDARD

Under Rule 12(b)(6), a complaint should be dismissed if it fails to plead "enough facts to

state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  To state a plausible claim, the government must provide sufficient factual content to

"raise more than 'the mere possibility of misconduct' by a defendant."  *Mohamed v. Donald J.*

*Nolan, Ltd.*, 967 F. Supp. 2d 647, 651 (E.D.N.Y. 2013) (Garaufis, J.) (citation omitted), *aff'd*,

574 F. App'x 45 (2d Cir. 2014).

When a plaintiff alleges fraud, as the government does here, it must also satisfy the

heightened pleading standards of Rule 9(b).  *Innovation Ventures, LLC v. Ultimate One Distrib.*

*Corp.*, 2014 WL 1311979, at *4 (E.D.N.Y. Mar. 28, 2014).  Under Rule 9(b), "[t]he time, place,

and nature of the misrepresentations must be set forth so that the defendant's intent to defraud, to

employ any scheme or artifice to defraud, [or] to make any untrue statement of a material fact

. . . is revealed."  *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990).  In addition, "to safeguard a

defendant's reputation from improvident charges of wrongdoing," the Second Circuit "ha[s]

repeatedly required plaintiffs to plead the factual basis that gives rise to a strong inference of

fraudulent intent."  *Wood ex rel. United States v. Applied Research Assocs., Inc.*, 328 F. App'x

744, 747 (2d Cir. 2009).

# ARGUMENT

### I.   THE COMPLAINT DOES NOT ADEQUATELY ALLEGE THAT THE PURPORTED VIOLATIONS OF THE MAIL AND WIRE FRAUD STATUTES AFFECTED A FEDERALLY INSURED FINANCIAL INSTITUTION

FIRREA permits the government to seek monetary penalties in a civil action for certain criminal offenses, including, as relevant here, violations of the mail or wire fraud statutes that "affect[] a federally insured financial institution."  12 U.S.C. § 1833a(c)(2).  Such claims benefit from a ten-year statute of limitations.  *Id.* § 1833a(h).  Congress enacted §1833a in 1989 following the savings-and-loan crisis to, among other things, "strengthen the civil sanctions and criminal penalties for defrauding or otherwise damaging depository institutions and their depositors."  Pub. L. No. 101-73, § 101(1), 103 Stat. 183, 187 (1989); *see also United States v. Bank of N.Y. Mellon*, 941 F. Supp. 2d 438, 463 (S.D.N.Y. 2013) (FIRREA's purpose is to "deter frauds that might put federally insured deposits at risk").

In this case, no federally insured financial institution was ever at risk from the wire and mail fraud schemes alleged in the Complaint.  Neither Deutsche Bank, nor any of the investors in HE4 or HE5—the only potential candidates that could have been exposed to a risk of loss—are alleged to be federally insured financial institutions.  Instead, the government claims that HSBC and Wells Fargo were somehow affected.  The Complaint even trumpets that the alleged scheme "targeted" financial institutions, expecting the Court to somehow believe that the alleged schemers at Deutsche Bank were really out to get the trustee and the master servicer, mere contractual service providers on the deals who were never at risk.  (Compl. at 60.)   The Court should see through this unhelpful hyperbole and reject the government's FIRREA claims because no federally insured financial institution was "affected."

19

A.    **"Affecting" Under FIRREA Excludes Conduct That Does Not Create or Increase Risk of Loss**

Under the plain terms of § 1833a(c)(2), the government has no claim under FIRREA unless it can show that the "*violation . . . affect[ed]* a federally insured financial institution." (Emphasis added).  As used in FIRREA, the word "affecting" contemplates a detrimental and injurious impact on the federally insured financial institution.  *See* Webster's Third New Int'l Dictionary 35 (1961) (defining "affect" as "to act upon" and "to have a detrimental influence on"); *see also United States v. Mullins*, 613 F.3d 1273, 1278-79 (10th Cir. 2010) (Gorsuch, J.) (citing same).  Indeed, at the time FIRREA was enacted in 1989, Black's Law Dictionary defined "affect" as "to act upon; influence; change; enlarge or abridge; often used in the sense of acting injuriously upon persons or things."  Black's Law Dictionary 53 (5th ed. 1979).

Consistent with the statutory text, the Second Circuit has ruled that, while the statute "broadly applies to any act of wire fraud 'that affects a [federally insured] financial institution,'" it also provides a meaningful limitation on the government's authority by requiring that the effect of the fraud be "sufficiently direct."  *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (citation omitted).[9]  Such an interpretation adheres to the canon that "[p]unitive statutes, such as FIRREA, are to be narrowly construed."  *United States v. Vanoosterhout*, 898 F. Supp. 25, 30 (D.D.C. 1995) (citing *Busic v. United States*, 446 U.S. 398, 406 (1980)), *aff'd*, 96 F.3d 1491 (D.C. Cir. 1996); *see also Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 70 (2d Cir. 1990) ("[A] statute with a punitive thrust . . . is to be strictly construed.").  Had Congress intended to expand the scope of FIRREA to include any alleged fraud that in any way touches a federally

---

[9] In *Bouyea*, the Second Circuit interpreted 18 U.S.C. § 3293(2), a statutory provision amended by FIRREA to extend the statute of limitations for mail and wire fraud offenses "if the offense affects a financial institution."  152 F.3d at 195.  Courts rely on cases interpreting this FIRREA provision when analyzing the "affecting a federally insured financial institution" language of § 1833a.  *See Bank of N.Y. Mellon*, 941 F. Supp. 2d at 452 n.83.

insured financial institution (as the government advocates here), it could have included language to that effect. *See Chisom v. Roemer*, 501 U.S. 380, 396 (1991) ("[I]f Congress ha[s] . . . an intent, Congress would . . . ma[k]e it explicit in the statute . . . ."). The absence of such language confirms Congress's intent to limit the application of FIRREA's civil penalties to criminal offenses, such as mail and wire fraud, that have a meaningful detrimental impact on depository institutions and their depositors.

Cases interpreting the "affecting" language of § 1833a and other similarly worded provisions of FIRREA have consistently required that the alleged wrongful conduct present a new or increased risk of loss to the insured financial institution. *See, e.g.*, *United States v. Agne*, 214 F.3d 47, 53 (1st Cir. 2000) (rejecting claim where "bank suffered no actual financial loss and experienced no realistic prospect of loss"); *United States v. Countrywide Fin. Corp.*, 996 F. Supp. 2d 247, 250 (S.D.N.Y. 2014) (FIRREA requires facts "demonstrat[ing] that the bank suffered an increased risk of loss due to its conduct"). "[R]emote," "indirect," and "attenuated" consequences are insufficient because, in such cases, the defendant's conduct does not affect a federally insured financial institution "in any meaningful sense." *Mullins*, 613 F.3d at 1278; *see also United States v. Carollo*, 2011 WL 3875322, at *2 (S.D.N.Y. Aug. 25, 2011) (risk of loss must be "substantial" and not "de minimis"). A fraudulent scheme's "mere utilization of the financial institution in the transfer of funds" is therefore not enough. *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000).

*Agne* is instructive. There, the defendant submitted fraudulent documents to a bank to draw on a letter of credit opened by the victim to facilitate payment for industrial parts that the defendant never delivered. *Agne*, 214 F.3d at 50-51. Relying on the fraudulent documents, the bank wired the funds to the defendant and, a week later, debited the victim's account for the full

amount. *Id.* at 51.  The letter of credit insulated the bank from liability for acting upon forged or fraudulent documents. *Id.* at 52.  Despite the bank's receipt and reliance on fraudulent documents, the First Circuit found that the bank was not "affected" because it "suffered no actual financial loss and experienced no realistic prospect of loss because of the adequacy of the funds in [the victim's] corporate account and the protective terms of the letter of credit." *Id.* at 53.

Cases where courts have found institutions to be "affected" by violations present circumstances in which the federally insured financial institution—either itself or through a wholly owned subsidiary—has either put its capital at risk through loans or been an active participant in the violation. *See, e.g.*, *Bouyea*, 152 F.3d at 195 (parent company that loaned money to its defrauded subsidiary was "affected" by the fraud); *Bank of N.Y. Mellon*, 941 F. Supp. 2d at 456-57 (bank "affected" where its own fraudulent conduct exposed it to liability). Unlike these cases, the government does not allege that any insured depository institution participated in the alleged fraud or otherwise risked its capital as a service provider for the HE4 or HE5 securitizations.

The government agrees with this standard given that is how the Complaint frames the issue.  (Compl. ¶ 259 (alleging HSBC was "exposed to loss or risk of loss").)  But the failure to plead facts that show how either HSBC or Wells Fargo were, in the absence of any capital at risk, exposed to increased risk of loss destroys the viability of the government's FIRREA claims.

### B.    HSBC as Trustee Was Not Plausibly Affected by the Alleged Scheme

The government alleges that HSBC, the trustee for HE4 and HE5, was affected by (i) being exposed to "possible costly investor litigation" (Compl. ¶ 259); and (ii) being "obligated to monitor and enforce" the representations and warranties in the MLPAs, which HSBC did through now-settled litigation with Deutsche Bank (*id.* ¶ 261).  Neither circumstance created nor

increased a risk of loss.[10]

*First*, the theory that HSBC was "affected" by being exposed to "possible investor litigation" is speculative and implausible.  There is no allegation that investors in either HE4 or HE5 sued HSBC, and the only cases the government cites involve claims against HSBC relating to other securitizations.  (*Id*. ¶ 259).  The risk of investor litigation is also implausible given that HSBC pursued the exact remedies against Deutsche Bank on behalf of HE4 and HE5 investors that the trustees in the cases referenced in the Complaint allegedly failed to pursue.  (*Id*. ¶¶ 259, 261.)

Even if HSBC faced the hypothetical risk of an investor lawsuit, the cases cited in the Complaint confirm that any such lawsuit would "relate to HSBC's breach of common duties owed to the Trusts and Certificateholders through its mismanagement of the Trusts."  Compl., *BlackRock*, 14 Civ. 09366, 2014 WL 6767573, ¶ 222 (S.D.N.Y. Nov. 24, 2014); Am. Compl., *Phoenix Light SF Ltd. v. HSBC Bank USA, Nat'l Ass'n*, 14 Civ. 10101, 2015 WL 5697802, ¶ 15 (S.D.N.Y. July 6, 2015) ("By failing to perform its duties, HSBC has caused Plaintiffs to suffer . . . damages.").  Therefore, any lawsuit against HSBC—no matter how remote—would be based on HSBC's own failings and the speculative decision of investors to pursue claims, both of which serve to "break the necessary link between the underlying fraud and [any remote risk of] financial loss" to HSBC.  *United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015); *cf. United States v. Benson*, 79 F. App'x 813, 829 (6th Cir. 2003) (finding bank not "affected" by "voluntary actions" of a receiver in bringing a lawsuit against it to recover funds from defendant's Ponzi scheme).

---

[10] The government also alleges that Deutsche Bank "made the fraudulent representations directly to HSBC" by virtue of clauses in the PSAs assigning all rights under the MLPAs to HSBC on behalf of the trust.  (Compl. ¶ 260.) This does not appear to be an independent theory of how the alleged fraud "affected" HSBC and there is no allegation that HSBC put its capital at risk in reliance on these representations.

23

*Second*, the government's other theory—that HSBC was affected by virtue of its obligation to "monitor and enforce" the representations and warranties in the HE4 and HE5 MLPAs—is equally unavailing. (Compl. ¶ 261.) The government is wrong when it states that HSBC was obligated to "monitor" the collateral pools for adherence to the representations and warranties in the MLPAs as that obligation was expressly delegated to the "Credit Risk Manager" (Ex. 22 at S-168 (HE4 prosupp)), and the PSAs make plain that HSBC did not have a duty to conduct any "affirmative investigation" into potential breaches (Ex. 20 § 9.02(a)(xii) (HE4 PSA)). In any event, that HSBC had a contractual duty to "enforce" Deutsche Bank's obligations to cure, repurchase, or replace the non-conforming loans is not a new or increased risk—it was part of HSBC's job as trustee. (*Id.* § 2.03.) HSBC exercised that duty by bringing now-settled litigation against Deutsche Bank based on alleged breaches of contract, not fraud.[11]

The implausibility of any loss to HSBC is further underscored by the numerous PSA provisions ensuring that HSBC did not spend or risk its own funds. These protective terms expressly state that the trustee is not required "to expend or risk its own funds" unless, in its own opinion, the certificateholders provided adequate indemnification. (Ex. 20 § 9.02(a)(iii), (a)(xi).) Under analogous circumstances, the First Circuit refused to expand FIRREA's reach where the financial institution, which served in an administrative function, was insulated from liability by similarly "protective terms." *See Agne*, 214 F.3d at 53.[12]

---

[11] *See* Am. Compl., *HSBC v. DB Structured Prods. Inc.*, 13 Civ. 2828, at 1, 6 n.5 (S.D.N.Y. Apr. 1, 2015) (HE4); Am. Compl., *HSBC v. DB Structured Prods. Inc.*, 13 Civ. 3687, at 1, 6 n.5 (S.D.N.Y. Apr. 1, 2015) (HE5).

[12] Unlike *Countrywide*, 996 F. Supp. 2d at 249, where the court found that Bank of America was "affected" under FIRREA despite indemnification provisions in its favor, HSBC does not face any liability as a successor-in-interest to Deutsche Bank or any other alleged perpetrator of the supposed fraud. HSBC's protections are more akin to those in *Agne*, which protect HSBC from loss in all relevant circumstances. *See Agne*, 214 F.3d at 53.

C.      **Wells Fargo as Master Servicer and Securities Administrator Was Not Plausibly Affected by the Alleged Scheme**

The government alleges that Wells Fargo "suffered losses" from reduced servicer fees, unearned interest on the "float," and "potentially having to advance" payments of defaulting borrowers.  (Compl. ¶ 262.)  None of these alleged effects are sufficient under FIRREA.

The government does not explain how reduced fees and unearned interest amount to "losses" to Wells Fargo that are tied to the alleged misrepresentations to investors.  Earning less than one expects is not a "loss" in the ordinary sense of that word, and there is no authority for the theory that reduced fees or unearned interest, standing alone, are sufficient to establish FIRREA's "affecting" element.  *See United States v. Grass*, 274 F. Supp. 2d 648, 656 (M.D. Pa. 2003) ("routine transaction fees and lost income" did not establish an "effect").  The PSAs set forth Wells Fargo's compensation for serving as master servicer and securities administrator, and there is no allegation that Wells Fargo was not paid the fees to which it was entitled or did not earn interest income on the "float" that was available.  Generic assertions about potentially reduced income cannot replace allegations of a "material, detrimental effect" to the federally insured institution, which is required for a claim to "fall[] . . . within the proper scope of the statute."  *Mullins*, 613 F.3d at 1278-79.

The allegation that Wells Fargo "potentially" may be required to advance payments of defaulting borrowers is similarly deficient.  The prospect of making an advance would be premised on attenuated circumstances, as it was the sub-servicers, not Wells Fargo, which bore the obligation, in certain circumstances, to advance payments to the trust.  (Ex. 20 § 5.03(b), (c).)  Only if the sub-servicers failed to fulfill their obligation was Wells Fargo required to make the payments, and, even then, its obligation was contingent on its determination that the advance would be recoverable.  (*Id.* § 5.03(e); *id.* at 44 (definition of "Nonrecoverable P&I Advance").)

25

Even if Wells Fargo did advance defaulting-borrower payments, the government does not allege that those funds were at risk of loss; rather, it alleges that any advance "may not be recouped until the eventual foreclosure and sale of the mortgage property." (Compl. ¶ 262.) The government does not allege that the advanced funds were subject to a risk of loss in the intervening period between advancement and the eventual sale of the mortgage property. Nor could it because Wells Fargo could recoup an unrecoverable advance from the collection account, which was an account maintained by the servicers into which borrowers remitted mortgage payments. (Ex. 20 §§ 1.01 (definition of "Collection Account"), 3.08-09).) Under the terms of the PSAs, Wells Fargo could "reimburse itself" from the collection account for any unrecoverable advance. (*Id.* § 3.09(a)(vi).) As the government concedes, at least 20% of the loans in HE4 and at least 25% of the loans in HE5 continued to perform (Compl. ¶ 19), meaning that borrowers continued to remit payments to the collection accounts for each securitization. The government does not allege that Wells Fargo advanced payments that exceeded the available cash in the collection accounts. Similar to the bank in *Agne*, Wells Fargo "suffered no actual loss and experienced no realistic prospect of loss because of the continuing adequacy of funds" in the collection account to cover any potential outlays. 214 F.3d at 53.

## II. THE COMPLAINT FAILS TO STATE A CLAIM THAT MR. MANGIONE VIOLATED THE MAIL OR WIRE FRAUD STATUTES

When stripped of its rhetoric and baseless conclusions, which are not entitled to the presumption of truth, the government's Complaint fails to allege a scheme to defraud investors in HE4 and HE5. To allege a scheme to defraud, the government must satisfy Rule 9(b)'s particularity pleading requirements, which require the government to "(1) detail the statements (or omissions) that [it] contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are

26

fraudulent." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014).

Additionally, the government must plead facts that "give rise to a strong inference of fraudulent

intent." *Bank of N.Y. Mellon*, 941 F. Supp. 2d at 464 (quoting *S.Q.K.F.C., Inc. v. Bell Atl. Tricon

Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)).  The government's Complaint is devoid of

well-pled allegations that satisfy these pleading requirements.  And since, for the reasons

discussed below, the government fails to adequately allege a claim for mail or wire fraud, its

civil-penalty conspiracy claim (Claim III) must also be dismissed.  *Cf. Crigger v. Fahnestock &

Co., Inc.*, 443 F.3d 230, 237 (2d Cir. 2006) (state-law civil-conspiracy claims not actionable

absent a properly pled underlying fraud); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp.

3d 73, 89, 98 (D.D.C. 2014) (conspiracy claim under federal False Claims Act dismissed for

failure to allege an underlying fraud).

## A.      The Complaint Fails to Allege an Actionable Misstatement or Omission

The government alleges a scheme to defraud investors in the HE4 and HE5 offerings

"primarily based on Deutsche Bank's misrepresentations about Chapel loans and Chapel's

origination standards and practices."  (Compl. ¶¶ 127, 161.)  Separately, the government claims

that Mr. Mangione and Deutsche Bank "concealed the existence of second liens on properties

collateralizing HE4 and HE5."  (*Id.* ¶¶ 128, 161.)  While the mail and wire fraud statutes "are

violated by affirmative misrepresentations or by omissions of material information that the

defendant ha[d] a duty to disclose," *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000),

the Complaint fails to allege an actionable misstatement or omission with sufficient particularity

under Rule 9(b).

### 1.      The Complaint Fails to Allege that Statements Concerning Chapel
### Loans and Its Origination Practices Were Materially False

The government identified several representations in the HE4 and HE5 prosupps

27

regarding Chapel's underwriting standards (Compl. ¶¶ 134-39), yet it fails to identify a single

loan in the collateral pools for HE4 or HE5 that violated these standards.  Instead, the

government relies on the blanket assertion that any disclosure about Chapel was false because it

had allegedly "abandon[ed] . . . any semblance of reasonable underwriting practices."  (*Id.* ¶ 236;

*see also id.* ¶¶ 4, 9, 230.)  The government's alleged support for its blanket assertion is the

results of the quality-control reviews instituted by Deutsche Bank after its acquisition of Chapel

and anecdotal reports of past problems at Chapel that the Diligence Director conveyed to Mr.

Mangione.  Neither source satisfies Rule 9(b)'s particularity requirements.

     The government's reliance on the quality-control reports is misplaced (and misleading).

The government omits key facts about the quality-control reports, such as when the reports were

prepared, who reviewed the reports, and what the reports actually said about the underwriting

defects for the loans in the HE4 or HE5 collateral pools.  *See Landesbank Baden-Wurttemberg v.*

*Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 622 (S.D.N.Y. 2012) ("To move past the pleading

stage, plaintiff must 'specify the internal reports, who prepared them and when, how firm the

numbers were or which company officers reviewed them."), *aff'd*, 478 F. App'x 679 (2d Cir.

2012).  This alone renders the quality-control reports meaningless in evaluating the alleged

falsity of Chapel's disclosed underwriting standards.  *See IKB Int'l S.A. v. Bank of Am.*, 2014

WL 1377801, at *16 (S.D.N.Y. Mar. 31, 2014) ("Without identification of the specific facts that

allegedly put defendants on notice that the originators' representations concerning their

adherence to underwriting guidelines w[ere] false, plaintiffs' allegations are insufficient to allege

fraud."), *aff'd*, 584 F. App'x 26 (2d Cir. 2014).

     The only information provided in the Complaint about the quality-control reports is the

percentage of Chapel loans that Clayton or Adfitech graded as an EV3 or Severity Code 3-5.

(Compl. ¶¶ 218-25.)  But these grades do not say anything about the nature of the alleged defects in the loans, and the government fails to connect any specific loan-level findings, much less a material number of findings, to the loans in either the HE4 or HE5 collateral pool.  *See Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, 2013 WL 1342529, at *7 (S.D.N.Y. Mar. 29, 2013) (observing that, "[o]n their own, allegations regarding due diligence . . . by . . . Clayton . . . may not satisfy the heightened pleading standard of Rule 9(b)"); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *12 (S.D.N.Y. Sept. 28, 2010) (dismissing fraud claim where plaintiffs failed to allege "that any loan not conforming with the . . . guidelines was actually included in the Securitizations" at issue).[13]

The government's allegations show that only an immaterial number of loans that were graded as an EV3 or Severity Code 3-5 were actually securitized in either offering.  The Complaint alleges that loans graded by Clayton as an EV3 made up 3.3% of the HE4 issuance and *none* of the HE5 issuance.  (Compl. ¶¶ 220, 220 n.41.)  Similarly, the Complaint alleges that loans Adfitech assigned a Severity Code of 3-5 made up 1% of the HE4 issuance and 3% of the HE5 issuance.  (*Id.* ¶¶ 223, 227.)  In the RMBS context, the Second Circuit recently affirmed a district court's holding that a deviation from disclosed statistics of 5% or less is "immaterial" as a matter of law.  *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 535, 558 (S.D.N.Y. 2015), *aff'd*, 873 F.3d 85, 147-48 (2d Cir. 2017).  Despite the immaterial number of allegedly non-conforming loans that were actually securitized in HE4 and HE5, the

---

[13] The government's reliance on quality control scores is also insufficient to allege that the loans failed to comply with guidelines.  Clayton graded a loan as an EV3 in certain circumstances even when "*the loan generally complied with the originator's underwriting guidelines*."  (Compl. ¶ 174 (emphasis added).)  Likewise, Adfitech used a Severity Code 4 when the loan file was "missing material compliance documents," but such an omission does not indicate whether the loan was originated according to Chapel's guidelines.  (*Id.* ¶ 179.)  At best, the quality-control scores show that there is a possibility that some loans did not comply with guidelines, which fails to satisfy the less onerous plausibility pleading standard.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (finding that the plausibility standard requires "more than a sheer possibility that [a] defendant has acted unlawfully").

government provides no explanation for its *ispe dixit* assertion that Clayton's and Adfitech's monthly samples could be "extrapolated to the unreviewed Chapel loans" (Compl. ¶¶ 219, 220 n.41, 222, 226).  *See In re Salomon Analyst Level 3 Litig.*, 373 F. Supp. 2d 248, 252 (S.D.N.Y. 2005) (requiring "particularized allegations," including "what methodology and assumptions" went into the analysis, to satisfy Rule 9(b) when relying on statistical analysis).  Nor could it provide a valid explanation, as it is wholly inappropriate to extrapolate the quality-control results to the HE4 and HE5 collateral pools when the quality-control result samples included loans that are not part of the challenged securitizations.  *See Landesbank*, 821 F. Supp. 2d at 622 (dismissing complaint for failing "to allege any connection between the mortgages reviewed in the Clayton report and those collateralizing [the securitization]").

The April 18 and 20 conversations between Mr. Mangione and the Diligence Director likewise fail to satisfy Rule 9(b)'s particularity pleading requirements.  The Diligence Director's statements about issues he encountered with Chapel lack any details about how those issues impacted the HE4 or HE5 collateral pools.  While the Diligence Director admits that some loans with "issues . . . are probably in the security" (Ex. 25 at 4:6-7 (Apr. 20 Tr.)), he does not mention how many loans were impacted, how much principal could have been affected, or whether a single loan was included in the HE4 loan pool that suffered from an underwriting defect.  And the stories of alleged past problems with Chapel's origination practices and quality-control processes at the time of Deutsche Bank's acquisition do not amount to notice of a material defect in the HE4 and HE5 collateral pools given the Diligence Director's confirmation that the issues had been remedied and that the bank took corrective actions to address the issues.  (*Id.* at 5:6-6:2.)  Absent contemporaneous—and particularized—allegations that Chapel had effectively abandoned its underwriting practices at the time of the HE4 or HE5 offering, the government

fails to "state with particularity the specific facts in support of [its] belief that [the prosupps']

statements were false *when made*."  *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004)

(emphasis added).

### 2.     The Complaint Fails to Allege that Mr. Mangione Made Any Statements About Chapel or Its Underwriting Standards

Even if the government alleged that the statements in the HE4 and HE5 prosupps

regarding Chapel's underwriting standards were false, the statements are not actionable against

Mr. Mangione because the government's allegations fail to tie Mr. Mangione to the Chapel

disclosures.  The prosupps made plain that the information regarding Chapel's underwriting

standards "ha[ve] been provided . . . by DB Home," "formerly known as Chapel Funding, LLC."

(Ex. 22 at S-68 (HE4 prosupp).)  But the Complaint lacks any particularized allegations linking

Mr. Mangione to DB Home, its operations, or its disclosure of Chapel's underwriting standards.

The government cannot rely on Mr. Mangione's tangential participation in the

securitization process to allege that he is responsible for all statements in the prosupps when the

prosupps disclose that DB Home provided the challenged Chapel disclosures.  *See Union Cent.*

*Life Ins.*, 2013 WL 1342529, at *9 (finding plaintiffs failed to allege an actionable misstatement

where the challenged statements "explicitly stated" that the information came from another

party); *Footbridge*, 2010 WL 3790810, at *9 (same).  DB Home was a subsidiary of Deutsche

Bank, and the government does not even attempt to allege that Mr. Mangione's position as a

whole-loan trader at Deutsche Bank provided any exposure to the subsidiaries' actions related to

the HE4 and HE5 disclosures.  *See DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y.

2014) (rejecting "theory . . . that the Individual Defendants are liable for any statement that has

any link to MF Global or its subsidiaries" because "[t]he group pleading doctrine does not extend

so far").  The government, therefore, cannot "circumvent the general pleading rule that

fraudulent statements must be linked directly to the party accused of the fraudulent intent."
*Footbridge*, 2010 WL 3790810, at *23.  Its failure to *directly* link Mr. Mangione to the Chapel
disclosures is fatal to its fraud claims against him based on those representations in the HE4 and
HE5 prosupps.

### 3.    The Complaint Fails to Allege that the MLPAs Contained an Actionable Misstatement

The government attempts to bolster its fraud claims by referencing "standard"
representations and warranties in the MLPAs that Deutsche Bank executed at the time it
transferred the collateral pool to ACE.  (Compl. ¶¶ 140-42.)  The Second Circuit has rejected the
government's previous attempt to convert a breach of contract action into a FIRREA fraud claim.
*See United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662-63 (2d
Cir. 2016).  In *Countrywide*, the Second Circuit explained that a "breach of contract does not
amount to mail fraud.  Failure to comply with a contractual obligation is only fraudulent when
the promisor *never intended* to honor the contract."  *Id.* at 660 (quoting *United States v.
D'Amato*, 39 F.3d 1249, 1261 (2d Cir. 1994)).

The government's claim regarding the MLPA representations is that the contractual
promises were false because the loan pools for HE4 and HE5 contained mortgages at the time of
contracting that did not comply with Chapel's underwriting guidelines, as promised.  But the
MLPA does not provide a blanket guarantee that each mortgage loan transferred to ACE lacked
any non-conforming defect.  To the contrary, the "Representations and Warranties" provided an
assurance that, if a loan did not conform with the contractual promises, Deutsche Bank would
repurchase the loan.  (Ex. 5 § 7.)  The government does not claim that Deutsche Bank never
intended to honor its repurchase obligations at the time of contracting or that Mr. Mangione was
aware of such an intent.

The government's attempt to fashion a fraud claim based on representations in a contract misconstrues the purpose of the MLPA and contracts generally. The law views contracts "as 'simply a set of alternative promises either to perform or to pay damages for nonperformance.'" *Countrywide*, 822 F.3d at 661 (citation omitted). Where there is a contractually determined remedy—such as repurchase—in place for breached obligations, the Second Circuit has recognized the improvidence of imposing fraud liability because the "parties bargained *precisely* in an alternative fashion to provide [conforming] loans or to repurchase defective loans sold." *Id.* at 662 n.13. Imposing fraud liability for contract breaches in these circumstances, even if the breaches are knowing or willful, would undermine the agreed-upon remedies and result in the "dramatic expansion of fraud liability" that the Second Circuit has "counsel[ed] with persuasive force against." *Id.* at 662.

### 4. The Complaint Fails to Allege a Duty to Disclose the Existence of Unsecuritized Second Liens

Having failed to allege sufficient well-pled facts demonstrating that the disclosures regarding Chapel were false (or otherwise linking Mr. Mangione to those disclosures), the government tries to salvage its Complaint with an unrelated claim that the CLTV disclosures in the HE4 and HE5 prosupps were misleading. (Compl. ¶¶ 238-50.) The government bases this claim on Deutsche Bank's decision to omit second-lien information from the CLTV calculation when the second lien was not part of the underlying security. (*Id.* ¶¶ 128, 238.) An omission, however, "can violate the fraud statute[s] only in the context of a duty to disclose." *Autuori*, 212 F.3d at 119.

Here, the government does not allege any legal obligation or fiduciary duty to disclose the existence of unsecuritized second liens that were not part of the HE4 or HE5 collateral pools. While the government references SEC Regulation AB, 17 C.F.R. § 229.111 (2007), there was no

requirement under that regulation at the time to disclose unsecuritized second liens. The government's claim appears to be based on an obligation to correct Deutsche Bank's decision to omit the value of the second lien from the CLTV calculation when the second lien was not part of the underlying security. But Mr. Mangione was not responsible for Deutsche Bank's disclosure policy, and he is not alleged to have determined how to calculate CLTV ratios. *See, e.g.*, *Wang v. Bear Stearns Cos.*, 14 F. Supp. 3d 537, 543-44 (S.D.N.Y. 2014) (defendant "did not have a duty to correct any misstatement allegedly made by anyone else at Bear Stearns, since there is no allegation that he was involved in any way in the making of those statements").

The single email and lone phone conversation that the government cites to implicate Mr. Mangione in the bank's disclosure decision do not show that Mr. Mangione had decision-making authority over the bank's disclosure policy. (Compl. ¶¶ 247-48; Ex. 35 (June 17, 2005 email); Ex. 36 at 6:13-17 (Apr. 25, 2007 Call Tr.).) His statements about the omission of second-lien information in the prosupps reflect his understanding of Deutsche Bank's disclosure policy, which was set by the Securitization Group with the advice and counsel of outside advisors, including accountants at Deloitte & Touch and legal counsel at Thacher. (Compl. ¶¶ 58, 112-13; Ex. 4 at 1, 5 (HE4 Working Group List).) In any event, two random comments—one of which comes from an email that predates the deals at issue by nearly two years—that the government unearthed during its multi-year investigation into Deutsche Bank's securitization practices fall short of the Rule 9(b) requirement that the government allege that Mr. Mangione was "the person responsible for the failure to disclose." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001).[14]

---

[14] The government has also failed to sufficiently allege that "investors understood CLTV to include the impact of silent seconds liens." (Compl. ¶ 242.) For support, the government references a single investor request from an unrelated securitization—ACE 2006-HE1—and alleges that the investor request included a template that "*expressly*

### B.     The Complaint Fails to Allege that Mr. Mangione Acted with Fraudulent Intent

The Second Circuit has "repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent." *IKB Int'l*, 584 F. App'x at 27 (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)).  To establish a strong inference of fraudulent intent, the government must either (i) "alleg[e] facts to show that [the] defendant[] had the motive and opportunity to commit fraud," or (ii) "alleg[e] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Id.* at 27-28 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290-91 (2d Cir. 2006)).  The government's Complaint fails under both prongs.

### 1.     The Complaint Fails to Allege a Sufficient Motive to Commit Fraud

To plead motive, the government would have to allege that Mr. Mangione "benefitted in some concrete and personal way from the purported fraud."  *ECA & Local 123 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  In conclusory fashion, the government claims that Mr. Mangione was motivated to offload Chapel mortgages in order to protect Deutsche Bank's "bottom line," and in turn, his salary, which was allegedly based on the profitability of the subprime trading desk.  (Compl. ¶¶ 17, 50, 79, 79 n.11, 192.)[15] Such a claimed motive fails as a matter of law for at least two reasons:

*First*, courts have repeatedly rejected similar allegations of motive based on a desire to maximize profits and compensation because such "[m]otives . . . are common to most corporate

---

*stated that CLTV* 'should include first mortgage balance and any additional mortgages on the property (whether in this collateral pool or not) at the time of origination.'"  (*Id.* (emphasis added).)  The template actually refers to "*COLTV*," not CLTV (Exs. 29-29(a)), which contradicts the government's claim that there was any uniform CLTV definition.  *See DeBlasio v. Merrill Lynch*, 2009 WL 2242605, at *25 (S.D.N.Y. July 27, 2009) (dismissing fraud claims because plaintiffs' "contention is not supported by the documents upon which [they] rely").

[15]  In the event that the Complaint could be read to allege that Mr. Mangione was motivated to mislead investors about the CLTV ratios in order to increase Deutsche Bank's profits and his own compensation, such allegations are legally insufficient for the same reasons discussed below.

officers."  *ECA*, 553 F.3d at 198; *see also Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001)

("[D]esire to maintain or increase executive compensation is insufficient because such a desire

can be imputed to all corporate officers.").  The government does not even attempt to articulate

how the Bank calculated Mr. Mangione's yearly compensation.  At best, the Complaint alleges

that a discretionary component of Mr. Mangione's compensation was tied to the performance of

the subprime trading desk, which falls short of alleging a "direct link between the compensation

package and the fraudulent statements."  *ECA*, 553 F.3d at 201.

  *Second*, the government's own allegations defy economic (and common) sense, and

undermine its claim that either Deutsche Bank or Mr. Mangione would profit by unloading

allegedly "toxic" Chapel collateral.  The government acknowledges that Deutsche Bank retained

the residual component of its subprime securitizations.  (Exs. 3, 3(a) ("Position Summary" tab).)

There are no allegations that Deutsche Bank sold the residual for either HE4 or HE5 and thereby

offloaded the riskiest component of each security.  (Compl. ¶ 89.)  In connection with HE4

specifically, the government alleges that Deutsche Bank and Mr. Mangione declined to sell the

residual component to a potential investor.  (Compl. ¶¶ 89, 195 n.29, 206-07.)

  If, as alleged, Mr. Mangione "and his co-conspirators . . . decided to defraud investors so

that they could shift the risk—or, more aptly, near certainty—of loss from the Bank (and their

bonuses) to their unsuspecting victims" (*id.* ¶ 237), surely Mr. Mangione would have sold the

residual at any price to shift the "near certain[]" loss to a willing buyer.  But retaining the riskiest

component of the security that would suffer near certain losses, even when faced with a willing

buyer, "defies not only economic reason but also common sense" and is insufficient as a matter

of law to raise any inference of fraudulent intent.  *In Re UBS AG Secs. Litig.*, 2012 WL 4471265,

at *12 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret.*

36

*Sys. v. UBS AG*, 752 F.3d 173, 184 n.50 (2d Cir. 2014).

### 2. The Complaint Fails to Allege Strong Circumstantial Evidence of Conscious Misbehavior

Where, as here, the government has failed to allege a legally sufficient motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. To establish a strong inference of fraudulent intent in the mail and wire fraud context based on circumstantial evidence, the government must allege facts that "demonstrate that the defendant had a 'conscious knowing intent to defraud . . . [and] that the defendant contemplated or intended some harm to the property rights of the victim." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (citation omitted). The government's allegations of fraudulent intent are insufficient to raise a strong inference of fraud with respect to either the alleged scheme to (i) offload materially worse-than-disclosed Chapel collateral, or (ii) conceal unsecuritized second-lien information on properties collateralizing HE4 and HE5.

#### (i) The Circumstantial Allegations Related to the Chapel Scheme Fail to Raise a Strong Inference of Fraud

The government's Chapel claim rests primarily on Mr. Mangione's alleged knowledge of internal quality-control results. (Compl. ¶¶ 193-227.) The government does not allege that Mr. Mangione received a single quality-control report from the diligence vendors or anyone else at Deutsche Bank. To fill this gap, the government resorts to rank speculation about Mr. Mangione's knowledge of the quality-control results. For example, the government alleges that Mr. Mangione "knew precisely how many defective loans he had chosen to securitize in HE4 and HE5" (*id.* ¶ 208) and that he "was aware of the specific results of Chapel's quality control reviews" (*id.* ¶ 217). But there is not a single well-pled allegation to support these claims.

At best, the government alleges that Mr. Mangione was aware that quality-control

reviews occurred.  (*Id.* ¶¶ 209, 211, 215.)  But knowledge that the quality-control process

occurred does not equate to knowledge of the specific reports or the results that the government

claims conflicted with the HE4 and HE5 prosupp disclosures.  *Landesbank*, 821 F. Supp. 2d at

622 (rejecting fraud claims where plaintiff "only references the Clayton Report without alleging

who drafted it, who prepared it, or who, if anyone, at Goldman reviewed it").  The government

cannot remedy its inability to tie Mr. Mangione to the quality-control reports with "speculati[ve]

and conclusory allegations lacking a factual foundation."  *Faulkner v. Verizon Commc'ns, Inc.*,

189 F. Supp. 2d 161, 170 (S.D.N.Y. 2002); *see also Teamsters Local 445 Freight Div. Pension

Fund v. Dynex Capital Inc.*, 531 F.3d 190, 193 (2d Cir. 2008) (affirming dismissal of fraud

claims against individuals where plaintiff failed to allege that the individuals "saw or had access

to specific reports or statements that indicated malfeasance").

Nor do the two phone calls between Mr. Mangione and the Diligence Director that took

place days before the closing of HE4 salvage the Complaint's fatal pleading defects.  These calls

are unrelated to any determination about what to disclose about Chapel's underwriting standards

to HE4 and HE5 investors that is at the heart of the government's fraud claim.  And even if the

calls were relevant to the alleged misrepresentations in the HE4 or HE5 prosupps, consideration

of the complete recorded statements reveals key omitted facts that undermine any inference of

fraudulent intent.  For example, in the April 18 call:

- Mr. Mangione questions why the bank did not conduct a review "before we approve a loan and close on it"  (Ex. 24 at 6:5-8 (Apr. 18 Tr.).)

- The Diligence Director confirmed that he "did a review when we bought the company," and based on issues identified during that review, the bank "cut off a broker, [and] fired some underwriters."  (*Id.* at 6:17-18, 7:11-14.)

- Mr. Mangione asked *twice* whether the incident that occurred "a long time ago" where Chapel employees were "scrubbing files" was relayed to the Diligence

Director's supervisors, and the Diligence Director confirmed that "it went all the way up" including to the head of Chapel.  (*Id.* at 8:3-6, 9:7-13, 10:11-21.)

- The Diligence Director informed Mr. Mangione that he had alerted his supervisors about problems he encountered with Chapel in an email that said the head of Chapel "can't be trusted to protect the credit or regulatory or reputational risk of the bank." (*Id.* at 11:13-18.)

Similarly, in the April 20 call:

- Mr. Mangione asked if Deutsche Bank did any reviews before the bank bought the loans, to which the Diligence Director responded that the bank did post-close reviews but "kept all th[e] loans in." (Ex. 25 at 2:18-3:4 (Apr. 20 Tr.).)

- The Diligence Director confirmed that the bank gave the quality-control reviews to Chapel for feedback. (*Id.* at 3:18-4:4.)

- Mr. Mangione asked if the issues at Chapel were "remedied," to which the Diligence Director responded "[o]h absolutely." (*Id.* at 5:6-8.)

- Mr. Mangione sought confirmation—again—that the Chapel issues were reported to superiors, and the Diligence Director confirmed that the issues were reported to a litany of people including the "head of credit" for Deutsche Bank.  (*Id.* at 5:13-19.)

Mr. Mangione's questions and tone do not indicate someone knowingly intending to defraud OSI, much less investors generally, as he is plainly trying to understand the Chapel process and sought reassurance—and was reassured—that any issues were remedied and reported to the highest levels of the bank.  These clear indications of good faith undermine any inference of fraudulent intent.  *Cf. United States v. Alkins*, 925 F.2d 541, 549-50 (2d Cir. 1991) ("Good faith is a complete defense to mail fraud.").

While the government speculates that Mr. Mangione and the Diligence Director "expressly agreed to defraud OSI" by omitting Chapel quality-control results (Compl. ¶¶ 204-05), the full text of the two April 2007 calls destroys this claim.  Further, no due diligence results were provided to OSI that show the omission of Chapel information because, as the government concedes, Mr. Mangione determined that OSI's bid "was too low," which obviated the need to

39

provide any information.  (Compl. ¶ 206; Ex. 27 at 6:11-14 (Apr. 26 Call Tr.).)  The lack of

factual support, coupled with the clear indicia of good faith, undermine any inference of

fraudulent intent.

> *(ii)*     *The Circumstantial Allegations Related to the Concealment of*
> *Second Liens Fail to Raise a Strong Inference of Fraud*

The unrelated scheme to conceal the existence of second liens on properties underlying

the HE4 and HE5 collateral pools fares no better.  The government's own allegations show that

investors understood that there was no uniform definition for CLTV because numerous investors

requested silent-second figures and also provided their own templates for Deutsche Bank to

complete that had their own party-specific definitions.  (Compl. ¶ 242, 244, 247-48; Exs. 28-

28(a) (Declaration Template).)  The notion that Mr. Mangione concealed second-lien

information is also belied by the fact that Mr. Mangione facilitated the disclosure of second-lien

information for loans in the HE4 and HE5 collateral pools by, among other ways, providing the

information to investors either directly upon request or indirectly via Deutsche Bank's Syndicate

Desk.  (Comp. ¶¶ 151, 155, 244, 247; Exs. 29-34.)  The disclosure of the exact information the

government claims was concealed eviscerates any inference of intentional concealment and

dooms the CLTV fraud claims.[16]

## CONCLUSION

For the forgoing reasons, the Complaint should be dismissed in its entirety with

prejudice.

---

[16] The government also concocts an incident where Mr. Mangione allegedly participated in a scheme to conceal the delinquency rates for Chapel loans in the 2006 ACE securitizations from a potential investor by removing the 2006 vintage from a spreadsheet.  (Compl. ¶ 205 n.37.)  But the government concedes that it has no clue who was responsible for the decision to remove the 2006 delinquency rates and speculates that "either [Mr.] Mangione or his report instructed the junior member . . . to excise the two 2006 deals." *Id.*  This is just another way of using "information and belief" allegations, which are not entitled to any weight. *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 619 n.17 (S.D.N.Y. 2013) (observing that the government's power to investigate fraud before bringing suit means "it may not be allowed to rely on information and belief.").

Dated:  New York, New York
          December 15, 2017

                          Respectfully submitted,

                          By:  /s/ Patrick J. Smith
                              Patrick J. Smith
                              Andrew J. Rodgers
                              Brian T. Burns
                              SMITH VILLAZOR LLP
                              1700 Broadway, Suite 2801
                              New York, New York  10019
                              Tel:  (212) 582-4400
                              Fax:  (347) 338-2532

                          *Attorneys for Defendant Paul Mangione*